**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER
FOR UNITED WESTERN BANK,

      Plaintiff,

v.

CHARLES J. BERLING, JAMES H.
BULLOCK, ANTHONY C. CODORI,
BERNARD C. DARRÉ, GARY G.
PETAK, WILLIAM D. SNIDER,
CINDY J. STERETT, JOHN S.
UMBAUGH and SCOT T. WETZEL,

      Defendants.

---

**COMPLAINT**
**JURY TRIAL DEMANDED**

---

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for United Western

Bank, Denver, Colorado ("FDIC-R"), for its Complaint states as follows:

## I.      INTRODUCTION

1.      The Federal Deposit Insurance Corporation ("FDIC") brings this lawsuit in its

capacity as Receiver for United Western Bank ("UWB" or "Bank") pursuant to authority granted

by 12 U.S.C. § 1821.

2.      The FDIC-R seeks to recover damages in excess of $35 million caused by former

UWB officers Anthony C. Codori ("Codori"), Cindy J. Sterett ("Sterett"), and John S. Umbaugh

("Umbaugh"); officer-directors Gary G. Petak ("Petak"), William D. Snider ("Snider"), and Scot T. Wetzel ("Wetzel"); and non-officer directors Charles J. Berling ("Berling"), James H. Bullock ("Bullock"), and Bernard C. Darré ("Darré").

3.      The Defendants breached their fiduciary duties to UWB and were negligent and grossly negligent by, among other things, recommending or approving, in violation of UWB's applicable lending policies and prudent, safe, and sound lending practices, at least 17 improper loans and loan modifications between November 2006 and August 2009 ("Loans").

4.      The Defendants' negligence, gross negligence, and breaches of fiduciary duties caused damages to UWB, for which the Defendants are jointly and severally liable.  In this lawsuit, the FDIC-R does not seek to collect from UWB's borrowers or guarantors on any unpaid loans, but rather seeks to collect from the Defendants the damages caused by their negligence, gross negligence, and breaches of fiduciary duties.  The compensatory damages sought herein are those caused by the Defendants' tortious and wrongful conduct in approving such lending of depositors' money, which is the direct and proximate cause of the damages the FDIC-R now seeks to recover.

## II.      PARTIES

### A.      Plaintiff

5.      The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a).  On January 21, 2011, the Office of Thrift Supervision ("OTS") appointed the FDIC as Receiver for UWB.  12 U.S.C. § 1821(c).  The FDIC-R is acting in its capacity as Receiver and is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles, powers, and privileges of the Bank and, among others, the depositors, accountholders, and stockholders of the

Bank.  In this action, the FDIC-R seeks to recover damages resulting from the tortious conduct of the Defendants.

**B.      Defendants**

6.      Berling was a director of the Bank from December 31, 2003, and a member of the Directors' Loan Committee ("DLC") from October 5, 2004, until May 3, 2010.

7.      Bullock was a director of the Bank from 1993 and a member of the DLC from March 9, 2006, until May 3, 2010.

8.      Codori was Vice President of Credit Administration – Real Estate from May 22, 2006, Senior Vice President ("SVP") of Credit Administration as of May 1, 2007, and Executive Vice President ("EVP") of Problem Asset Resolution as of July 16, 2010.  Codori was an Executive Loan Committee ("ELC") member from May 31, 2006, until October 29, 2010.

9.      Darré was a director of the Bank from July 31, 2006, and a member of the DLC from May 30, 2007, until May 3, 2010.

10.     Petak was a SVP and the Chief Credit Officer ("CCO") from January 30, 2006, an ELC member from January 31, 2006, and EVP and CCO from August 3, 2006, until October 29, 2010. He was a DLC member from August 3, 2006, until May 3, 2010.

11.     Snider was an EVP and the Chief Financial Officer ("CFO") from December 9, 2005, until April 15, 2010.  Snider was an ELC member from January 31, 2006, until March 2, 2010.  He was a DLC member from January 31, 2006, until December 29, 2009.

12.     Sterett was the SVP of Credit Administration – Real Estate from May 7, 2007, until November 30, 2010.  She was an ELC member from October 3, 2007, until October 29, 2010.

13.     Umbaugh was the VP of Small Business Administration ("SBA") Lending from December 31, 2003, SVP of SBA Lending from September 7, 2005, and President of the SBA

Division from April 3, 2008, until November 30, 2010.  Umbaugh was an ELC member from March 9, 2006, until October 29, 2010.

14.     Wetzel was the Chairman of the Board, Chief Executive Officer ("CEO"), and President from December 9, 2005, until April 30, 2010.  He was the Corporate Development Officer from May 1, 2010, until August 2, 2010.  Wetzel was an ELC and DLC member from December 9, 2005, until April 29, 2010.

### III.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this case pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

16.     This Court has personal jurisdiction over the Defendants, who at all relevant times were residents of and conducted the business of the Bank in the State of Colorado.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because one or more of the Defendants resides in this district and a substantial portion of the events and/or omissions giving rise to the claims and damages asserted herein occurred in this District.

### IV.     FACTUAL BACKGROUND

**A.     History of UWB**

18.     UWB, a federal savings association, was established in January 1960 as Dona Ana Savings and Loan Association, Inc., in Las Cruces, New Mexico.  In 2002, the Bank moved its headquarters to Denver, Colorado, and became UWB on September 1, 2006.  UWB had eight branch offices in Colorado.

19.     For more than 45 years, the Bank successfully served the New Mexico and Colorado regions.  However, in December 2005, the Bank's board of directors ("Board") appointed a new management team and began implementing a new community banking strategy to increase the Bank's earnings.  As part of this new strategy, the Bank dramatically increased its portfolio of acquisition, development, and construction ("ADC") loans, commercial real estate

("CRE") loans, and non-mortgage commercial loans, while allowing its portfolio of single-family mortgages to run-off.  As a result, the Bank's portfolio became heavily concentrated in speculative, high-risk CRE/ADC loans.

20.    From March 31, 2006, to March 31, 2009, the Bank's portfolio of CRE/ADC loans grew from $498.9 million (approximately 24% of total assets and 376% of the Bank's Tier 1 Core Capital) to $1.12 billion (approximately 50% of total assets and 605% of the Bank's Tier 1 Core Capital).  This high concentration of speculative lending made the Bank susceptible to steep losses from declines in the real estate market.  From June 30, 2007, to March 31, 2009, UWB's adversely classified assets (loans rated substandard, doubtful, or loss) increased from $25.2 million to $70.3 million.  UWB recorded net losses of $69.4 million in 2009 and $68.8 million through the first three quarters of 2010.  The Bank failed on January 21, 2011.

## B.    Regulatory Guidance and Warnings

21.    Prior to making the Loans, regulators warned of the risks inherent in ADC lending even in a *favorable* real estate market, including an oversupply of developed property.  Among other things, regulators warned that ADC lending is a highly specialized field with inherent risks that must be managed and controlled to ensure that this activity remains profitable.

22.    Before all but one of the Loans was approved, the regulators cautioned that concentrations of credit exposure add a dimension of risk that compound the risk inherent in individual loans.

## C.    Defendants Knew the Risks Associated with the Weak Real Estate Market

23.    On March 1, 2006, Petak received an email from Larry Heesch ("Heesch"), who was then CCO and SVP.  Heesch wrote, "Note softness in the housing markets.  Emerging issue we need to keep in mind in managing spec. exposure."  In that email, Heesch forwarded a message from MBA NewsLink that contained numerous links to "Top National News."  The titles of certain of the linked articles included "Real Estate Continues to Cool," "Demand for

New Homes Softens in Several Markets," and "For This Industry, A Rise in Foreclosures Is a Good Thing."

24.     At a Board meeting on January 3, 2007, Wetzel commented that certain external factors could make business difficult for UWB.  Those factors included softness in the real estate market, weak or slow job growth, and the Bank's reliance on the Colorado market.  Berling, Bullock, Darré, Petak, and Snider were all in attendance in person or via teleconference.

25.     On July 25, 2007, Codori, Petak, Snider, Sterett, and Wetzel were among numerous Bank employees who received or forwarded an email message from equity research analysts regarding Centennial Bank Holdings, Inc.  The equity research analysts stated in their email, "Centennial is yet another victim of the soft housing market. . . .  We have very few details about the nature of the bank's current batch of problem loans, except that they are predominantly residential construction and development loans.  Colorado has been one of the most problematic housing markets in the country in recent years."  (Emphasis added.)

26.     At a Board meeting on December 13, 2007, Wetzel commented that the 2008 projected community bank loan growth was a stretch given the current economy and competitive factors.  Berling, Bullock, Darré, Petak, and Snider were all in attendance in person or via teleconference.

27.     On April 1, 2008, Snider forwarded an email from Nautilus Capital to Petak.  The email from Nautilus Capital stated, "Increased regulatory scrutiny, tighter credit markets and declining real estate prices will make for a challenging year ahead."  In addition, the email stated that "fallout from the residential markets has started to infiltrate the commercial side as well."  With respect to regulatory scrutiny, "global cash flow and debt service coverage are hot button issues."  The email continued, "In January [2008], commercial real estate prices . . . dropped for the third consecutive month. . . .  THERE WILL BE A CORRECTION."  (Emphasis in original).

28.     The Defendants nevertheless increased the Bank's concentrations in CRE and ADC loans during this period.  The Defendants knew that the Bank was highly exposed in the area of CRE and ADC loans that would be negatively affected by a decline in the real estate market, and, therefore, the Defendants needed to exercise a heightened degree of care when approving such loans.  Instead of exercising heightened care, however, the Defendants did the opposite.  They repeatedly failed to follow their own policies and prudent, safe, and sound lending practices.

**D.     UWB's Loan Policy**

29.     UWB's loan policy ("Loan Policy") was divided into sections, including but not limited to the General Loan Policy Statement, the Commercial Loan Policy, the Real Estate Policy, and the Real Estate Appraisal Policy.  From time to time, the Board approved amendments to the Loan Policy's various sections.  Unless otherwise alleged herein, the provisions of the Loan Policy that are relevant and applicable to the allegations regarding the Loans are set forth in paragraphs 29-48.

30.     UWB had a tiered loan approval process.  The Board approved the "Delegations of Authority," which established the respective lending authority of individuals, the ELC, and the DLC.  The Loan Policy provided that the ELC was the approval authority for "all loans and aggregate credit relationships totaling $3,000,000 or greater that [we]re less than or equal to $9,000,000."  The ELC was not a Board-level committee, and, therefore, the members of the ELC acted in their capacities as officers of the Bank when they recommended or approved loans.

31.     The DLC consisted of a "minimum of five directors" and was chaired by the Vice Chairman of the Bank.  The DLC approved loans and aggregate credit relationships in excess of $9,000,000.  The Loan Policy provided that any credit requests taken to the DLC needed to have the prior approval of the ELC and the CCO's recommendation.

32.     For each credit request, a loan officer was required to prepare a credit write-up that described the transaction and all of the material factors that were relevant to the credit decision.  At the top of the first page of the credit write-up, the loan officer would indicate whether the loan was a "NEW CREDIT REQUEST," "LOAN MODIFICATION," or "RENEWAL" by marking an "X" next to one of these categories.

33.     The Loan Policy required the credit write-up to identify any and all exceptions to the Loan Policy on the front page of the write-up.  In addition, the Loan Policy required the write-up to identify, clearly, the relevant credit factors that justified granting each exception.

34.     For any extension of credit, the Loan Policy required a careful evaluation of: (1) the borrower; (2) the borrower's financial condition and cash flow as reflected on acceptable financial statements; (3) the borrower's management capability; (4) the borrower's debt service capacity; (5) the borrower's industry; and (6) the economic environment in which the loan would be granted.

35.     The Loan Policy provided that prudent lending required: (1) the borrower to be an honest and creditworthy individual; (2) the borrower to be a capable manager; (3) the loan officer to understand the specific purpose of the loan; (4) the loan officer to understand the source and plan of repayment; (5) the loan officer to identify and evaluate all secondary sources of repayment; (6) the loan officer to find the purpose, plan, source of repayment, and collateral to be "acceptable, reasonable, practical, and achievable"; and (7) the loan officer to document the undesirable features of a loan request and the risk mitigating factors.

36.     For secured loans made before August 22, 2008, the Loan Policy required the borrower's cash flow to be the Bank's primary source of repayment and did not allow collateral to be a substitute for the borrower's ability to repay.  For secured loans made on or after August 22, 2008, the Loan Policy provided that the borrower's cash flow was the primary source

of repayment in most cases.  At all relevant times, the Loan Policy required a confirmation of the quality and liquidity of collateral before the loan was made.

37.     The Loan Policy identified working capital loans to new businesses that were not well secured as undesirable.  Prohibited loans included but were not limited to: (1) loans lacking a clearly defined primary source of repayment; and (2) loans to people whose honesty was questionable.

38.     UWB's market area was the Front Range area of Colorado, including Denver, the Denver Tech Center, Boulder, Fort Collins, and the surrounding communities.  The Loan Policy provided that commercial construction loans should be located in the Bank's market area.

39.     The Loan Policy generally required that all primary or majority shareholders guarantee loans to closely-held corporations and partnerships.  Any individual or corporation that owned or controlled 20% or more of a borrower was generally required to guarantee the borrower's debt to UWB.

40.     The Loan Policy provided that a loan to support speculative investment activities was an exception to the Loan Policy unless the borrower could fully qualify for the loan on an unsecured basis and repayment was in no way dependent upon the success of the speculative venture.  In particular, commercial real estate loans were not to be made for speculative purposes.  A loan whose primary source of repayment was the resale of commercial real estate was considered a speculative loan.

41.     Commercial real estate loans were to be based on the financial strength of the borrower and the cash flow generated by the real property.  The primary source of repayment for such loans was the borrower's cash flow from real estate operations.  Collateral and guaranties were secondary sources of repayment.

42.     For commercial real estate loans, the borrowers needed to have "the capacity to repay their loans."  The Loan Policy provided that the Bank would not make a loan if, among

other things: (1) there was no sound feasibility study or analysis that reflected current and reasonably anticipated market conditions, or (2) the loan was an advance of additional funds that was to be used to support an existing loan that lacked credible repayment sources.

43.     For all loans secured by real estate, the Loan Policy provided loan-to-value ("LTV") ratio and loan-to-cost ("LTC") ratio maximums.  The maximums for certain types of loans were as set forth in the following table.

| Loan Type | Lesser of | |
| --- | --- | --- |
| | Maximum LTV | Maximum LTC |
| Land Development Loans | 75% | 80% |
| 1-4 Family Residential Construction Loans (Spec) | 80% | 80% |
| Nonresidential Construction Loans | 75% | 80% |
| Commercial Mortgage Loans | 75% | 80% |

44.     With respect to the table in paragraph 43, the version of the Loan Policy approved on or about August 22, 2008, renamed Commercial Mortgage Loans as Commercial Real Estate Loans.  The limits on the LTV and LTC ratios remained 75% and 80%, respectively.  In addition, the August 22, 2008, Loan Policy made clear that construction loans for multi-family, investment, or for-lease buildings were Commercial Real Estate Loans.

45.     With respect to CRE loans, the Loan Policy expressly provided that the LTC ratio "should generally not exceed 80%."

46.     For loans made on or after December 5, 2006, and secured by real estate, the Loan Policy required meaningful equity from the borrower on a "first-in basis" in the form of cash, land, prepaid entitlement costs, prepaid engineering fees, or other acceptable equity investments by the borrower.

47.     The Loan Policy provided that commercial real estate construction loans "should be made when there is a demonstrated exit strategy (sale or refinance) with adequate cash flow & collateral margins to qualify for sale or refinance.

48.     The Loan Policy provided that an "essential part of the underwriting process is an accurate and timely appraisal of the real property and other assets comprising the investment or loan security."  Appraisal reports needed to "be sufficiently current to the effective date of the appraisal to reduce the likelihood that material changes in actual market conditions . . . occurred by the time the loan or purchase decision [wa]s made."  The Loan Policy required the CCO to review the effective valuation dates of appraisal reports to determine if new appraisals or updates were necessary.  If an update was necessary, the update needed to provide sufficient information and analysis so that, in combination with the original appraisal report, the update satisfied the applicable reporting requirements.

### E.     Defendants Caused the Bank to Suffer Damages

49.     The Defendants are liable for the damages that they caused the Bank to suffer.  In this lawsuit, the FDIC-R seeks to collect damages caused by the Defendants' negligence, gross negligence, and breaches of fiduciary duties.  The Defendants' acts and omissions with respect to the Loans, as alleged below, illustrate the types of failures, breaches, and violations of duties committed by the Defendants, resulting in damages to the Bank.

50.     The Loans are CRE/ADC loans, commercial loans, and loan modifications approved from November 2006 to August 2009.  In approving the Loans, the Defendants ignored Loan Policy violations that were clear from the face of the documentation available to them, and they approved the Loans, which had various combinations of deficiencies including, but not limited to, excessive LTV and/or LTC ratios, inadequate collateral, financially weak borrowers, guarantors who lacked creditworthiness, purposes that were speculative, and ill-defined or uncertain sources of repayment.

51.     The Loans are as follows:

| Loans | Amount (millions) | Approvals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Berling | Bullock | Codori | Darré | Petak | Snider | Sterett | Umbaugh | Wetzel |
| 1.   AZCO II | $12.00 | x | x | x | x | x | x | | x | x |
| 2.   High Prairie | $14.97 | x | x | x | x | x | x | | x | x |
| 3.   One Carefree | $8.95 | x | | x | x | x | x | | x | x |
| 4.   Arizona Land | $5.28 | x | | x | x | x | x | | x | x |
| 5.   Natches Way | $3.03 | x | x | x | x | x | x | | | x |
| 6.   Colorado Main | $6.25 | | | x | | | x | | x | x |
| 7.   Communicom | $11.25 | x | x | x | x | x | x | x | | x |
| 8.   18 Cottonwood | $2.31 | | | x | | x | x | x | x | x |
| 9.   ROC Henge Equip. LOC | $1.65 | x | x | x | | x | x | | | x |
| 10.  ROC Henge Rev. LOC | $0.80 | x | x | x | | x | x | | | x |
| 11.  Borrower A[1] | $3.13 | x | x | x | x | x | x | x | x | x |
| 12.  Red Butte | $7.15 | | | x | | x | | x | | x |

### AZCO II Loan

52.     AZCO II, LLC was a single-purpose entity established in August 2006 to acquire and develop property in the Shock Hill subdivision in Breckenridge, Colorado.  The principals and investors behind AZCO II, LLC planned on building a lodge, condominiums, and townhomes on the property.

53.     On or about November 30, 2006, the ELC, including Codori, Petak, Snider, Umbaugh, and Wetzel, approved a participation of $6,935,250 in an acquisition and development loan of $19,815,000 from Bank Midwest to AZCO II, LLC (the "AZCO II Loan").  On or about December 4, 2006, the DLC, including Berling, Bullock, Darré, Petak, Snider, and Wetzel, approved the Bank's participation of $6,935,250 in the AZCO II Loan.

---

[1] Borrower A; Principal A; and Guarantors A, B-1, B-2, C-1, and C-2 referenced herein represent individuals.  LLC A represents a limited liability company named after its principal.  The names of these individuals and the LLC have been withheld to protect their privacy, but will be provided once an appropriate protective order is in place.

54.     The credit write-up for the AZCO II Loan, dated November 17, 2006, ("AZCO II Loan Write-Up") provided that the primary, secondary, and tertiary sources of repayment were the sale of the "townhome units," the "Sale or refinance of subject property," and the guarantors' assets, respectively.  The AZCO II Loan Write-Up identified the collateral as a first deed of trust on 10 acres in Breckenridge, Colorado, "UCC's on all construction material," and an "assignment of contracts."  AZCO II, LLC was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

55.     The AZCO II Loan was a speculative acquisition and development loan whose repayment depended upon the future sales of the planned townhomes and condos.  The AZCO II Loan Write-Up stated that a second loan would fund the construction of the project ("Vertical Construction Loan"), but the borrower did not have a commitment for the Vertical Construction Loan from any lender when the AZCO II Loan was approved.

56.     In addition, there were serious weaknesses with the guaranties.  First, the AZCO II Loan Write-Up made clear that the Bank did not have a guaranty from Mesatex, LLC, which owned 60% of AZCO II, LLC.  This was a violation of the Loan Policy, which required a guaranty from any individual or entity that owned 20% or more of the borrower.  Moreover, the guaranties that the Bank did have were inadequate.  The AZCO II Loan Write-Up showed that the guarantors' combined liquid and current assets totaled $3,157,550, which was only about 15.9% of the AZCO II Loan commitment of $19,815,000.  The guarantors did not have sufficient liquid and current assets to repay the AZCO II Loan.

57.     After the AZCO II Loan was approved, officials from Breckenridge requested that the footprint of the AZCO II project be reduced and the density increased by approximately 40%. This change in plans increased the development costs of the project.  AZCO II, LLC needed additional funds to complete the development phase, and it turned to UWB.

58.     On or about September 20, 2007, the ELC, including Codori, Petak, Snider, Umbaugh, and Wetzel, approved: (1) the replacement of Bank Midwest with UWB as the administrator of the AZCO II Loan, (2) an increase in the total amount of the AZCO II Loan to $24,000,000, and (3) an increase in the Bank's commitment in the AZCO II Loan to $12,000,000 (the "AZCO II Loan Modification").  On or about September 24, 2007, the DLC, including Berling, Bullock, Darré, Petak, Snider, and Wetzel, approved the AZCO II Loan Modification.

59.     The credit write-up for the AZCO II Loan Modification, dated September 13, 2007, ("AZCO II Modification Write-Up") provided that the primary, secondary, and tertiary sources of repayment were a construction loan, the "sale or refinance of subject property," and the guarantors' assets, respectively.  The AZCO II Modification Write-Up listed the collateral as a first deed of trust on 9.56 acres in Breckenridge, Colorado, "UCC's on all construction material," and an "assignment of contracts."

60.     As before, the AZCO II Loan Modification was a speculative acquisition and development loan, and its repayment depended upon a Vertical Construction Loan.  JP Morgan Chase provided AZCO II, LLC with a term sheet for takeout financing.  The term sheet, however, was not a commitment by JP Morgan Chase to provide takeout financing.  On the face of the AZCO II Modification Write-Up, the borrower did not have a Vertical Construction Loan takeout commitment from JP Morgan Chase or any other lender, as required by the Loan Policy. Ultimately, JP Morgan Chase did not extend a Vertical Construction Loan to AZCO II, LLC.

61.     The AZCO II Modification Write-Up also showed that there were still serious weaknesses with the guaranties.  As before, Mesatex, LLC, the 60% owner of the borrower, was not a guarantor on the AZCO II Loan Modification.  The AZCO II Modification Write-Up also showed that the guarantors' combined liquid and current assets totaled $3,217,900, which was only about 13.4% of the AZCO II Loan Modification commitment of $24,000,000.  The guarantors lacked the liquid and current assets to repay this loan.

62.     Both the AZCO II Loan and AZCO II Loan Modification were speculative loans for which the borrower could not fully qualify on an unsecured basis.

63.     The Bank disbursed approximately $11,209,242 of this loan.

64.     AZCO II, LLC defaulted on the loan.

65.     The Defendants' acts and omissions with respect to the AZCO II Loan and AZCO II Loan Modification caused UWB to incur damages in an amount to be proved at trial. Had the Defendants who approved the AZCO II Loan and AZCO II Loan Modification followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the AZCO II Loan and AZCO II Loan Modification, and the resulting damages would not have occurred.

### High Prairie

66.     High Prairie Polo Construction Company, LLC ("HPPC") proposed to build a polo club called High Prairie Polo Club near Parker, Colorado.  The plans for the club included 60 upscale residential lots, three polo fields, and a 60-stall horse stable.  HPPC sought a loan from UWB to refinance the borrower's acquisition loan from Community Bank and to finance site improvements ("High Prairie Project").

67.     On or about January 30, 2007, the ELC, including Codori, Petak, Snider, and Umbaugh, approved a land development loan of $14,970,000 to HPPC (the "High Prairie Loan").  On or about February 1, 2007, the DLC, including Berling, Bullock, Darré, Petak, Snider, and Wetzel, approved the High Prairie Loan.

68.     The credit write-up for the High Prairie Loan, dated October 16, 2006, provided that the primary, secondary, and tertiary sources of repayment were the sale of the lots, cash flow or assets of the guarantors, and sale of the collateral, respectively.  The credit write-up listed the collateral as a first deed of trust on the High Prairie Project's property in Douglas County, Colorado, and an assignment of contracts, plans, and specifications on the subject property.

HPPC was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

69.     The High Prairie Loan was a speculative loan that depended upon the success of the project for repayment.  The Bank could not rely on the guarantors—LLC A and LLC A's principal, Guarantor A—because the credit write-up showed that they were not creditworthy. The credit write-up showed that Guarantor A's adjusted gross income ("AGI") was *negative* $34,081 in 2003, *negative* $79,301 in 2004, and *negative* $249,034 in 2005.  In addition, his current assets were only $7,954.  The credit write-up similarly reported LLC A's net income as *negative* $68,162 in 2003, *negative* $45,220 in 2004, and *negative* $178,526 in 2005.  LLC A also had current assets of only $836,097, approximately 5.6% of the total loan commitment of $14,970,000.  In addition, the credit write-up showed that the Bank did not have guaranties from two equity holders of HPPC—Principal A and Green Serenity LLC.  Principal A was an oil investor and owned 28% of the borrower, and Green Serenity LLC owned 30% of the borrower. The failure to obtain guaranties from Principal A and Green Serenity LLC violated the Loan Policy.

70.     The borrower and guarantors also contributed minimal, if any, equity into the project and, therefore, had little at stake in the project.  Although the borrower pledged a first deed of trust on the land for the High Prairie Project, the credit write-up indicated that the land had been purchased in December 2005 for $5,057,838, and that the hard equity contributed to this purchase was only $630,000.

71.     The High Prairie Loan also exceeded the LTC limits set forth in the Loan Policy. The land for the High Prairie Project had been purchased in December 2005 for $5,057,838, but the proposed construction budget for the project showed land costs of $10,834,364, resulting in an artificially low LTC ratio of 68%.  In fact, the actual LTC ratio for the High Prairie Loan was approximately 132%.

72.     The credit write-up noted that a weakness of the High Prairie Loan was the "[l]imited personal financial sponsorship of Guarantor."  This weakness was purportedly mitigated by an unconditional letter of credit of no less than $4 million for the benefit of UWB. The letter of credit was also used to lower the LTV ratio by reducing the amount of the loan by $4 million.  However, the letter of credit had not been issued at the time of approval.  Moreover, the letter of credit obtained after approval suffered from a fatal defect because it did not support either the borrower's or guarantors' obligations.  Instead, the letter of credit supported the obligations of Green Serenity LLC, which was not a guarantor on the loan despite the fact that it was a 30% owner of HPPC.

73.     The High Prairie Loan was a speculative loan for which the borrower could not fully qualify on an unsecured basis.  Repayment depended upon the success of the High Prairie Project, and the relevant custom home market for the High Prairie Project was soon to be saturated with competitive homes from other contemporaneous projects.  Even with the collateral, the High Prairie Loan was an unacceptable risk.

74.     The Bank disbursed approximately $14,901,021 of this loan.

75.     HPPC defaulted on the loan.

76.     The Defendants' acts and omissions with respect to the High Prairie Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved the High Prairie Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the High Prairie Loan, and the resulting damages would not have occurred.

### *One Carefree*

77.     One Carefree Place, LLC was a newly-formed entity created to acquire land and construct medical offices in Scottsdale, Arizona, outside of the Bank's approved lending area.

The principals behind One Carefree Place, LLC requested a loan from UWB to pay off the land acquisition loan and to finance the construction of the medical offices ("One Carefree Project").

78.     On or about May 10, 2007, the ELC, including Codori, Petak, Snider, Umbaugh, and Wetzel, approved a commercial construction loan of $11,453,193 to One Carefree Place, LLC (the "One Carefree Loan") with Bank Midwest as a participant for $2,500,000. Bank Midwest's participation reduced UWB's commitment to $8,953,193. On or about May 11, 2007, the DLC, including Berling, Darré, Petak, Snider, and Wetzel, approved the One Carefree Loan.

79.     The credit write-up for the One Carefree Loan, dated May 1, 2007, provided that the primary, secondary, and tertiary sources of repayment were the sale of the office condos and parking stalls, cash flow or assets of the guarantors, and the refinancing or bulk sale of the collateral, respectively. The credit write-up listed the collateral as a first deed of trust on the One Carefree Project's property in Scottsdale, Arizona, and "appropriate UCC agreements." One Carefree Place, LLC was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

80.     Repayment of the One Carefree Loan depended upon a speculative commercial real estate construction project located outside of the Bank's market area. In addition, the credit write-up raised serious concerns about the creditworthiness of the guarantors. The contingent liabilities of the borrower and guarantors totaled almost $30 million. Furthermore, the credit write-up showed that the guarantors' cash flow decreased approximately 50% from 2004 to 2005. No analysis was provided for 2006 even though the One Carefree Loan was approved in May 2007.

81.     In addition, the credit write-up also showed that the borrower and guarantors put very little, if any, hard equity into the One Carefree Project. The borrower's equity was solely from land appreciation which purportedly grew 125% in two years. Without this purported appreciation "equity," the borrower contributed almost no hard equity to the One Carefree

Project.  The small amount of equity in this project resulted in an LTC ratio of 86.4%, which exceeded the Loan Policy's guideline of 80%.

82.     The Bank disbursed approximately $7,973,316 of this loan.

83.     One Carefree Place, LLC defaulted on the loan.

84.     The Defendants' acts and omissions with respect to the One Carefree Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved the One Carefree Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the One Carefree Loan, and the resulting damages would not have occurred.

### Arizona Land

85.     The individual principals behind Arizona Land Company, LLC were the same principals behind One Carefree Place, LLC.  They formed Arizona Land Company, LLC to purchase a two-story office building in Colorado Springs, Colorado, make improvements, and then lease the offices ("Arizona Land Project").  They requested a loan from UWB to finance the project.

86.     On or about May 10, 2007, the ELC, including Codori, Petak, Snider, Umbaugh, and Wetzel, approved a commercial real estate loan of $5,280,000 to Arizona Land Company, LLC (the "Arizona Land Loan").  On or about May 11, 2007, the DLC, including Berling, Darré, Petak, Snider, and Wetzel, approved the Arizona Land Loan.

87.     The credit write-up for the Arizona Land Loan, dated February 26, 2007, provided that the primary, secondary, and tertiary sources of repayment were the income from the property, refinance in the secondary market or sale of the asset upon stabilization, and the borrower's or guarantors' assets, respectively.  The credit write-up listed the collateral as a first deed of trust on the commercial property to be acquired with the proceeds of the Arizona Land Loan and all the improvements constructed thereon; assignment of leases; subordination, non-

disturbance, and attornment agreements executed by all prospective tenants; and "Other project-related collateral as required by the Bank."

88.     The credit write-up for the Arizona Land Loan raised serious concerns about the creditworthiness of the guarantors.  The contingent liabilities of the borrower and guarantors totaled almost $30 million.  Furthermore, the credit write-up showed that the guarantors' cash flow decreased 50% from 2004 to 2005.  No analysis was provided for 2006 even though the Arizona Land Loan was approved in May 2007.

89.     The LTC ratio for the Arizona Land Loan was 96% based on the loan amount of $5.28 million.  Although the credit write-up listed the LTC ratio as 88.2%, that percentage was calculated using an incorrect loan amount of $4.85 million, which was apparent on the face of the credit write-up.  In any event, the 88.2% LTC ratio also exceeded the Loan Policy's guideline of 80%.  The borrower and guarantors had very little equity at stake in the Arizona Land Project.

90.     The Bank disbursed approximately $5,454,509 of this loan.

91.     Arizona Land Place, LLC defaulted on the loan.

92.     Defendants' acts and omissions with respect to the Arizona Land Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved the Arizona Land Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Arizona Land Loan, and the resulting damages would not have occurred.

### Natches Way

93.     The principals behind Natches Way Development, LLC requested a loan to finance the construction of a residential duplex in Steamboat Springs, Colorado ("Natches Way Project").

94.     On or about July 12, 2007, the ELC, including Codori, Snider, and Wetzel, approved a speculative residential construction loan of $3,029,000 to Natches Way

Development, LLC (the "Natches Way Loan").  On or about July 13, 2007, the DLC, including Berling, Bullock, Darré, Petak, Snider, and Wetzel, approved the Natches Way Loan.

95.     The credit write-up for the Natches Way Loan, dated July 9, 2007, provided that the primary, secondary, and tertiary sources of repayment were the sale of the units, assets of the guarantors or support from the mezzanine lender, and sale of the collateral, respectively.  The credit write-up listed the collateral as a first deed of trust on the Natches Way Project in Steamboat Springs, Colorado.  The borrower was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

96.     The credit write-up for the Natches Way Loan raised serious concerns about the creditworthiness of the guarantors.  The credit write-up showed that UWB's total exposure to the guarantors was $14,157,467, including the Natches Way Loan.  The guarantors' combined liquid and current assets equaled only $1,136,750, and their combined 2005 discretionary cash flow was only $74,118.  The guarantors could not repay the Natches Way Loan, much less the $14,157,467 of debt to UWB that they had guaranteed.  In addition, two of the three guarantors provided outdated financial statements showing negative cash flow through 2005, and no information for 2006.  While the third guarantor showed positive cash flow for 2006, that cash flow was from the one-time sale of business equipment, and the guarantor showed far less cash flow in 2005.

97.     The Natches Way Loan was a speculative loan for which the borrower could not fully qualify on an unsecured basis.  Repayment of the Natches Way Loan depended upon the success of the Natches Way Project.

98.     The Bank disbursed approximately $3,603,000 of this loan.

99.     Natches Way Development, LLC defaulted on the loan.

100.    The Defendants' acts and omissions with respect to the Natches Way Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved

the Natches Way Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Natches Way Loan, and the resulting damages would not have occurred.

### Colorado Main

101.    The principals behind Colorado Main Development, LLC planned to develop a 26-unit townhome complex in downtown Carbondale, Colorado ("Colorado Main Project").

102.    On or about October 23, 2007, the ELC, including Codori, Snider, Umbaugh, and Wetzel, approved a multi-family residential construction loan of $6,250,000 and a letter of credit of $520,000 to Colorado Main Development, LLC (the "Colorado Main Loan").

103.    The credit write-up for the Colorado Main Loan, dated October 16, 2007, provided that the primary, secondary, and tertiary sources of repayment were the sale of the finished townhome units, cash flow and assets of the guarantors, and liquidation of the collateral, respectively.  The credit write-up listed the collateral as a first deed of trust on the Colorado Main Project in Carbondale, Colorado.  The borrower was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

104.    The collateral for the Colorado Main Loan was inadequate to secure the loan. The credit write-up showed that the LTV and LTC ratios of the Colorado Main Loan were 80% and 85%, respectively.  The LTV ratio exceeded the Loan Policy's LTV ratio limit of 75%, and the LTC ratio exceeded the Loan Policy's LTC ratio guideline of 80%.

105.    In addition, the guarantors were not creditworthy because they lacked the liquid and current assets to repay the Colorado Main Loan.  The credit write-up showed that the guarantors' combined liquid and current assets equaled only $280,000 and combined 2006 discretionary cash flow was only $611,206.  The guarantors could not repay the Colorado Main Loan.

106.    The Colorado Main Loan was a speculative loan for which the borrower could not fully qualify on an unsecured basis.  Repayment of this loan depended upon the success of the Colorado Main Project.

107.    The Bank disbursed approximately $6,549,472 of this loan.

108.    Colorado Main Development, LLC defaulted on the loan.

109.    The Defendants' acts and omissions with respect to the Colorado Main Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved the Colorado Main Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Colorado Main Loan, and the resulting damages would not have occurred.

### Communicom

110.    The borrowers on this loan, Communicom Corporation of America, LLC ("Communicom Corp.") and Communicom Broadcasting, LLC ("Communicom Broadcasting"), were organized to own and operate Christian-themed AM radio stations.  Jointly, Communicom Corp. and Communicom Broadcasting owned four Christian radio stations—two in Phoenix, Arizona, one in Detroit, Michigan, and one in New Orleans, Louisiana.  The radio stations' business model was to sell block time to customers.  Each of the four subsidiary radio stations was a co-borrower on this loan.  The credit write-up, dated February 7, 2008, stated that the Phoenix radio stations were acquired in 2006 and that the Detroit radio station was acquired in 2007.  The borrowers, therefore, had very little experience operating the Phoenix and Detroit radio stations when they requested financing from UWB.

111.    The principals behind Communicom Corp. and Communicom Broadcasting requested a loan from UWB to refinance existing senior debt owed to MCG Capital Corporation ("MCG").

112.    On or about February 7, 2008, the ELC, including Codori, Petak, Snider, Sterett, and Wetzel, approved a commercial term loan of $11,250,000 to Communicom Corp. and Communicom Broadcasting (the "Communicom Loan").  On Petak's recommendation, the DLC, including Berling, Bullock, Darré, Petak, Snider, and Wetzel, approved the Communicom Loan on or about February 8, 2008.

113.    The credit write-up provided that the primary, secondary, and tertiary sources of repayment were cash flow from the sale of block programming, assets of the guarantors, and liquidation of the borrowers' assets, including the borrowers' FCC licenses, respectively.  The credit write-up listed the security as a first priority security interest in all of the tangible and intangible assets of the borrowers and co-borrowers.  The most valuable asset was the borrowers' FCC licenses, which were valued at $11.8 million as of December 31, 2007, and accounted for approximately 58% of the borrowers' total assets.

114.    The borrowers were located outside of the Bank's market area and were not creditworthy.  The credit write-up showed that Communicom Corp. and Communicom Broadcasting's combined net income was *negative* $858,606 in 2006 and *negative* $26,110 in 2007.  In addition, the credit write-up indicated that the borrowers' combined liquidity was "less than adequate based on a current ratio of 0.9x."  The borrowers contributed a mere $22,500 (0.2%) in cash equity toward the refinancing of the loan from MCG.  Not only were the borrowers financially weak, they did not have a long track record of success with the four radio stations, as two were acquired in 2006 and one was acquired in 2007.

115.    The credit write-up also showed serious weaknesses with the guarantors.  The guarantors of the Communicom Loan were Guarantor B-1 and Guarantor B-2.  Guarantor B-1 had only $110,000 in liquid, current assets.  Guarantor B-1's AGI was *negative* $1,558,959 in 2005 and *negative* $2,027,792 in 2006, and his discretionary cash flow was $47,036 in 2005 and *negative* $168,317 in 2006.  Stating the obvious, the credit write-up acknowledged that

Guarantor B-1's "AGI and discretionary cash flow have trended in a negative direction for the 2005 and 2006 tax periods."

116.    Although the credit write-up listed Guarantor B-2's current assets as $3,407,363, the write-up also provided that a "credit report was not reviewed for [Guarantor B-2] and therefore no conclusions can be determined regarding his liquidity position."  The credit write-up explained that no data in his credit report was available "due to a frozen status alert submitted by [Guarantor B-2]."  In addition, in his personal financial statement, Guarantor B-2 did not itemize his unsecured debt obligations, nor did he disclose any value or debt related to his personal residence.  The credit write-up concluded that no "interpretation regarding [Guarantor B-2's] available cash flow can be concluded until we receive authorization from [Guarantor B-2] to disclose his credit bureau report to the Bank."  Guarantor B-2's frozen status alert on his credit report was a red flag to the Defendants who approved this loan.  Guarantor B-2's lack of candor warranted additional investigation and cast doubt on his honesty and creditworthiness.

117.    In addition to the guarantors' specific weaknesses, the credit write-up showed that the Communicom Loan would not be fully guaranteed.  The credit write-up provided that Guarantor B-1 would "guaranty the lesser of $6MM or 50% of the outstanding balance" and that Guarantor B-2 would "guaranty the lesser of $3MM or 50% of the outstanding balance."

118.    The Bank disbursed approximately $11,250,000 of this loan.

119.    The borrowers and co-borrowers on the Communicom Loan defaulted.

120.    The Defendants' acts and omissions with respect to the Communicom Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who recommended or approved the Communicom Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Communicom Loan, and the resulting damages would not have occurred.

*Cottonwood*

121.    The principals behind 18 Cottonwood Lane, LLC planned to build a high-end "spec" home in Greenwood Village, Colorado.  UWB funded the acquisition of the land for the speculative home, and the principals sought to take out the acquisition loan and finance the construction of the speculative home ("Cottonwood Project").

122.    On or about February 28, 2008, the ELC, including Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel, approved a speculative residential construction loan of $2,334,000 to 18 Cottonwood Lane, LLC (the "Cottonwood Loan").

123.    The credit write-up for the Cottonwood Loan, dated February 22, 2008, ("Cottonwood Loan Write-Up") provided that the primary, secondary, and tertiary sources of repayment were the sale of the finished home, cash flow and assets of the guarantors, and liquidation of the collateral, respectively.  The collateral for the Cottonwood Loan was a first deed of trust and a lien of $260,000 on a certificate of deposit at UWB.  The borrower was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

124.    The Cottonwood Project was a speculative project in a weak real estate market, which was specifically identified as a weakness in the Cottonwood Loan Write-Up.  The Cottonwood Loan Write-Up indicated that there were already 46 active listings for custom homes for sale between $2 million and $4 million in the Cottonwood Project's area.  Based on this number of active listings, the Cottonwood Loan Write-Up concluded that there was already 13 months of supply.

125.    In addition, the Cottonwood Loan Write-Up showed that the guarantors were not creditworthy.  The Cottonwood Loan Write-Up reported that the guarantors had combined liquid and current assets of only $1,515,000.  The guarantors' combined discretionary cash flow was $248,135 in 2004, $177,384 in 2005, and $235,958 in 2006.  Guarantor C-1's discretionary cash flow and debt service coverage ratio had declined, year to year, from 2004 to 2006.

Guarantor C-2 had a large amount of debt associated with his partially owned real estate investment entities, and his working capital levels were poor.  Guarantor C-2's debt service coverage ratio was below the generally accepted level of 2.0x.  Moreover, neither Guarantor C-1 nor Guarantor C-2 provided any cash flow or AGI information for 2007.  Even if the guarantors' combined assets and discretionary cash flow from 2006 remained steady, repayment of the Cottonwood Loan was dependent upon the success of the Cottonwood Project by the time the loan matured in 15 months.

126.    Shortly after the Cottonwood Loan was approved, Guarantor C-1 and Guarantor C-2 requested a modification to the Cottonwood Loan to match a purported offer of credit from Community Bank of Colorado.  The guarantors requested that the Bank reduce the required equity contribution to 15% of cost and lower the lien on the certificate of deposit to $100,000.

127.    On or about March 4, 2008, the ELC, including Petak, Snider, Sterett, Umbaugh, and Wetzel, approved a modification to the Cottonwood Loan (the "Cottonwood Modification"), which lowered the Bank's commitment to $2,310,000 and, as requested, purported to reduce the required equity to 15% of cost and lowered the lien on the certificate of deposit to $100,000.

128.    The LTC ratio of the Cottonwood Modification was approximately 88.9%, which exceeded the Loan Policy's guideline of 80%.  Moreover, the borrower contributed insufficient hard equity to the Cottonwood Project, and there was no justification for reducing the lien on the certificate of deposit to $100,000.

129.    The Cottonwood Loan and Cottonwood Modification were speculative loans for which the borrower could not fully qualify on an unsecured basis.  When the Cottonwood Loan and Cottonwood Modification were approved, repayment depended upon the success of the Cottonwood Project.

130.    The Bank disbursed approximately $2,249,124 of this loan.

131.     Cottonwood Development, LLC defaulted on the loan.

132.     The Defendants' acts and omissions with respect to the Cottonwood Loan and Cottonwood Modification caused UWB to incur damages in an amount to be proved at trial. Had the Defendants who approved the Cottonwood Loan and Cottonwood Modification followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Cottonwood Loan and Cottonwood Modification, and the resulting damages would not have occurred.

### ROC Henge

133.     ROC Henge LLC ("ROC Henge") was a stone and tile company located in Denver, Colorado.  ROC Henge requested a revolving line of credit from UWB for working capital and an equipment line of credit to finance capital expenditures.

134.     On or about March 20, 2008, the ELC, including but not limited to Codori, Petak, Snider, and Wetzel, approved a revolving line of credit of $800,000 to ROC Henge LLC (the "ROC Henge RLOC") and an equipment line of credit of $1,650,000 to ROC Henge LLC (the "ROC Henge ELOC").  On Petak's recommendation, the DLC, including Berling, Bullock, Petak, Snider, and Wetzel, approved the ROC Henge RLOC on or about March 21, 2008.  Also, on or about March 21, 2008, the DLC, including Berling, Bullock, Petak, Snider, and Wetzel, approved the ROC Henge ELOC.

135.     The credit write-up for the loans, dated March 19, 2008, indicated that the primary, secondary, and tertiary sources of repayment were the cash flow from ROC Henge's operations, liquidation of the collateral, and the assets of the guarantor, respectively.  The credit write-up listed the collateral as a security interest in all business assets, including accounts receivable and inventories; specific liens on fixed assets purchased with proceeds from the ROC Henge ELOC; and a first deed of trust on land and improvements of real property in Denver, Colorado.

136.     ROC Henge was not a creditworthy borrower.  As reflected in the credit write-up, ROC Henge projected immediate profitability and a 139% increase in sales for 2008, even though the company was newly formed and unproven, with a loss of $173,986 for 2007.  In addition, the company was already highly leveraged, with a debt to worth ratio of 5:1.  The credit write-up relied upon ROC Henge's future revenue projections, as opposed to its historical performance, to establish ROC Henge's purported financial stability and improving trends.

137.     The guarantor of the ROC Henge RLOC and ELOC was also not creditworthy. UWB's total exposure to the guarantor, including the ROC Henge RLOC and ELOC, was $13,854,826.  However, the credit write-up showed that the guarantor's cash and cash equivalents totaled only $1,609,239.  In addition, the credit write-up indicated that his cash flow available to service debt was *negative* $988,998 in 2005 and *negative* $1,253,280 in 2006.  The six-year average of cash flow available to service debt, from 2001 through 2006, was only $186,883.

138.     The ROC Henge RLOC and ELOC were entirely dependent upon a booming real estate market which by March 2008 was suffering and in decline.

139.     The Bank disbursed approximately $445,810 of the ROC Henge RLOC.  The Bank disbursed approximately $1,350,370 of the ROC Henge ELOC.

140.     ROC Henge LCC defaulted on the ROC Henge RLOC and ELOC.

141.     The Defendants' acts and omissions with respect to the ROC Henge RLOC and ELOC caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved the ROC Henge RLOC and who recommended or approved the ROC Henge ELOC followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the ROC Henge RLOC and ELOC, and the resulting damages would not have occurred.

*Borrower A*

142.    Borrower A planned to convert the New Hope Baptist Church in Denver, Colorado into four luxury condominiums called the Bell Tower Residences.  To start the project, Borrower A requested short-term interim financing until he could obtain a construction loan.

143.    On or about March 31, 2008, Wetzel approved an interim draw line of credit of $250,000 to Borrower A (the "Borrower A Loan").  On or about June 2, 2008, Wetzel approved an increase of $250,000 to the Borrower A Loan for a total commitment of $500,000 (the "Borrower A Modification I").  On or about July 14, 2008, Petak and Sterett, on Petak's recommendation, approved the conversion of the Borrower A Loan from an interim draw line of credit to a construction loan, and Petak and Sterett, also on Petak's recommendation, approved additional funding of $2,350,000 to bring UWB's commitment to $2,850,000 (the "Borrower A Modification II").  On or about August 25, 2009, the ELC, including Codori, Petak, Sterett, Umbaugh, and Wetzel, approved additional funding of $278,000 to bring UWB's commitment to $3,128,000 (the "Borrower A Modification III").  On or about August 27, 2009, the DLC, including Berling, Bullock, Darré, Petak, Snider, and Wetzel, approved the Borrower A Modification III.  Collectively, the Borrower A Loan, Borrower A Modification, Borrower A Modification II, and Borrower A Modification III are referred to herein as the "Borrower A Loan and Modifications."

144.    The credit write-up for the Borrower A Modification II ("Borrower A Modification II Write-Up") provided that the primary, secondary, and tertiary sources of repayment were the sale of the condo units, the income and assets of the borrower, and liquidation of the collateral, respectively.  The Borrower A Modification II Write-Up listed the collateral as a first deed of trust on the Bell Tower Residences and an assigned note of $545,000 due to Borrower A.

145.    Borrower A was not creditworthy, and he lacked the ability to repay the Borrower A Loan and Modifications.  The Borrower A Loan Write-Up provided that Borrower A's total cash and cash equivalents were only $57,000.  His other current assets valued at $545,000 were two mortgages due to Borrower A in the fall of 2008.  Although Borrower A's AGI was $359,764 in 2005 and $1,376,046 in 2006, the Defendants knew they could not rely on those figures.  The Borrower A Loan Write-Up explained that the income in 2006 "was mostly the result of a large capital gain" that Borrower A realized when he "liquidated a guest ranch."  The income in 2005 was from "rent paid by the ranch."  Having sold the ranch, Borrower A had no demonstrated source of continuing future income.  In an email dated July 6, 2008, Petak acknowledged that Borrower A looked "relatively weak on paper with limited liquidity."

146.    The Borrower A Loan and Modifications were speculative loans for which the borrower could not fully qualify on an unsecured basis.  Repayment of the Borrower A Loan and Modifications depended upon the success of the Bell Tower Residences.  The Bell Tower Residences was a speculative residential construction project that the Defendants decided to fund at a time when the real estate market was declining.

147.    The Bank disbursed approximately $3,125,842 of this loan.

148.    Borrower A defaulted on the loan.

149.    The Defendants' acts and omissions with respect to the Borrower A Loan and Modifications caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who recommended or approved any of the Borrower A Loan and Modifications followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Borrower A Loan and Modifications, and the resulting damages would not have occurred.

### *Red Butte*

150.    The principals behind 1375 Red Butte Drive, LLC planned to repurchase a luxury single-family residence in Aspen, Colorado (the "Red Butte Property") from a group of investors that financed the acquisition of the lot on which the Red Butte Property was built.  The principals requested a loan from UWB to finance the repurchase of the Red Butte Property and to take out the existing construction loan from Community Bank.

151.    On or about April 1, 2008, the ELC, including Codori, Petak, Sterett, and Wetzel, approved a term loan of $7,145,000 to 1375 Red Butte Drive, LLC (the "Red Butte Loan").

152.    The credit write-up for the Red Butte Loan, dated March 20, 2008, provided that the primary, secondary, and tertiary sources of repayment were the sale of the home at market price, income of the guarantors, and liquidation of the collateral, respectively.  The credit write-up listed the collateral as a first deed of trust on the Red Butte Property and a certificate of deposit for $450,000.  The borrower was a single-purpose entity, and its assets, other than the collateral, were not a source of repayment.

153.    The Red Butte Loan was a speculative loan for which the borrower could not fully qualify on an unsecured basis.  Repayment of the Red Butte Loan depended upon the sale of the Red Butte Property, but the credit write-up showed that the collateral was insufficient.  The credit write-up stated that the Red Butte Property was listed for sale in March 14, 2007, and that it did not sell.  The Red Butte Property was withdrawn from the market on September 29, 2007, and was completed in October 2007.  As of the date of the loan approval, the Red Butte Property had been sitting vacant for nearly six months.

154.    Furthermore, the credit write-up revealed that the Bank did not have a current appraisal of the Red Butte Property by an approved appraiser, in violation of the Loan Policy.  Although the Red Butte Property had been previously appraised for $11.5 million, this valuation was based on a six-month-old appraisal dated October 1, 2007.  In addition, the previous

appraiser was not an approved appraiser.  Had the Defendants who approved this loan required a more recent appraisal by an approved appraiser, they would have learned that a comparable home in the area had sold for only $7.5 million in February 2008.  A value of $7.5 million would have resulted in an LTV ratio of approximately 95.3%, which would have been far in excess of the Loan Policy's limit of 75%.

155.    The Bank disbursed approximately $7,145,000 of this loan.

156.    1375 Red Butte Drive, LLC defaulted on the loan.

157.    The Defendants' acts and omissions with respect to the Red Butte Loan caused UWB to incur damages in an amount to be proved at trial.  Had the Defendants who approved the Red Butte Loan followed prudent, safe, and sound lending practices and the Loan Policy, the Bank would not have made the Red Butte Loan, and the resulting damages would not have occurred.

## V.      CAUSES OF ACTION

### A.      COUNT I – BREACH OF FIDUCIARY DUTY (Against All Defendants)

158.    The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-157 above as if fully set out in this Count.

159.    As officers, officer-directors, or directors of the Bank, at all times, the Defendants owed to UWB the fiduciary duties of care and loyalty.

160.    As officers or officer-directors of the Bank and members of the ELC, defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel's fiduciary duties included, but were not limited to, the following:

a.      Discharging their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Bank

b.      Conducting the business of UWB in a manner consistent with prudent, safe, and sound lending practices;

c.      Conducting the business of UWB in compliance with all applicable state and federal laws and regulations;

d.      Using prudent procedures for recommending or approving loans;

e.      Recommending or approving loans in accordance with UWB's Loan Policy;

f.      Ensuring that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

g.      Ensuring that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans;

h.      Ensuring that loans not be made on the basis of inadequate appraisals;

i.      Ensuring that loans not be made without taking proper and reasonable steps to ensure that the loan proceeds would be used in accordance with the loan application;

j.      Ensuring that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

k.      Ensuring that loans not be made outside the normal and prudent trade areas of the Bank;

l.      Ensuring that loans not be made where there was very little likelihood of the loan being repaid within the term of the loan;

m.      Taking reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

n.        Informing themselves, prior to making business decisions, of all the material information reasonably available to them;

o.        Informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; and

p.        Ensuring that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank, when the Loan Policy or prudent, safe, and sound lending practices required the loans to be secured.

161.    As officer-directors or directors of the Bank and members of the DLC, defendants Berling, Bullock, Darré, Petak, Snider, and Wetzel's fiduciary duties included, but were not limited to, the following:

a.        Discharging their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Bank

b.        Conducting the business of UWB in a manner consistent with prudent, safe, and sound lending practices;

c.        Conducting the business of UWB in compliance with all applicable state and federal laws and regulations;

d.        Using prudent procedures for recommending or approving loans;

e.        Recommending or approving loans in accordance with UWB's Loan Policy;

f.        Ensuring that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

g.        Ensuring that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or

guarantor, and the prospective source of repayment, and the security provided for the loans;

h.      Ensuring that loans not be made on the basis of inadequate appraisals;

i.      Ensuring that loans not be made without taking proper and reasonable steps to ensure that the loan proceeds would be used in accordance with the loan application;

j.      Ensuring that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

k.      Ensuring that loans not be made outside the normal and prudent trade areas of the Bank;

l.      Ensuring that loans not be made where there was very little likelihood of the loan being repaid within the term of the loan;

m.      Taking reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

n.      Informing themselves, prior to making business decisions, of all the material information reasonably available to them;

o.      Informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; and

p.      Ensuring that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank, when the Loan Policy or prudent, safe, and sound lending practices required the loans to be secured.

q.      Representing the Board in all matters of the Bank's lending function;

r.      Developing, with the assistance of the Bank's management, the Loan Policy for the Board's approval; and

        s.        Ensuring compliance with the Loan Policy and legal requirements.

162.    As CCO, defendant Petak had the additional duty of providing his recommendation on DLC-level loans prior to submitting them to the DLC for approval.

163.    For each loan, the material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV and LTC ratios, the risks associated with the downturn in the real estate market, and any other information necessary to ensure that the proposed loan complied with UWB's Loan Policy and prudent, safe, and sound lending practices.

164.    UWB reasonably reposed trust and confidence in each Defendant and believed each Defendant would exercise that trust and confidence with great care.

165.    The Defendants each knew or should have known that the Bank was placing its trust and confidence in each of them, and the Bank did place its trust and confidence in each of them, as demonstrated by the fact that the Defendants were officers, officer-directors, or directors of the Bank and had the responsibility to recommend or approve loans.

166.    With respect to the Loans, each Defendant possessed significant access to relevant knowledge and facts due to each Defendant's special position of power at the Bank and the confidence each Defendant invited from others with respect to the Loans, based on the fact that each Defendant actively engaged in the recommendation or approval of the Loans.

167.    As officers, officer-directors, or directors of the Bank, and as individuals recommending or approving the Loans, each Defendant was in a special position of influence and power, and each of them exercised that influence and power in a manner that directly caused harm to the Bank.

168.    The Defendants breached their duties to the Bank by committing the acts and omissions alleged herein, including, among other things:

a.      Failing to consider, or knowing and disregarding, the risks presented by the Bank's high concentration in CRE/ADC loans when they recommended and/or approved some or all of the Loans;

b.      Failing to consider, or knowing and disregarding, the risks the Loans posed to the Bank before they recommended and/or approved them;

c.      Failing to consider, or knowing and disregarding, that the Loans were not underwritten in a prudent, safe, and sound manner;

d.      Failing to consider, or knowing and disregarding, that the collateral for some or all of the Loans was insufficient to prevent or minimize the risk of loss to the Bank; and

e.      Failing to consider, or knowing and disregarding, that the Loans violated the Loan Policy and/or prudent, safe, and sound lending practices.

169.    Each Defendant is liable for the damages resulting from the loans that he or she recommended and/or approved, as alleged herein.

170.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff has suffered damages in an amount to be proved at trial, in excess of $35 million.

171.    With respect to their breaches of fiduciary duties in managing the affairs of UWB, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

**B.      COUNT II – GROSS NEGLIGENCE (Pleaded in the Alternative to Count I) (Against All Defendants)**

172.    The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-157 above as if fully set out in this Count.

173.    Under Colorado law and 12 U.S.C. § 1821(k), as officers, officer-directors, or directors of the Bank, the Defendants are personally liable for damages to UWB that were caused by their gross negligence.

174.    As officers, officer-directors, or directors of the Bank, the Defendants owed to UWB a duty to use reasonable care, skill, and diligence in the performance of their duties.

175.    As officers or officer-directors of the Bank and members of the ELC, defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel's duties included, but were not limited to, the following:

a.    Discharging their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Bank

b.    Conducting the business of UWB in a manner consistent with prudent, safe, and sound lending practices;

c.    Conducting the business of UWB in compliance with all applicable state and federal laws and regulations;

d.    Using prudent procedures for recommending or approving loans;

e.    Recommending or approving loans in accordance with UWB's Loan Policy;

f.    Ensuring that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

g.    Ensuring that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans;

h.    Ensuring that loans not be made on the basis of inadequate appraisals;

i.      Ensuring that loans not be made without taking proper and reasonable steps to ensure that the loan proceeds would be used in accordance with the loan application;

j.      Ensuring that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

k.      Ensuring that loans not be made outside the normal and prudent trade areas of the Bank;

l.      Ensuring that loans not be made where there was very little likelihood of the loan being repaid within the term of the loan;

m.      Taking reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

n.      Informing themselves, prior to making business decisions, of all the material information reasonably available to them;

o.      Informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; and

p.      Ensuring that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank, when the Loan Policy or prudent, safe, and sound lending practices required the loans to be secured.

176.   As officer-directors or directors of the Bank and members of the DLC, defendants Berling, Bullock, Darré, Petak, Snider, and Wetzel's duties included, but were not limited to, the following:

a.      Discharging their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Bank

b.      Conducting the business of UWB in a manner consistent with prudent, safe, and sound lending practices;

c.      Conducting the business of UWB in compliance with all applicable state and federal laws and regulations;

d.      Using prudent procedures for recommending or approving loans;

e.      Recommending or approving loans in accordance with UWB's Loan Policy;

f.      Ensuring that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

g.      Ensuring that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans;

h.      Ensuring that loans not be made on the basis of inadequate appraisals;

i.      Ensuring that loans not be made without taking proper and reasonable steps to ensure that the loan proceeds would be used in accordance with the loan application;

j.      Ensuring that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

k.      Ensuring that loans not be made outside the normal and prudent trade areas of the Bank;

l.      Ensuring that loans not be made where there was very little likelihood of the loan being repaid within the term of the loan;

m.      Taking reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

n.      Informing themselves, prior to making business decisions, of all the material information reasonably available to them;

o.      Informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; and

p.      Ensuring that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank, when the Loan Policy or prudent, safe, and sound lending practices required the loans to be secured.

q.      Representing the Board in all matters of the Bank's lending function;

r.      Developing, with the assistance of the Bank's management, the Loan Policy for the Board's approval; and

s.      Ensuring compliance with the Loan Policy and legal requirements.

177.   As CCO, defendant Petak had the additional duty of providing his recommendation on DLC-level loans prior to submitting them to the DLC for approval.

178.   The Defendants breached their duties to the Bank by committing the acts and omissions alleged herein, including, among other things:

a.      Failing to consider, or knowing and disregarding, the risks presented by the Bank's high concentration in CRE/ADC loans when they recommended and/or approved some or all of the Loans;

b.      Failing to consider, or knowing and disregarding, the risks the Loans posed to the Bank before they recommended and/or approved them;

c.      Failing to consider, or knowing and disregarding, that the Loans were not underwritten in a prudent, safe, and sound manner;

      d.      Failing to consider, or knowing and disregarding, that the collateral for some or all of the Loans was insufficient to prevent or minimize the risk of loss to the Bank; and

      e.      Failing to consider, or knowing and disregarding, that the Loans violated the Loan Policy and/or prudent, safe, and sound lending practices.

179.    Each Defendant is liable for the damages resulting from the loans that he or she recommended and/or approved, as alleged herein.

180.    As a direct and proximate result of the Defendants' gross negligence, Plaintiff has suffered damages in an amount to be proved at trial, in excess of $35 million.

181.    With respect to their grossly negligent actions and inactions in managing the affairs of UWB, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

**C.    COUNT III – NEGLIGENCE (Pleaded in the Alternative to Counts I and II) (Against Defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel)**

182.    The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-157 above as if fully set out in this Count.

183.    Under Colorado law, as officers or officer-directors of the Bank, defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel are personally liable for damages to UWB caused by their negligence.

184.    As officers or officer-directors of the Bank, defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel owed to UWB a duty to use reasonable care, skill, and diligence in the performance of their duties.

185.    As officers or officer-directors of the Bank and members of the ELC, defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel's duties included, but were not limited to, the following:

     a.    Discharging their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Bank

     b.    Conducting the business of UWB in a manner consistent with prudent, safe, and sound lending practices;

     c.    Conducting the business of UWB in compliance with all applicable state and federal laws and regulations;

     d.    Using prudent procedures for recommending or approving loans;

     e.    Recommending or approving loans in accordance with UWB's Loan Policy;

     f.    Ensuring that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

     g.    Ensuring that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans;

     h.    Ensuring that loans not be made on the basis of inadequate appraisals;

     i.    Ensuring that loans not be made without taking proper and reasonable steps to ensure that the loan proceeds would be used in accordance with the loan application;

     j.    Ensuring that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

k.    Ensuring that loans not be made outside the normal and prudent trade areas of the Bank;

l.    Ensuring that loans not be made where there was very little likelihood of the loan being repaid within the term of the loan;

m.    Taking reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

n.    Informing themselves, prior to making business decisions, of all the material information reasonably available to them;

o.    Informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; and

p.    Ensuring that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank, when the Loan Policy or prudent, safe, and sound lending practices required the loans to be secured.

186.    As officer-directors of the Bank and members of the DLC, defendants Petak, Snider, and Wetzel's duties included, but were not limited to, the following:

a.    Discharging their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Bank

b.    Conducting the business of UWB in a manner consistent with prudent, safe, and sound lending practices;

c.    Conducting the business of UWB in compliance with all applicable state and federal laws and regulations;

d.    Using prudent procedures for recommending or approving loans;

e.  Recommending or approving loans in accordance with UWB's Loan Policy;

f.  Ensuring that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

g.  Ensuring that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans;

h.  Ensuring that loans not be made on the basis of inadequate appraisals;

i.  Ensuring that loans not be made without taking proper and reasonable steps to ensure that the loan proceeds would be used in accordance with the loan application;

j.  Ensuring that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

k.  Ensuring that loans not be made outside the normal and prudent trade areas of the Bank;

l.  Ensuring that loans not be made where there was very little likelihood of the loan being repaid within the term of the loan;

m.  Taking reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

n.  Informing themselves, prior to making business decisions, of all the material information reasonably available to them;

o.  Informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; and

p.      Ensuring that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank, when the Loan Policy or prudent, safe, and sound lending practices required the loans to be secured.

q.      Representing the Board in all matters of the Bank's lending function;

r.      Developing, with the assistance of the Bank's management, the Loan Policy for the Board's approval; and

s.      Ensuring compliance with the Loan Policy and legal requirements.

187.    As CCO, defendant Petak had the additional duty of providing his recommendation on DLC-level loans prior to submitting them to the DLC for approval.

188.    Defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel breached their duties to the Bank by committing the acts and omissions alleged herein, including, among other things:

a.      Failing to consider, or knowing and disregarding, the risks presented by the Bank's high concentration in CRE/ADC loans when they recommended and/or approved some or all of the Loans;

b.      Failing to consider, or knowing and disregarding, the risks the Loans posed to the Bank before they recommended and/or approved them;

c.      Failing to consider, or knowing and disregarding, that the Loans were not underwritten in a prudent, safe, and sound manner;

d.      Failing to consider, or knowing and disregarding, that the collateral for some or all of the Loans was insufficient to prevent or minimize the risk of loss to the Bank; and

e.      Failing to consider, or knowing and disregarding, that the Loans violated the Loan Policy and/or prudent, safe, and sound lending practices.

189.    Each of Defendants Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel is liable for the damages resulting from the loans that he or she recommended and/or approved, as alleged herein.

190.    As a direct and proximate result of Codori's, Petak's, Snider's, Sterett's, Umbaugh's, and Wetzel's negligence, Plaintiff has suffered damages in an amount to be proved at trial, in excess of $35 million.

191.    With respect to their negligent actions and inactions in managing the affairs of UWB, Codori, Petak, Snider, Sterett, Umbaugh, and Wetzel pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each of them is jointly and severally liable for all damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver for United Western Bank, demands a trial by jury and judgment in its favor against the Defendants as follows:

1.    For compensatory damages and other damages, jointly and severally, against the Defendants for their negligence, gross negligence, and/or breaches of fiduciary duties that resulted in damages;

2.    For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l) and Colorado law; and

3.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by a jury.

Dated:  January 17, 2014

SHOEMAKER GHISELLI + SCHWARTZ LLC

*/s/  Paul H. Schwartz*
Paul H. Schwartz
Shoemaker Ghiselli + Schwartz LLC
1811 Pearl Street
Boulder, CO  80302
Telephone:  (303) 530-3452
FAX:  (303) 530-4071
E-mail:  pschwartz@sgslitigation.com

Daniel P. Larsen (D. Colo. bar application forthcoming)
Jeff M. Peterson (D. Colo. bar application forthcoming)
Ater Wynne LLP
1331 NW Lovejoy Street
Suite 900
Portland, Oregon  97209
Telephone:  (503) 226-1191
FAX:  (503) 226-0079
dpl@aterwynne.com

**ATTORNEYS FOR PLAINTIFF
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
UNITED WESTERN BANK**