# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00137-CMA-MJW

FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR UNITED WESTERN BANK,

       Plaintiff,

v.

CHARLES J. BERLING,
JAMES H. BULLOCK,
ANTHONY C. CODORI,
BERNARD C. DARRÉ,
GARY G. PETAK,
WILLIAM D. SNIDER,
CINDY J. STERETT,
JOHN S. UMBAUGH, and
SCOT T. WETZEL,

       Defendants.

---

## DECLARATION OF RICHARD W. GEORGE

---

I, Richard W. George, declare:

1.   I have personal knowledge of the matters set forth in this declaration and, if called upon to testify as a witness under oath as to these matters, I would and could provide competent testimony.

2.   I hereby verify that I have prepared the expert report of Richard W. George, dated June 12, 2015, attached as Exhibit A.

3.   I further verify that I have prepared the supplemental expert report of Richard W. George, dated August 26, 2015, attached as Exhibit B.

4.   If called, I would testify as set forth in my reports.

**FDIC-R Opp. Appx. 1988**

10/13/2015   13:23  5305501455                    Richard_George                    #0886 P.002 /002

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of October, 2015 in Truckee, California.

Richard W. George

- 2 -

**FDIC-R Opp. Appx. 1989**

# EXHIBIT A

**FDIC-R Opp. Appx. 1990**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-00137

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR
UNITED WESTERN BANK,

Plaintiff,

v.

CHARLES J. BERLING, JAMES H. BULLOCK, ANTHONY C. CODORI,
BERNARD C. DARRÉ, GARY G. PETAK, WILLIAM D. SNIDER,
CINDY J. STERETT, JOHN S. UMBAUGH and SCOT T. WETZEL, Defendants.

## EXPERT REPORT

### OF

### RICHARD W. GEORGE

**JUNE 12, 2015**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 1991**

## I.  INTRODUCTION

1.      I have been retained by Nixon Peabody LLP, counsel for the Federal Deposit Insurance Corporation as Receiver for United Western Bank ("FDIC-R"), to provide my opinions as an expert witness on certain issues relating to the underwriting, approval, and funding of certain loans made by United Western Bank ("UWB" or the "Bank").  My opinions are based on my years of training and experience in banking and the information I have reviewed as of the date of this report, and are given to a reasonable degree of certainty.  I reserve the right to revise my opinions if new and material evidence comes to light.  I also reserve the right to review and respond to any expert reports filed in this action.

## II.  QUALIFICATIONS

1.      I received a Master's degree in Business Administration (MBA) from the University of California, Berkeley, in 1969.  My fields of emphasis were international business and finance.

2.      As an educator, I am a Lecturer in finance at the Haas Graduate School of Business at the University of California, Berkeley, and am a member of the Board of Advisors, Institute for Bank Director Education, an arm of the American Association of Bank Directors.  As a banker and businessman, I am a Principal in a consulting firm, Bank Experts Group, which specializes in matters relating to financial institutions, and also a partner in Gulf Banking Consultants, a firm that consults with international financial institutions and investors.

3.      I have held a number of positions during the past 44 years that qualify me to give opinions regarding this matter.  These experiences include:

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

a.   As a bank CEO, managing the turnaround and sale of a $120 million community bank in the U.S.;

b.   As a Senior Relationship Manager, underwriting commercial real estate projects for U.S. developers;

c.   As Head of Citicorp's North American commercial real estate Business Risk Review group, evaluating resolution strategies for major real estate workouts in North America;

d.   As a Business Head, improving profitability for a secured finance and securitization business in the U.S.; and

e.   As a Lecturer to MBA candidates, teaching banking and corporate finance at Georgetown University's Graduate School of Foreign Service and the University of California, Berkeley, Haas Graduate School of Business from 1998 to 2013. My C.V. is attached as Appendix A.

4.   I worked at Citibank from 1971 to 2000.  During my 29 year career with Citibank, I held a number of senior line management and credit positions in both retail and commercial businesses.   Those positions include commercial banking and credit committee head in two countries, relationship manager for several major U.S. accounts, and senior line officer for a major corporate relationship.   My experience as a commercial lender includes underwriting, administering, restructuring and remediating all types of commercial real estate projects and properties.

5.   From 1986 through 1988, I was the senior relationship manager for a national real estate developer based in Dallas.  The scope of my responsibilities was to facilitate a

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

$2.0 billion debt restructuring and loan reduction program in conjunction with approximately five other lenders.

6.  From 1989 through 1992, I was the head of Citicorp's North American commercial real estate loan review team.  The scope of this assignment was to carry out independent reviews of loan portfolio quality and to assess management performance at approximately 15 Citicorp Real Estate offices in the U.S. and Canada with a total portfolio in excess of $25 billion.  In addition to real estate businesses, I led reviews of other Citicorp units during the 1989-1992 period, including securitization, venture capital, insurance, municipal bond underwriting and general corporate lending.

7.  I was a Credit Officer for my entire career at Citicorp and became a Senior Credit Officer in 1993. As a Senior Credit Officer, I had responsibility for reviewing and evaluating loans underwritten by other officers at the Bank.

8.  In 2000, I was recruited by the board of a Washington DC-based community bank that was operating under a Formal Agreement with the Office of the Comptroller of the Currency, to become CEO and to restructure and sell the bank.  I was also a Director of the bank and served as Chair of the Directors' Loan Committee.  I led and supervised all staff and provided guidance and training to credit officers.  Key to the bank's turnaround was stemming losses in the loan portfolio by reducing problem loans.  This $120 million bank was sold in April 2001 to a large financial institution.

9.  Over the course of my career, I have had extensive experience with many types of businesses and products offered by banks.  Most of my career was in corporate and commercial lending, involving loan underwriting, structuring, documenting, administering, work-out negotiation and re-financing loans.  Most of these loans were

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

secured by collateral of various types, including real estate, inventory, accounts receivable, shares of stock and other forms of support commonly taken as security for repayment of loans. I developed and taught a graduate-level finance course titled "Global Financial Services" at Georgetown University from 1998 to 2002 and at the University of California, Berkeley from 2002 to 2013. This course encompasses banking and corporate finance, including securitization, valuation, derivatives, and credit and investment analysis and decision-making. I have most recently taught a graduate course on business and banking at the University of California, Berkeley, Haas Graduate School of Business, which focuses on emerging markets. I have not published any articles or books in the last ten years.

10.    As a member of the Board of Advisors of the American Association of Bank Directors' (AABD) Institute of Bank Director Education, I contribute to the training of bank directors to attain their AABD certification.

11.    During the past four years, I have testified fourteen times at deposition, in court and in arbitration proceedings. A list of all cases in which I have so testified is attached hereto as Appendix B.

12.    A list of documents and other sources which I have considered in forming my opinions is attached hereto as Appendix C.

13.    I am being compensated for my services in this matter at $350 per hour. My compensation is not contingent on the outcome or decision in this matter and is not conditional upon the nature of my opinion or testimony. I am also being reimbursed for reasonable expenses that I incur for my services.

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### III.    BACKGROUND STATEMENTS

APPLICABLE STANDARDS OF CARE FOR LENDING[1]

1.      A bank should only make loans that fit within its business strategies and are consistent with safe and sound lending practices.  A cardinal rule is that the bank must receive strong assurance that it will be repaid before advancing a loan.  Although lending requires calculated and prudential decision making, a bank can be successful only so long as its decisions are reasonable and controlled within defined parameters that are consistent with the Bank's financial resources and credit competence.  Banks should make decisions in light of their expected return, which is typically far more modest than, for example, equity investment return.

2.      In extending loans, a bank must operate within state and federal banking regulations and should operate in accordance with its own internal policies and procedures.  Well developed and thought out lending policies create a framework for compliance with safe and sound lending practices.  Bank personnel should establish clear lending policies and, absent strong and documented reasons to deviate from those policies, follow those policies with discipline in order to support the bank's business strategies and to comply with safe and sound lending practices.

3.      Before a bank commences a credit evaluation, it should be able to answer several basic questions:

   a.      What is the nature and purpose of the transaction?

   b.      Who are the parties and what are their roles?

---

[1]   These observations and statements outline what I believe to be certain "universal truths" about lending, accumulated during my extensive career as a banker and lending officer. I believe these observations and statements would be ascribed to by persons with similar extensive and in-depth experience in banking. The opinions I express in this report are based in part on these observations and statements.

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 1996

    c.      What are the key risks and mitigants?

    d.      Why is the bank doing this transaction?

Once the bank has answered these questions regarding the rationale and structure of the transaction, it is ready to begin the credit analysis.

4.      Credit analysis determines the creditworthiness of a borrower and guarantor, as well as compliance with policies and the value of collateral or other forms of loan support. The definition of creditworthiness is a measure of a borrower's ability and willingness to repay a loan at maturity.  The procedure for determining creditworthiness includes:

    a.      <u>Qualitative Assessment</u> to determine the borrower's and guarantor's managerial ability, technical competence, track record, character and reputation, including by obtaining references from other lenders;

    b.      <u>Financial Analysis</u> to determine the quality and amount of the borrower's and guarantor's earnings, cash flow and liquidity, debt service capacity and the strength of the borrower's and guarantor's balance sheet;

    c.      <u>Collateral Evaluation</u> to determine whether one or more forms of collateral (e.g., real estate or  personal property) can be liquidated to repay the loan in the event of default by the borrower;

    d.      <u>Due Diligence</u>:

        i.      to investigate the feasibility of the transaction,

        ii.      to analyze how the potential borrower does business, and

        iii.      to check for past or pending legal proceedings; and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 1997**

e.   <u>Risk Evaluation</u>:

i.   to analyze the borrower's future financial performance, including forecasts, financial ratios and sensitivity analyses, and

ii.   to identify all other significant risks, including forecasted economic environment.

All these factors are considered in light of the bank's mission and strategies, appetite for risk, limitations and the overall appropriateness of entering into the transaction.

5.   A lender's goal is to make loans that will achieve the needs of the borrowers; at the same time, lenders expect to earn a profit while avoiding undue risks that might jeopardize full and timely repayment of the loan.  Determining the potential risks, while assessing the severity, probability, and estimated costs of those risks, is critical to prudent banking.  Prudent bankers structure loans to minimize risk.

6.   All regulated banks must have a formal documented credit process used to determine whether a loan is sound and a borrower is "creditworthy."  Key to this process is a set of lending policies that gave loan underwriters direction in identifying risks, obtaining relevant information, analyzing credit risks, and determining whether or not to make the loan.   The summation of this work is the credit memorandum that follows a standard format used by most lenders.  The credit memorandum should not be a sales tool.  It should be objective, accurate and honest in summarizing all information and detailing the risk analysis pertaining to the particular loan.  It should contain all information material to the credit decision being made.

7.   When considering a loan, prudential banking requires the bank to identify at least two alternative plans for repayment to account for unexpected events and alternative ways

8

of resolving the loan.   A banker must be prepared for the unexpected and should act to protect against loss by identifying alternative sources of repayment.

8.   "Red Flags" must be identified and addressed.  Starting during the loan evaluation and approval process, and continuing after a loan is committed and disbursed until final repayment is obtained, bankers should be on the lookout for "red flags" that may signal existing or potential problems with the loan.

9.   A banker should avoid entering into unfamiliar transactions such as lending outside of its approved lending area or making loans secured by collateral that the bank typically does not lend against.  A bank can get into trouble when the bank's loan approvers fail to recognize risks because they did not understand or know how to deal with one or more aspects of a borrower's business or the specific transaction.

10.   At all times, bankers should maintain a "healthy skepticism" regarding financial information presented to them, especially if the information is provided by the borrower.  Sound banking practice dictates independent analysis and verification of individual financial information.   Conflicting, unclear, or facially questionable information from a borrower or guarantor requires additional investigation and analysis. It is not healthy skepticism to assume that because a borrower previously repaid a loan that the borrower's financial condition is permanent or the market will not change.

11.   A bank's officers and directors set the tone for a bank's credit process.  They owe the bank duties of care, obedience, and loyalty.   Officers and directors need to be independent thinkers and good questioners, not rubber stamps.  If they cannot make an informed decision, they should postpone the decision until adequate information is available.  They must be objective and independent when addressing the bank's affairs.

9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 1999**

Directors are ultimately accountable to the bank's shareholders and other stakeholders – employees, depositors, community, and regulators – for its safe, sound, and efficient operation.  They should ask management the questions and elicit the facts necessary to satisfy themselves that management's recommendations are feasible and in the bank's best interest.

12.     It is critical to remember in evaluating a loan that cash is the only form of payment that can repay the bank's loan.  Guarantees, collateral and other forms of credit support, or "credit enhancement," are backstops and are only valuable to the extent they can be converted into cash.

13.     The loan officer and loan approvers should make sure to follow the Bank's lending policies, regulatory requirements and safe lending practices.  Exceptions, when permitted, should be clearly identified, fully discussed, justified and approved only when there are significant countervailing strengths supporting the loan.

14.     A loan must be closed consistent with the terms of the loan approval.  Loan documentation should be complete in all respects and appropriate to the type of transaction.  These requirements should be consistently and rigorously enforced in order to protect the Bank.

15.     The above lending standards are not all-inclusive, but are examples of minimum prudent lending standards.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2000**

RELEVANT CONSIDERATIONS SPECIFIC TO UNITED WESTERN BANK

1.     Economic Environment

a)     As reflected below, the Approvers[2] received a number of communications regarding macroeconomic issues presenting challenges to banks and borrowers in Colorado and nationally.  For example:

(1)     On July 25, 2007, Codori, Petak, Snider, Sterett, and Wetzel were among numerous Bank employees who received or forwarded an email message from equity research analysts regarding Centennial Bank Holdings, Inc. The equity research analysts stated in their email, "Centennial is yet another victim of the soft housing market. . . . We have very few details about the nature of the bank's current batch of problem loans, except that they are predominantly residential construction and development loans. Colorado has been one of the most problematic housing markets in the country in recent years."[3]

(2)     A September 13, 2007 loan modification memo regarding the loan known as "AZCO II" (discussed below) noted that there was "Turmoil in the mortgage industry" and "Softening trends in the location [Breckenridge, Colorado] and national housing markets."[4]

(3)     At a Board meeting on December 13, 2007, Wetzel commented that the 2008 projected community bank loan growth was a stretch given the

---

[2]     The "Approvers" are Charles J. Berling ("Berling"), James H. Bullock ("Bullock"), Anthony C. Codori ("Codori"), Bernard C. Darre ("Darre"), Gary G. Petak ("Petak"), William D. Snider ("Snider"), Cindy J. Sterett ("Sterett"), John S. Umbaugh ("Umbaugh"), and Scot T. Wetzel ("Wetzel").

[3]     FDIC-R-UNWB-0093654_003 & 004.

[4]     FDIC-R-UNWB-0030417_002.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2001**

current economy and competitive factors.  Berling, Bullock, Darré, Petak, and Snider were all in attendance in person or via teleconference.[5]

(4)    On April 1, 2008, Snider forwarded an email from Nautilus Capital to Petak.  The email from Nautilus Capital stated, "Increased regulatory scrutiny, tighter credit markets and declining real estate prices will make for a challenging year ahead."  In addition, the email stated that "fallout from the residential markets has started to infiltrate the commercial side as well."  With respect to regulatory scrutiny, "global cash flow and debt service coverage are hot button issues."  The email continued, "In January [2008], commercial real estate prices . . . dropped for the third consecutive month. . . . THERE WILL BE A CORRECTION." (Emphasis in original).[6]

b)    This evidence shows that the Approvers knew that loans connected with the real estate and housing markets presented growing risks.  This situation made the loans discussed below even more risky and unjustifiable from the standpoint of safe and sound lending practices.

c)    The FDIC has for years stressed the importance of attention to economic conditions in making lending decisions: "Lack of Attention to Changing Economic Conditions.  Economic conditions, both national and local, are continuously changing, management must be responsive to these changes.  This is not to suggest that lending policies should be in a constant state of flux, nor does it suggest that management should be able to forecast totally the results of

---

[5]   FDIC-R-UNWB-0194096_009.

[6]   FDIC-R-UNWB-0179965_002.

12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

economic changes.   It does mean, however, that bankers should realistically evaluate lending policies and individual loans in light of changing conditions. Economic downturns can adversely affect borrowers' repayment potential and can lessen a bank's collateral protection.   Reliance on previously existing conditions as well as optimistic hopes for economic improvement can, particularly when coupled with one or more of the causes and sources of loan problems previously mentioned, lead to serious loan portfolio deterioration."[7]

d)   The Subject Loans were approved despite the inherent risk to these types of loans of changing economic and market conditions.   In my opinion, this was an extraordinarily risky course of action.   Although several of the write-ups for the Subject Loans mentioned the economic and housing downturn, they included little if any substantive discussion of risks to loan repayment as a consequence of deterioration in market conditions.   This was an especially critical omission in those cases where the primary source of repayment had been identified as sale of speculative real estate.   In view of the softening economy and the weak features of all these loans, the Approvers should not have made these loans.

2.   The Loan Policy and Underwriting Process

a)   A bank has an obligation to its stakeholders – shareholders, depositors, community, and deposit insurer, the FDIC – to carry out its lending activities in accordance with the standards of care described above and other banking industry laws, regulations, customs, practices and standards, including the "5 C's of

---

[7]   FDIC, Risk Management Manual of Examination Policies, Section 3.2 – Loans, Other Credit Issues, Loan Problems, Lack of Attention to Changing Economic Conditions, Updated 02/02/2005.

13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2003

Credit."[8]   To assist in carrying out this obligation, the Bank had written policies to guide its lending process and to ensure compliance with such laws, regulatory guidelines and banking standards.   These written policies were included in a loan policy manual ("Loan Policy") put into place by the Bank's board of directors to ensure that safe and sound lending practices were followed.   Every FDIC-insured bank has such a manual.   In my experience, all such manuals contain similar provisions in greater or lesser detail.   Effectively managed and successful banks are those that understand the importance of these policies and adhere to them unfailingly absent strong, documented mitigating circumstances justifying a policy exception.   Conversely, most banks that fail have non-existent or poorly followed loan policies.

b)   In this case, the Bank's own standards and policies frequently were not followed. The Bank's Credit Policy Manual states *"[i]t is the ultimate responsibility of the Board of Directors of the Bank to oversee the safe and sound operation of the Bank."*[9]   Further, *"[i]ncluded in management's commitment is the assurance regarding the reliability and integrity of information and compliance with laws, regulations, and internal policies and procedures."*[10]   Because the Bank was chartered by the Office of Thrift Supervision ("OTS"), the principal applicable external standards included rules and regulations issued by the OTS, the Federal

---

[8]   The "5 C's of Credit" is a common term in banking.   The "C's" are <u>Character</u>, <u>Capacity</u>, <u>Collateral</u>, <u>Capital</u> and <u>Conditions</u>.   "Character" refers to the personal character and integrity of the borrower's management; "Capacity" refers to the borrower's and/or guarantor's ability to pay a specific obligation when due; "Collateral" refers to specific property, securities or other assets pledged by a borrower as a secondary source of loan repayment; "Capital" refers to the net worth, capital investment or owner's equity in the borrower; and "Conditions" refers to both the specific terms of the loan and to economic or other external conditions.

[9]   Loan Policy, Section 1302.

[10]   Loan Policy, Section 1305.

14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2004**

Financial Institutions Examination Council (FFIEC), the Federal Reserve Board of Governors, and the FDIC. The Approvers failed to follow prudent lending practices in evaluating and approving each of the Subject Loans. These failures included the failures detailed below.

c)     Pursuant to the Bank's Loan Policy, the Approvers were responsible for overall credit functions. The process of creating a safe and sound loan portfolio requires care and attention. Solid underwriting is fundamental to sound lending. The Approvers permitted loans to be presented for approval that were not properly underwritten and that did not comply with the Loan Policy. This practice violated safe and sound lending practices and deviated from the appropriate standard of care. Despite clear deficiencies in the loan presentations, the Approvers failed to decline these risky loans in violation of banking standards, regulatory requirements and Bank policies.

d)     In my review of the Subject Loans at the Bank, I found repeated failures to adhere to appropriate lending standards and the Bank's own loan policies. As a whole, the credit process was not carried out with the required discipline to be expected of a concerned banker. The checks, balances and internal controls normally present in banks were absent. Here, the Approvers ignored obvious red flags that a responsible and prudent banker would not ignore. In my opinion, by their failure to demand policy compliance the Approvers acted irresponsibly and well outside the bounds of reason.

e)     This report deals with eleven "Subject Loans," all of which were approved by the Approvers and all of which contained multiple violations of the Bank's loan

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

policies and safe lending practices.   In my opinion, each Loss Loan was so imprudent that it was well below the standard of care.  The Approvers must have known that they were subjecting the Bank to a serious danger of significant losses and disregarded the consequences to the Bank of the loans.

3.   Speculative Loans

a)   The Bank's Commercial Real Estate Loan Policy states "When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."[11]  "A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."[12]  "It is also exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."[13]  Speculative loans were, understandably, an exception to bank policy.

b)   In the Subject Loans, the Approvers approved speculative loans without complying with their heightened obligation to evaluate and understand the loan and ensure that very strong mitigating circumstances offset the risks of the loan.

4.   Prohibited Loans

a)   According to Bank policy, loans *"lacking a clearly defined primary source of repayment"* are "Prohibited" (2006 Credit Policy, Section 102.1.6).

---

[11]   Loan Policy, Section 500.1.

[12]   Loan Policy, Section 500.6, 500.9.

[13]   Loan Policy, Section 100.2.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2006**

5.   Guarantees

a)   The OCC recommends: "If the loan has a guarantor, a bank should obtain information on the guarantor's financial condition, income, liquidity, cash flow, contingent liabilities, and other relevant factors to evaluate the guarantor's financial capacity to fulfill the obligation if the borrower defaults on the loan."[14] Bank policy requires that a guarantee from a "financially responsible guarantor" have the following attributes: (1) "[t]he guarantor must have both the financial capacity and (2) willingness to provide support for the credit. (3) The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term."[15]   In other words, the guarantor must be able to repay the loan if the project fails.

b)   In the event of default on risky loans, the guarantee would be a secondary source of repayment. Because a guarantee is an important source of repayment of a loan, the Bank must have sufficient information on the guarantor's financial condition, income, liquidity, cash flow, contingent liabilities, and other relevant factors (including personal credit ratings) to demonstrate the guarantor's financial capacity to fulfill the obligation.   In most of the Subject Loans, information and analysis included in the loan presentation was insufficient to determine whether these guarantors could carry the loan or, even worse, the information showed that the guarantors could not carry the loan.

c)   The Federal Reserve Board states: "Partners/guarantors generally have investments in other projects included as assets on their financial statements. The

---

[14]   OCC, Real Estate and Construction Lending, November 1995, page 14.

[15]   Loan Policy, Section 200.4.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2007**

value of these investments frequently represents the partners'/guarantors' own estimate of the investments' worth, as opposed to a value based upon the investments' financial statements.  As a result, it is necessary to obtain detailed financial statements for each investment to understand the partners'/guarantors' complete financial picture and capacity to support the loan."[16]

d)   Where the primary repayment source is speculative, it is critical to carefully scrutinize financial information supplied by guarantors, particularly when the credit memorandum contains discrepancies or inconsistencies regarding that information.

e)   In none of the Subject Loans were the guarantees so strong as to justify the highly speculative primary sources of repayment.

6.   Collateral and Appraisals

a)   Unless a borrower's credit is so strong that the loan can be made on an unsecured basis, an expected secondary source of repayment for a loan is a security interest in some property, i.e. collateral.  In loans relating to real estate, the real estate is usually collateral.  However, under Bank policy and safe and sound lending practices, *"Collateral is not a substitute for the borrower's ability to repay."* Rather, *"collateral is a secondary source of repayment."*[17]  This means that, except in very unusual situations where the loan amount is only a small percent of the value of the collateral, collateral cannot provide the justification for a loan whose primary source of repayment is speculative.

---

[16]   FRB Commercial Bank Examination Manual, section 2100.1, May 2004.

[17]   2006 Loan Policy, Section 100.2.4.

18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2008**

b)   There are many reasons for this.  For example, the value of the collateral can change, often dramatically, between the time of the appraisal and the time a default occurs and the bank has to foreclose on the collateral.  Furthermore, it can be costly and time consuming for the bank to try to convert the collateral into cash.

c)   "[M]ost real estate-related financial transactions over the appraisal threshold [$250,000] are considered federally-related transactions and, thus, require appraisals."[18]  Regulations further require that "the appraisal must: Be written and contain sufficient information and analysis to support the institution's decision to engage in the transaction."[19]  Accurate appraisals ensure that the best judgment of the value of the loan collateral is considered in the calculation of the loan-to-value ratio ("LTV").  The appraised value of the properties being put forward as collateral for a loan is an important indicator in evaluating risk in the transaction.

d)   As discussed below, there were several obvious problems with the appraisals for the Subject Loans that prevented them from justifying the loans' speculative primary source of repayment.  A responsible banker would have ensured the Bank had adequate collateral coverage before approving the loan.

e)   The importance of an appraisal review is to ensure that the appraiser carried out the assignment in accordance with the Bank's objectives and that any deficiencies or unaddressed risk factors are identified.  Bank policy states "…*required appraisal reviews for real estate loans shall be completed in the course of the*

---

[18]   Interagency Appraisal and Evaluation Guidelines, VII. Transactions that Require Appraisals.

[19]   Interagency Appraisal and Evaluation Guidelines, VIII. Minimum Appraisal Standards.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2009

*underwriting process before the loan commitment is closed and funded.*"[20] Regulatory guidelines <u>require</u> that all appraisals undergo a compliance review "*prior to a final credit decision.*"[21]  Further, regulatory standards state: "*…a final credit decision or action should only occur after the regulated institution receives, reviews and accepts the appraisal.*"[22]

7.   <u>"Hard Equity"</u>

a)   The OCC has stated "other indications of potential or actual difficulties in a bank's commercial real estate portfolio may include . . . loans with no or minimal borrower equity."[23]

b)   Failure of a borrower to "have skin in the game" is a red flag.  Experience in the industry shows that borrowers whose own investments are not at risk are less likely to honor loans when faced with significant debt service shortfalls.[24]

c)   "Hard equity" – skin in the game – is a borrower's tangible equity invested in a property, including cash, unencumbered real estate, e.g., land, and materials for improvements.[25]

d)   In several of the Subject Loans, the borrowers had little or no apparent equity – a violation of regulatory guidelines and prudent lending practices because the

---

[20]   Loan Policy, Section 1000.11.2.

[21]   FDIC, Financial Institutions Letter, FIL-84-2003, Independent Appraisal and Evaluation Guidelines, October 27, 2003.

[22]   FDIC, <u>Frequently Asked Questions on Appraisal Regulations and Interagency Statement on Independent Appraisal and Evaluation Functions,</u> March 22, 2005.

[23]   OCC, Comptroller's Handbook, Real Estate and Construction Lending, Warning Signs for Problem Real Estate Loans, November 1995, page 20-21.

[24]   FDIC, Risk Management Manual of Examination Policies, Sect. 3.2, <u>Loan Problems, Poor Selection of Risks</u>; 12 CFR § 365.2, <u>Inter-agency Guidelines for Real Estate Lending Policies,</u> November 17, 2009.

[25]   OCC Comptroller's Handbook, Safety and Soundness, Commercial Real Estate Lending, Appendix C, August 2013, p. 122.

20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

borrower had little or nothing to lose if the project failed.  It is important for prudent lending that the borrower – not just the lender – share in the risks of the project.

8.   Unjustified Policy Exceptions

a)   The FDIC has issued the following instruction as it relates to compliance with guidelines for real estate lending policies found under Appendix A to Part 365: "*Exceptions to Policy – The board of Directors is responsible for establishing standards for reviewing and approving exceptions to loan policy.  The approval of any loan that is an exception to policy should be supported by a written justification that clearly sets forth all of the relevant credit factors supporting the underwriting decision.*"[26]  The OCC has also observed: "*Policy and underwriting exceptions are conditions in approved loans that violate the loan policy or underwriting guidelines.  Because underwriting guidelines are the primary means by which the bank steers lending decisions toward planned strategic objectives and maintains desired levels of risk within the portfolio, deviations from these guidelines should be well documented and justified . . . the loan approval document should clearly identify exceptions and provide mitigants that justify the decision to underwrite.  This information should be kept in the permanent loan file . . . . An excessive volume or a pattern of exceptions may signal an unintended or unwarranted relaxation of the bank's underwriting practices.*"[27]  Bank loan policy requires "*the loan write-up will identify the exception on the face page and*

---

[26]   FDIC, Financial Institution Letters, Acquisition, Development, and Construction Lending, FIL-110-98, October 8, 1998.

[27]   OCC, Comptrollers' Handbook, Loan Portfolio Management, April 1998, pages 26-27.

21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*state the reason(s) for granting the exception.  The relevant credit factors that justify granting the exception should be clearly identified."[28]*

b)     There may be occasional situations where it is appropriate to make a loan that is not in keeping with a particular loan policy.  Those circumstances, however, must be exceptional, i.e., a situation where special circumstances offset the risk created by the deviation from policy.

c)     In addition, prudent lending practices require that any policy exception be specifically identified, discussed, justified, and documented to make sure that proper attention is given to the fact that some aspect of the loan departs from the policies that have been set up to ensure safe and sound lending practices.  Only that way can loan committee members make a truly informed and responsible decision about policy exceptions.

d)     In all of the Subject Loans the primary source of repayment was speculative but was not indicated on the NCR as an exception.  These loans were not justified or approved as exceptions.

9.     <u>Risk Gradings</u>

a)     The assignment of a loan classification or risk rating to each credit is an essential component of a bank's recognition and management of risk.  The FDIC has stated: "*Loan classifications are expressions of different degrees of a common factor, risk of non-payment.*"[29]  The OCC has stated "*Effective risk identification starts with the evaluation of individual credits.  Rating the risk of each loan in*

---

[28]   Loan Policy, Section 100.2.5.

[29]   FDIC, Risk Management Manual of Examination Policies, Section 3.2 – Loans, Other Credit Issues, Loan Problems, Lack of Attention to Changing Economic Conditions, Updated 02/02/2005.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2012**

*timely credit evaluations is fundamental to loan portfolio management.*"[30] Accurately gauging individual loan risk is an important tool for pricing, estimation of the risk of loss for each loan and determining the overall risk of loss in the loan portfolio. A bank's loan loss reserve, Allowance of Loan and Lease Losses ("ALLL"), is calculated, in part, based on each loan's rating. For example, a loan rated "5" on a scale of 10 is considered more risky and therefore requires a larger loss reserve than a loan rated "4." When a certain risk grade is exceeded, a new loan (as opposed to a renewal or modification) cannot be made.

b) Typically, the bankers who prepare the loan write-up also assign the loan's initial risk rating as part of the presentation package. However, the FDIC cautions: "*…given the importance and subjective nature of loan classification or credit grading, the judgment of an institution's lending staff regarding the assignment of particular classification or grades to loans should be subject to review by: (i) peers, superiors or loan committee(s); (ii) an independent, qualified part-time or full-time employee(s); (iii) an internal department staffed with credit review specialists; or (iv) qualified outside credit review consultants.*"[31] Bank policy states: "*The Board of Directors is ultimately responsible for the adoption of an effective asset classification system. . . . The individuals directly responsible for the internal asset review are the Loan Review Officer, Asset Manager's and Chief Credit Officer and CFO, collectively referred to herein as 'Asset Review.'*"[32]

---

[30]   OCC, Comptroller's Handbook, Loan Portfolio Management, April 1998, page 22.

[31]   FDIC, Interagency Policy Statement on the Allowance for Loan and Lease Losses, Loan Classification or Credit Grading Systems, 1993.

[32]   Loan Policy, Section 200.2.1.

23

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2013**

c)     Different types of lending have their own distinct components to be considered when rating a loan. Regulatory guidance states: *"When crafting internal guidelines for ADC and other real estate lending programs, the board should carefully consider the Interagency Guidelines for Real Estate Lending Policies, which can be found under Appendix A to Part 365"*[33] *which include:*

- *The capacity of the borrower, or income from the underlying property, to adequately service the debt.*

- *The value of the mortgaged property.*

- *The overall creditworthiness of the borrower.*

- *The level of equity invested in the property.*

- *Any secondary sources of repayment.*

- *Any additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments).*

- *Loan to value limits.*

- *Feasibility studies and sensitivity analyses;*

- *Minimum initial investment and hard equity maintenance requirements;*

- *Minimum standards for net worth, cash flow, and debt service coverage of the borrower or the underlying property;*

- *Standards for the acceptability of, or limits on, non-amortizing loans and interest reserves;*

- *Pre-leasing and pre-sale requirements;*

---

[33]   FDIC, FIL 110-98, Acquisition, Development and Construction Lending, October 8, 1998.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2014**

- *Limits on partial recourse or non-recourse loans and requirements for guarantor support;*

- *Requirements for take-out commitments; and*

- *Minimum covenants for loan agreements.*[34]

The Risk Grade Descriptions set forth in the Bank's Asset Classification Policies do not track these considerations and are, therefore, not applicable to real estate loans. Instead, the criteria established refer to "Commercial Loan Ratings," rather than criteria or characteristics of real estate loans. An appropriate system would have used a risk description gauged to the specific risks of real estate loans, similar to the risks addressed in underwriting such loans.

d)   At origination, each of the Subject Loans was graded no better than "5-Acceptable." The criteria for this grade are included in the Bank's loan policy manual.[35] However, other than repeating the LTV maximum, the published criteria do not include risks attendant to real estate loans, including potential weaknesses 1) that the first source of repayment is speculative, 2) that there may be unsubstantiated value of the collateral and 3) that the guarantor's financial condition may be weak – all of which are serious structural flaws and potential sources of trouble. There was a declaration, but very little substantive analysis, in each credit memo demonstrating how each loan met the criteria for a Grade 5. In my view, these declarations were not relevant to the loans being presented because the criteria for grading that was used in the analysis was not directly relevant to evaluating the risk of these loans.

---

[34]   FDIC, 12 CFR Part 365, Real Estate Lending Standards.

[35]   2006 Loan Policy, Section 200.4.5.

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

e)   Had the loan classification criteria reflected industry standards contained in regulatory guidance and had the ratings been reviewed by a qualified, independent loan review officer, it is my opinion that the loans would have been graded no better than "6 – Watch" because each exhibited high risk, lack of creditworthiness, uncertainties in financial strength and high sensitivity to economic cycles.  It is important to note that by the Bank's definition, a Grade 6 loan *"includes credits designated for management attention due to higher risk,"* and *"[f]inancial trends, specifically sales and net income may be unstable."* **"New loans will not be underwritten to the standards of this grade."**[36]  In other words, a new loan had to be graded at least 5 to be considered for approval.  Presumably, if none of the Subject Loans had been graded at least "5," and the Approvers had respected the Bank's policies, none of these loans would have been approved.

## IV.   <u>METHODOLOGY</u>

I was requested by Counsel to apply my training, my years of experience in banking, and the information I have reviewed as of the date of this report to evaluate the loan recommendation and approval decisions made by the Approvers on the Subject Loans.  Based on the documents and information available to the Approvers, I was asked to opine to a reasonable degree of certainty as to:

- Whether the credit memoranda and documents prepared for the Approvers provided sufficient information to reach an approval decision;

- Whether the Approvers took reasonable steps to inform themselves;

---

[36]   2006 Loan Policy, Section 200.4.6.  (Emphasis Added).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2016**

- Whether the Approvers followed prudent banking practices, including compliance with the Bank's own loan policies and applicable regulatory guidance; and

- Whether the Approvers exercised appropriate care in their approval decisions, and whether those decisions were consistent with prudent lending standards.

I was asked by Counsel to provide a report of my opinions on each of the Subject Loans according to the criteria enumerated above as well as to provide my overall opinions regarding the approvals of the loans.  My approach and methodology in performing this assignment was to evaluate each of the Subject Loans according to industry standard practices, regulatory guidance, and the Bank's written policies applicable at the time:

*Purpose of Loan*: Was there a valid and clearly stated loan purpose that conformed to reasonable and prudent lending practices?

*Primary & Secondary Repayment Sources*: Was the primary repayment source clearly identified, available, and structured to be representative of the cash flow/collateral proposed? Was there a reliable secondary source of repayment?  Were these repayment sources sufficient and reliable enough to justify the extension of credit?

*Adequacy of Collateral*: Was the value and quality of the collateral sufficient and appropriate?

*Borrower/Guarantor Support*: Did the borrowers and guarantors provide sufficient support for the loan, and were their financial resources adequately analyzed both individually and as a group?  Were "global" or overall cash flow projections obtained and analyzed?

*Underwriting Structuring Process*: Were the loan structure and terms appropriately adapted to the level of risk identified?  Were identified risks properly mitigated either through the loan structure and/or additional collateral or pledges?

27

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2017**

*Approval Actions*: Should the Approvers have recommended and approved the subject loans, given the totality of the information and analyses available at the time?

For the purposes of my analysis, I understand that the Approvers had available to them, at a minimum, the New Credit Requests and/or Loan Modification memoranda, as well as industry and market data available to the Approvers independent from any information provided or omitted from the credit memoranda.

I have reviewed the credit memoranda and other materials available to the Approvers, and the other information set forth in greater detail in this Report and in Appendix C.

## V.     DETAILED OPINIONS ON THE SUBJECT LOAN TRANSACTIONS

This section sets forth my detailed opinions with respect to each of the Subject Loans.

### A.     AZCO II, LLC

**Loan Details**

- Approval Date: Commitment initially approved 12/4/06. Loan modification approved 9/20/07.

- Approvers: Codori, Petak, Snider, Umbaugh, Wetzel (ELC); Berling, Bullock, Darré, Petak, Snider, Wetzel (DLC)

- Borrower:  AZCO II, LLC, a single-asset entity established in 8/2006 to acquire and develop the subject property. Ownership was 60% Mesatex, LLC and 40% individuals.

- Loan Amount:  Initially $6,935,250 (participation in a $19,815,000 loan led by Bank Midwest); increased to $12,000,000 (part of a total $24,000,000 loan) on 9/20/07.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2018**

- Purpose:  According to the Bank's 11/17/06 NEW CREDIT REQUEST ("NCR"), "*Subject request is to participate in the loan approved by Bank Midwest to finance the Borrower's purchase of the subject property and to construct 126,800 square feet of improvements including a lodge, condominiums and townhomes.*" According to the 9/13/07 LOAN MODIFICATION ("LM"), the loan was increased to accommodate higher pre-development expenses associated with a change in project scope resulting from discussions with the Town of Breckenridge.

- Guarantors:  John Niemi, Robert Veratti, Steve McKeever, Richard Cross, and Loren Gerch.

- Term of Loan:  24 months.

- Pricing:  Interest Rate: Prime rate, Fee: 0.75%

- Collateral:  1st DOT on 9.56 acres in Breckenridge, CO, known as the Shock Hill property; UCC's on construction material and assignment of contracts.

- Appraisal(s):  8/17/06: $27,200,000 (Colorado Capital Bank by Rocky Mountain Valuation Specialists); 8/15/07: $32,000,000 as proposed, $30,000,000 as is (National Valuation Consultants, Inc.)

- Appraisal Review:  None indicated.

- LTV:  2006: 72%; 2007: 75% based on as proposed appraisal

- Interest Reserve:  $1,700,000 to cover 13 months interest.

- Repayment Sources:  Per 11/17/06 NCR: "*Primary: Sale of townhome units; Secondary: Sale or refinance of subject property; Tertiary: Call on Guarantor's assets.*" Per 9/13/07 LM: "*Primary: Construction Loan; Secondary: Sale or refinance of subject property; Tertiary: Call on guarantor's assets.*"

29

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Recommended Loan Grade:        5

- Purpose of Modification:  (1) to assume Lead Bank role from BMW; (2) to increase total loan commitment to $24 million; (3) to increase UWB's commitment to $12 million.

- Loan Officer:  Margie Joseph

## Overview

AZCO II involved an original loan and loan modification to finance the acquisition and development of speculative ski resort properties in Breckenridge, Colorado.  Substantially adding to its speculative nature, the original loan's primary source of repayment depended on, among other things, the borrower obtaining a to-be-determined construction loan in a situation where zoning/site approval issues remained unresolved.  In fact, the City of Breckenridge did require major changes to the project which increased the required construction loan from $9,000,000 in the NCR to as much as $95,000,000 in the LM. The Approvers did not make obtaining a construction loan commitment a condition of the loan or loan modification. Instead, it appears they assumed that a JP Morgan Chase term sheet for a potential construction loan of as much as $95,000,000 would, months later, become an actual commitment. The secondary source of repayment was the sale or refinance of the property which, absent a commitment, is also inherently speculative. Reported loan-to-value was not conservative, but rather at the maximum provided for in the loan policies for a loan of this type, and thus did nothing to mitigate the exception for a highly speculative primary source of repayment. Among other problems with the tertiary source of repayment, the guarantees, ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

30

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████ No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

1.    <u>The Identified Primary Source of Repayment Was Highly Speculative</u>

Bank policy states: *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."* (2006 Loan Policy, Section 500.1). *"A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2006 Loan Policy, Section 500.6). *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2006 Loan Policy, Section 102.1.2). *"It is also an exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2006 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2006 Loan Policy, Section 102.1.6).

This loan was especially risky and a clearly unjustified exception to the loan policies. The potential future sale of properties to unidentified end users was speculative and prohibited under the loan policies. The Bank was speculating that the marketplace would produce buyers at some

31

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2021**

future date.  The NCR and LM demonstrates that the borrower could not have qualified for the loan or loan modification on an unsecured basis.

This situation was made worse by the fact that the sale of properties depended on unresolved zoning and site approval issues, and the borrower obtaining an undetermined multimillion-dollar construction loan. However desirable ski properties in Breckenridge might be, they cannot be sold if they are not constructed. The NCR expressly recognized that *"final site approval is not yet complete"* and the City was contemplating condo rather than townhome construction. In addition, as of the NCR, a potential construction facility was merely "a TBD future Construction Facility." At the time of the LM, approximately nine months later, the borrower still had not obtained a construction loan. In addition, the City had insisted on a different scope of project, requiring a construction loan of up to $95,000,000.   In the LM, a $95,000,000 future construction loan, to be obtained in the first or second quarter of 2008 (four to nine months after approval), became the identified primary source of repayment. The Approvers assumed that JP Morgan Chase, which had not committed to the massive construction loan, would do so in the future. This was reckless. Safe and sound lending practices required that the Approvers not approve a multimillion-dollar loan that hinged on a separate multimillion-dollar construction loan without the borrower obtaining a commitment on the construction facility. In effect, the Approvers made the success of the Bank's loan dependent on JP Morgan Chase or some other unidentified construction lender becoming satisfied that the borrower should receive an additional $95 million in financing. Yet the Approvers could have had no meaningful insight into whether JP Morgan Chase (let alone an unidentified alternative lender) would commit to such a massive loan. Safe and sound lending practices required that the Approvers condition the Bank's loan upon the borrower obtaining a construction commitment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2022

2.      The Identified Secondary Source of Repayment Cannot Justify An Exception

Neither the identified secondary source of repayment nor any other factor remotely justified the policy exceptions discussed above.  The secondary source of repayment was to be the sale or refinance of the subject property.  But this was just as speculative as the primary source of repayment. No identified buyer existed for the property. No re-financing commitment existed. While a low loan-to-value ratio might be a mitigating circumstance making it likely that the property could be sold at a price high enough to repay the loan, the ratio here was not low, it was at the maximum allowed in the loan policies for loans of this type.  As a result, the ability of any future sale of the property to repay the loan would be subject to substantial market risk. The secondary source of repayment, therefore, was not strong enough to be a mitigant justifying an exception given the riskiness of the primary source of repayment.

3.      The Identified Tertiary Source of Repayment Cannot Justify An Exception

The identified tertiary source of repayment, the guarantees of five individuals, also cannot justify the loan.

Bank policy states: "*A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and willingness to provide 2. support for the credit. 3. The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable.*" (2006 Loan Policy, Section 200.4). The Federal Reserve Bank states: "*A loan to a single-asset entity is often predicated upon the strength of the partners/guarantors.  Accordingly, understanding their financial strength, which frequently is made up of various partnership interests, is key to assessing the project's strength.  In this example, it would be necessary to obtain financial information on the partner's/guarantor's other projects, even those not financed*

33

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2023

*by the bank, to understand their overall financial condition*"[37].  Although the credit memoranda listed "*Call on Guarantor's assets*" as the tertiary source of repayment, 

In addition, the Bank appears to have failed to develop an understanding of current and projected "global" cash flows, the combined cash flows of the Borrower, Guarantor and any closely affiliated companies.  Such cash flow analyses are widely used by lenders and strongly recommended by bank regulators.  Neither the NCR nor the LM demonstrated that the reported liquidity and global cash flows could independently pay interest and repay loan principal.

If the project were unsuccessful—which is when a tertiary source of repayment is needed—that value would not exist.  Further, there is no indication in the NCR that the stated assets of the Guarantors were verified; hence, the Guarantors' net worth could not be confirmed.  Without independent confirmation of all or a substantial portion of these assets it is not possible to determine whether the stated amounts would be sufficient and potentially available to support their guarantees.  Hence, the guarantees were not a reliable source of loan repayment.

---

[37]   FRB, Commercial Bank Examination Manual, November 2005, page 4.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2024

In the absence of a demonstration that the Guarantors had cash value that would have been available to repay the loan, the Approvers cannot have relied on them as a source of loan repayment.

Furthermore, the OCC states "*if the loan has a guarantor, a bank should obtain information on the guarantor's financial condition, income, liquidity, cash flow, contingent liabilities, and other relevant factors to evaluate the guarantor's financial capacity to fulfill the obligation if the borrower defaults on the loan.  The bank also should investigate the number and amount of the guarantees currently extended by a guarantor to determine whether the guarantor has the financial capacity to satisfy all existing contingent claims.*"[38]  There is no indication that the Bank did an analysis to confirm the Guarantors' liquidity and the NCR stated as such: "*Liquidity was not verified*" (NCR, page 2).  There is no indication that the Bank investigated the Guarantors' contingent liabilities and the NCR stated as such: "*their contingent debts are unknown.*" (NCR, page 2).

It is also noteworthy that Bank policy "*generally requires that all primary and/or majority stockholders guarantee loans to corporations.*" (2006 Loan Policy, Section 100.2.5).  Yet the Bank did not obtain the guarantee of Mesatex, LLC, AZCO II's 60% owner.  Nor does the NCR note this failure as a policy exception or attempt to justify it.

## B.    HIGH PRAIRIE

### Loan Details

- Approval Date:  The Bank's NCR, dated 10/16/06, was initially approved on or about 10/30/06 for $24,500,000; a second NCR, also dated 10/16/06, for $4,775,000 was

---

[38]   OCC, Comptroller's Handbook, Real Estate and Construction Lending, March 1998, page 14.

35

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2025

approved on 1/17/07; a third NCR, also dated 10/16/06, for $14,970,000 was approved on 2/1/07.

- Approvers: Codori, Petak, Snider, Umbaugh (ELC); Berling, Bullock, Darré, Petak, Snider, Wetzel (DLC)

- Borrower:  High Prairie Polo Construction Company, LLC ("HPPCC"), a single-asset entity established to acquire and develop the subject property. Ownership is Robert Gray entities (42%), an entity controlled by Joe Freeman (28%), and Green Serenity, LLC (30%).

- Loan Amount:   The Bank initially approved $24.5 million in credit facilities, including a $16.5 million, 18-month A&D loan and an $8 million, 24-month construction loan; as per the second NCR, the Bank extended a 60-day, $4,775,000 land loan; as per the third NCR, the Bank approved a $14,970,000 loan to refinance the land loan and provide development funds.

- Purpose:   To refinance existing acquisition debt and provide funds for site improvements.

- Guarantors:  Robert A. Gray, The Gray Group of Colorado, LLC

- Term of Loan:  18 months

- Pricing:  Interest Rate: Prime rate + 0.50%, Fee: 1.00%

- Collateral:   1st DOT and assignment of contracts, plans and specifications on the subject property.  An "Unconditional Letter of Credit" in the amount of $4 million was mentioned in the 10/16/06 NCR to be *"provided to the benefit of UWB . . . with the intent to meet the LTV requirement described in the Development Loan above"* (NCR, page 3).

36

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Appraisal:  $22,000,000 as of April 27, 2005; $27,000,000 as of March 2007.

- Appraisal Review:  March 19, 2007.

- LTV:  68% (2005 appraisal); 55% (2007 appraisal)

- Interest Reserve:  $1,028,125 for life of loan.

- Repayment Sources:  As per the NCR:  *"Primary: Interest reserve that is built into the loan would service the loan over 18 months; Lots sales will repay the balance; the 44th lot sale (73.3% of the total lots available for sale) should retire the debt; Secondary: Cash flow/liquidity of the Guarantors; Tertiary: Sale of Collateral.*"

- Recommended Loan Grade:      5

- Subsequent Modification:  (see above)

- Loan Officer:  David R. Livingston

### Overview

High Prairie was a loan to refinance the acquisition and complete the development of speculative "polo oriented" properties near Parker, Colorado. The identified primary source of repayment was the sale of lots to unknown buyers, and thus required an exception to the Bank's loan policy. No exception, however, was noted in the NCR or justified.  The situation became worse when, shortly before committee approvals, the borrower decided not to build the polo facilities that were supposed to make the development uniquely attractive until sales activity warranted it. Nor did the borrower have funding to construct the polo facilities.  The secondary source of repayment was supposed to be the cash flow and liquidity of the Guarantors. B████

███████████████████████████████████████████████████████

█████████████████████████████████ The Approvers knew ██████████████

████████████████████████████████████ In addition, the Approvers

37

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

irresponsibly deviated from the Bank's loan policies by failing to obtain guarantees from Green Serenity LLC ("Green Serenity"), a 30% owner of High Prairie, and another entity, a 28% owner. The Approvers could not rely on the tertiary source of repayment, the collateral, because the appraisals and market study of the property assumed a polo development. As of approval, no construction funding existed for the polo amenities and it was unclear whether those amenities would ever be built.  The Approvers seem to have placed great reliance on a $4 million letter of credit ("LOC").  But they did nothing to ensure that the LOC supported the loan. The LOC had not been issued at the time the loan was approved.  When it was issued, the LOC only supported obligations by Green Serenity.  But Green Serenity had no obligations with respect to the loan because the Approvers failed to get a guarantee from it.  No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices.  For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

1. The Identified Primary Source of Repayment Was Highly Speculative

Bank policy states:  *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."* (2006 Loan Policy, Section 500.1).  *"A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2006 Loan Policy, Section 500.6).  *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2006 Loan Policy, Section 102.1.2). *"It is also an exception to the policy of*

38

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2028

*the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2006 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2006 Loan Policy, Section 102.1.6).

This loan clearly met the definition of *"high risk loans, with speculative characteristics,"* that is, the sale of the properties was the primary source of loan repayment. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ As such, this was a risky loan that required a justified exception from Bank policy. The NCR and the meeting minutes approving the loans do not indicate that the Approvers recognized the need to justify any exceptions. In the section on *"Policy Exceptions"* and *"Mitigants to Exceptions,"* the NCR said there were *"None."* In the section of the approval on *"Loan Committee Additions to Approval,"* the ELC appears to have approved an exception relating to the review appraiser (without giving any justification), but said nothing about an exception for a speculative loan.

The situation was made worse by the fact that, at the last minute, before the committee approvals, the scope and nature of the project changed significantly when the borrower decided to delay construction of the polo facilities until some sales activity warranted their construction. To build the polo facilities, additional funding would be required, but none was in place. The NCR had emphasized the "unique" polo aspect of the project. For example, the nature of the business was said to include *"three (3) United States Polo Association regulation polo fields and a 60-stall horse stable."* The *"Background/Credit History"* section talked about *"the need for*

39

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*additional polo facilities in the area."*  The appraisal section even had an entire sub-section on *"The Sport of Polo."*  By the time of the approvals, however, it was not clear that the project would ever be a polo development.

      2.    <u>The Identified Secondary Source of Repayment Cannot Justify An Exception</u>

Neither the identified secondary source of repayment nor any other factor remotely justified the policy exceptions discussed above.  The secondary source of repayment was to be the liquidity and cash flow of the guarantors, Robert Gray and the Gray Group of Colorado, LLC. Bank policy states: *"A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and willingness to provide 2. support for the credit. 3. The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable"* (2006 Loan Policy, Section 200.4).  Robert Gray and Gray Group were not *"financially responsible guarantors"* as defined by Bank policy ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

40

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

In addition, Bank policy "*generally requires that all primary and/or majority stockholders guarantee loans to corporations. Exceptions are to be clearly indicated on the front page of the credit write-up.*" (2006 Loan Policy, Section 100.2.5). Guarantees were not obtained from two co-owners, the Joe Freeman entity (28%), even though, according to the NCR, Freeman was an oil investor, and Green Serenity LLC (30%). The NCR did not note, explain, or justify these omissions as policy exceptions.

The secondary source of repayment, therefore, was not strong enough to be a mitigant justifying an exception given the riskiness of the primary source of repayment.

3.      The Identified Tertiary Source of Repayment Cannot Justify An Exception

The identified tertiary source of repayment, the collateral, also cannot justify the loan.

The original appraisal on which the NCR was approved came from April 2005 and was unreliable. In addition, the appraisal was based on the hypothetical condition that polo facilities would be constructed. By the time of the approvals, the polo facilities would not be constructed unless sales activity warranted their construction and the borrower obtained funding to do the construction. After approval but before loan disbursement, the 2005 appraiser provided an updated appraisal of $27,000,000. The appraisal review, however, called into question both that appraisal and the 2005 appraisal. A subsequent market study on absorption rates – not a new appraisal – then concluded that absorption rates were likely to be somewhat lower than those used in the 2007 appraisal. Most significantly, though, the appraisal review made clear that the $27,000,000 valuation depended on the "extraordinary assumption" that the polo facilities were built. Similarly, the absorption rate in the market study depended on the extraordinary

41

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

assumption that the polo facilities would be built.  Because no financing was in place to construct those facilities, any such valuation was highly speculative and could not mitigate the risk of a speculative primary source of repayment.

Apparently recognizing the credit weakness of the loan, the Approvers seem to have relied on the $4 million LOC, which the NCR stated would have brought the LTV for the loan down to 49.9% or 56.8%, depending on how calculated (and based on the stale appraisal that assumed a polo-oriented development). For example, the NCR notes *"Credit Enhancement with L/C."*  Defendant Berling testified in his deposition that the guarantors were weak and that *"The real reliance was on the letter of credit."[39]*  Despite how important the LOC apparently was for this loan, however, the Approvers do not appear to have reviewed any actual or draft terms and conditions for the LOC, including on whose behalf it was being issued, or ensured that it met the credit's basic needs. In fact, the LOC only supported obligations of Green Serenity.  Because the Approvers violated the loan policies by not requiring a guarantee from Green Serenity, however, Green Serenity had no obligations to be supported and the LOC was useless.  The Approvers were grossly irresponsible in approving a $15 million loan in reliance on a $4 million LOC without making sure that the LOC actually provided support for the loan.


C.      **ONE CAREFREE PLACE**

        **Loan Details**

        • Approval Date:  May 11, 2007 (Note: the New Credit Request (NCR) was signed on

          the same date as a loan to a related borrower, Arizona Land Company, LLC).

---

[39]  Berling Dep. at 157.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2032

- Approvers:  Codori, Petak, Snider, Umbaugh, Wetzel (ELC); Berling, Darré, Petak, Snider, Wetzel (DLC)

- Borrower:  According to the NCR, "*One Carefree Place, LLC is a newly formed entity created to acquire and develop the subject property.*"

- Loan Amount: $8,953,193.  An additional $2,500,000 was participated out.

- Purpose:  "*Financing to pay off the land acquisition loan and provide funds necessary to complete construction of the Quail Run Medical Plaza located in Scottsdale, AZ.*"

- Guarantors:  Douglas and Elizabeth Dragoo; the Douglas A. and Elizabeth J. Dragoo Family Trust also guaranteed the loan, but were not listed on the first page summary.

- Term of Loan:  24 months.

- Pricing:  Interest at Wall Street Journal Prime Rate; 0.75% fee

- Collateral:  "*1st DOT on land and improvements as well as appropriate UCC agreements.*"

- Appraisal:  $15,300,000, per appraisal as of 4/30/07.

- Appraisal Review:  Not done as of date of approval. (As per NCR, "Appraisal will need to be reviewed by a qualified 3rd party Appraiser per UWB policy" (NCR page 6)).

- LTV:  74.86%

- Interest Reserve:  $884,702 ($1,478,312 per customer calculation)

- Repayment Sources:   According to NCR, "*Primary: Sale of office condos...; Secondary: Cash flow and/or assets of the Guarantor; Tertiary: Refinance or bulk sale of collateral.*"

- Recommended Loan Grade:        5

43

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2033**

- Loan Officer:  Jeff Thompson

**Overview**

One Carefree was a loan for an out-of-area project which did not conform to the Bank's loan policies.  The primary source of repayment was to be speculative future sales of medical office condominiums to unidentified buyers, and thus required an exception to the Bank's loan policy. No exception, however, was noted in the NCR or justified.  The secondary source of repayment was to be cash flow and/or assets of the Guarantors.   However, ███████████ ███████████████████████████████████████████████, and it does not appear much if any effort was made to validate the Guarantors' equity in those projects.   In addition, ████████████████████████████████████████████████████████████████ ██████████████████████████████ The tertiary source of repayment was refinance or bulk sale of the collateral. But compounding the risk of this being an out-of-area project, the appraiser was not on the Bank's approved list.   The reported LTV was at the maximum allowable under the loan policies and thus provided no exceptional protection to mitigate the riskiness of a speculative out-of-area loan. No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

1.    The Identified Primary Source of Repayment Was Highly Speculative

Bank policy states:  "*When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan.*" (2006 Loan Policy, Section 500.1).   "*A*

44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2006 Loan Policy, Section 500.6).   *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2006 Loan Policy, Section 102.1.2). *"It is also exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2006 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2006 Loan Policy, Section 102.1.6).

The Approvers knew this was a risky loan because the NCR said so on its face - under "Transaction Weaknesses" is the notation "Speculative project."   There could be no mistaking on the part of the Approvers that this loan met the Bank's definition of "speculative" – the primary source of repayment was stated on the NCR as "*Sale of office condos,*" and the *"Exit Strategy"* was stated to be *"sale of the medical office condos.*"   (NCR, page 13).   The NCR notes that the loan is being graded a "5" (rather than a "4") "…*due to the speculative office nature of the subject property.*"   (NCR, page 13).   At the time of approval, there was no indication that there were any pre-sales by which the Approvers could gauge the probable success of the project. Further, there is no information to indicate that either the Borrower or the loan officer had conducted or commissioned any sort of market analysis for for-sale medical condos in the geographic region.   In short, the Approvers improperly speculated that the project would be successful and allow for repayment of the loan.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2035**

This situation was made worse by the out-of-area nature of the loan. The Bank's Loan Policy states: "The Bank's service area, as defined, is the intermountain west and more particularly, the Front Range area of Colorado including our primary Community Bank locations in Denver, Cherry Creek, and the Denver Tech Center, Boulder and Fort Collins and the surrounding communities" (2006 Loan Policy, Section 105.1.1). Although the Loan Policy permits out-of-area loans "when customer relationships and credit factors warrant…" there was no explanation or justification in the NCR as to what customer relationship and credit factors warranted an exception to Loan Policy. The NCR itself indicates that Mr. Dragoo was a new customer of the Bank. Community banks typically identify specific geographic areas in which to operate. The importance of this policy is to limit the bank's lending activities to areas in which it is familiar with local law, regulation, markets, economics and customs and practices concerning extension of credit. This is particularly important in the event the loan defaults and the bank needs to take legal action to enforce its rights, including foreclosing on its collateral. In addition, this policy provides opportunity for bank officers to be in personal contact during the life of the loan and to visit the Bank's collateral from time-to-time. Absent a long-term customer relationship with the Dragoos, the Approvers did not have sufficient information to justify this exception to Loan Policy.

The NCR and the meeting minutes approving the loans do not indicate that the Approvers recognized the need to justify any exceptions for a speculative loan. Approving the loan in these circumstances fell well outside the bounds of safe and sound lending.

2.     The Identified Secondary Source of Repayment Cannot Justify An Exception

Neither the identified secondary source of repayment nor any other factor remotely justified the policy exceptions discussed above. The secondary source of repayment was to be

46

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2036

the cash flow and/or assets of the guarantors, Douglas and Elizabeth Dragoo.  Bank policy states: "*A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and willingness to provide 2. support for the credit. [sic] 3. The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable.  These characteristics generally indicate that a guarantee may improve the prospects for repayment of the debt obligation.*" (2006 Loan Policy, Section 200.4).  A federal regulator's definition is almost word-for-word the same:

> "*...a guarantee from a "financially responsible guarantor" has the following attributes:*
>
> • *The guarantor must have both the financial capacity and willingness to provide support for the credit;*
>
> • *The nature of the guarantee is such that it can provide support for repayment of the indebtedness, in whole or in part, during the remaining loan term; and*
>
> • *The guarantee should be legally enforceable.*"[40]

The Federal Reserve Bank states "*A loan to a single-asset entity is often predicated upon the strength of the partners/guarantors.  Accordingly, understanding their financial strength, which frequently is made up of various partnership interests, is key to assessing the project's strength.*"[41]   The Federal Reserve Bank further states: "*Partners/guarantors generally have investments in other projects included as assets on their financial statements.  The value of these investments frequently represents the partner's/guarantor's own estimate of the investment's*

---

[40]   Office of the Comptroller of the Currency, Commercial Real Estate and Construction Lending, Attachment 1, November 1995, page 55.

[41]   FRB, Commercial Bank Examination Manual, Section 2100.1, November 2005, page 4.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2037

*worth, as opposed to a value based upon the investment's financial statements. As a result, it is necessary to obtain detailed financial statements for each investment to understand the partner's/guarantor's complete financial picture and capacity to support the loan.*"[42]

A reasonably prudent banker is trained to be skeptical of information gathered in the course of due diligence and is especially cautious in accepting information from the borrower. In this instance, ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████

                  ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

The OCC states "*[i]f the loan has a guarantor, a bank should obtain information on the guarantor's financial condition, income, liquidity, cash flow, contingent liabilities, and other relevant factors to evaluate the guarantor's financial capacity to fulfill the obligation if the borrower defaults on the loan. The bank also should investigate the number and amount of the*

---

[42]   FRB, Commercial Bank Examination Manual, Section 2100.1, May 2004, page 5.

48

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2038

*guarantees currently extended by a guarantor to determine whether the guarantor has the financial capacity to satisfy all existing contingent claims*[43]   The Federal Reserve Bank has a similar guideline: "*It is also important to consider the number and amount of the guarantees currently extended by a partner/guarantor to determine if they have the financial capacity to fulfill the continent claims that exist.*"[44] Bank policy requires: "*[t]he following criteria should be considered when evaluating loans to home builders:  The reliability of the home builder; analyze at least two years of financial statements, credit history, cash flow, and <u>current contingent liabilities</u>*" (Emphasis Added). (2006 Loan Policy, Section 500.6.4).   An important step in evaluating a guarantor's ability to pay off a loan, if need be, is to determine the extent to which other lenders may also have a call on the guarantor's assets and liquidity.   ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████   There is no indication in the NCR or the loan file that the Bank made any effort to evaluate these other projects or to estimate risk that the Dragoos may have had that would have affected their ability to repay the Bank's loan.

For all these reasons, the Approvers did not obtain sufficient information to make a proper determination as to whether the guarantees justified the riskiness of the primary source of repayment.

---

[43]   OCC, Comptroller's Handbook, Real Estate and Construction Lending, March 1998, page 14.

[44]   FRB, Commercial Bank Examination Manual, May 2004, page 5.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2039

3.        The Identified Tertiary Source of Repayment Cannot Justify An Exception

The third source of repayment was "*refinance or bulk sale of collateral.*"  Aside from that cryptic note, there is no discussion or explanation of the particulars for the method of repayment. No information appears in the NCR to inform the Approvers as to how the project would be refinanced in the event that the primary and secondary sources of repayment failed.  Any experienced banker would know that if the primary source of repayment (sale of the condominiums) and the secondary source of repayment (a call on the guaranty) both failed, then the likelihood of refinancing is extremely remote and a bulk sale would almost certainly result in a serious discount resulting in a loss to the Bank.

Finally, the LTV for this loan was 75%, the maximum allowed in the loan policies for loans of this type.  Thus, the collateral did not provide any exceptional credit support justifying the highly speculative primary source of repayment.

4.        Failure to Confirm Borrower Equity ("skin in the game")

For Land Development Loans, the Bank's Loan Policy states that the maximum Loan-to-Cost is 80% (2006 Loan Policy Manual, Section 500.3), requiring substantial borrower equity in the project, or "skin in the game."  The OCC has observed "*Although some commercial real estate loans become troubled because of a general downturn in the market, others were originated on an unsound or a liberal basis. Common examples of these types of problems include: Loans with no or minimal borrower equity.*"[45]

According to the NCR, *"The rezoning of the property has resulted in significant property appreciation which is the source of borrower equity for the subject request."*  (NCR, page 3). This is not hard equity in the project, or "skin in the game."  The Approvers knew or should have

---

[45]   OCC, Comptroller's Handbook, Commercial Real Estate and Construction Lending, November 1995, pages 20-21.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2040

known that a borrower is expected to have significant hard equity in any real estate project.  In this case, the NCR made it easy to see that this loan did not comply with Bank policy because the write-up clearly stated that deficiency.  And yet, the Approvers approved it anyway without even flagging this deficiency as an exception, let alone justifying it.

D.     **ARIZONA LAND**

**Loan Details**

- Approval Date:  The NCR, dated 2/26/07, was approved 5/11/07.  (Note: this NCR was signed on the same date as the NCR for a related borrower, One Carefree Place, LLC).

- Approvers:  Codori, Petak, Snider, Umbaugh, Wetzel (ELC); Berling, Darré, Petak, Snider, Wetzel (DLC)

- Borrower:  Arizona Land Company, LLC

- Loan Amount:  $5,280,000.

- Purpose:    Per 2/26/07 NCR:    "*Acquisition of the subject property, tenant improvements, leasing commissions and interest carry through lease-up.*"

- Guarantor:  Douglas and Elizabeth Dragoo; the Douglas A. and Elizabeth J. Dragoo Family Trust also guaranteed the loan, but were not listed on the first page summary.

- Term of Loan:  24 months.

- Pricing:  Interest at WSJ Prime rate, floating; Fee: 0.75%

- Collateral:  1st DOT on land, 5.68 acres, and improvements.

- Appraised Value:  $3.56MM "As Is" value, $7.04MM stabilized value, per 3/13/07 appraisal report.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2041**

- Appraisal Review:  Not done at time of approval.

- LTV:  75%

- Interest Reserve:  $627,000

- Repayment Sources:   As per NCR, "*Primary: Income from property; Secondary: Refinance in secondary market or sale of asset upon stabilization; Tertiary: Call on Borrower/Guarantors' Assets.*"

- Recommended Loan Grade:  5

- Subsequent Modifications:  (Not reviewed)

- Loan Officer:  Jeff Thompson

## Overview

Arizona Land Company LLC was a loan to finance the acquisition of a two-story rental office building in Colorado Springs, Colorado, and to finance related tenant improvements, leasing commissions, and interest carry during the lease-up period.   The primary source of repayment was income from speculative leases to unidentified future tenants of the property, and thus required an exception to the Bank's loan policy.   No exception, however, was noted in the NCR or justified.   The secondary source of repayment was a refinance of the Bank's loan in the secondary market, or the sale of the property upon stabilization.   The only refinancing discussed in the NCR was conversion of the loan to a "mini-perm" facility at UWB, which would not have repaid the loan but merely restructured it, and third party refinancing was speculative because it depended on the Borrower obtaining a to-be-determined loan from an unidentified lender.   The sale of the property was also speculative, as the property had not yet stabilized and there was no clearly identified buyer.   In addition, the reported LTV was at the maximum allowable under the loan policies and thus provided no exceptional protection to mitigate the riskiness of a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2042

speculative loan.   The tertiary source of repayment was to be a call on the assets of the Borrower or the Guarantors.   The Borrower was a recently formed entity with no historical financial information and only one property held as an asset, and the NCR includes no analysis of the Borrower's financial condition or ability to repay.   With respect to the Guarantors, ██████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████   No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

     1.   <u>The Identified Primary Source of Repayment Was Highly Speculative</u>

Bank policy states:   *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2006 Loan Policy, Section 102.1.2). *"It is also an exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2006 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2006 Loan Policy, Section 102.1.6).

The Approvers knew this was a risky loan because the NCR said so on its face - the NCR notes that the loan is being graded a "5" (rather than a "4") ". . . due to the speculative office nature of the subject property."   This loan plainly met the Bank's definition of "speculative"—

53

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2043**

the primary source of repayment stated on the NCR was "Income from property" (NCR, p. 13), and the NCR disclosed that "at this time, no leases have been executed for future tenancy" (NCR, p. 3).  Thus, at the time of approval, there were no leases by which the Approvers could gauge the probable success of the project.

The NCR and the meeting minutes approving the loans do not indicate that the Approvers recognized the need to justify any exceptions for a speculative loan.  Approving the loan in these circumstances fell well outside the bounds of safe and sound lending.

2.      The Identified Secondary Source of Repayment Cannot Justify An Exception

The secondary source of repayment was "[r]efinance in secondary market or sale of asset upon stabilization."   However, the only refinancing discussed in the NCR concerns the conditions required for a conversion of the loan to a "mini-perm" facility at UWB, which would merely restructure the loan and not repay it.  No information appears in the NCR to inform the Approvers as to how the project would be refinanced by a third party lender in the event that the primary source of repayment failed.  Any experienced banker would know that if the primary source of repayment (rental income from the property) failed, then the likelihood of refinancing is extremely remote.  The sale of the property presents similar problems, as a rental property with little or no income stream is unlikely to be attractive to would-be buyers.  In addition, the LTV for this loan was 75%, the maximum allowed in the loan policies for loans of this type.  Thus, the collateral did not provide any exceptional credit support justifying the highly speculative primary source of repayment.

3.      The Identified Tertiary Source of Repayment Cannot Justify An Exception

The tertiary source of repayment was to be a call on the assets of the guarantors, Douglas and Elizabeth Dragoo.   Bank policy states: "*A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and willingness to*

54

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*provide 2. support for the credit(sic). 3. The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable.  These characteristics generally indicate that a guarantee may improve the prospects for repayment of the debt obligation"* (2006 Loan Policy, Section 200.4). A federal regulator's definition is almost word-for-word the same:

> *"...a guarantee from a "financially responsible guarantor" has the following attributes:*
>
> - *The guarantor must have both the financial capacity and willingness to provide support for the credit;*
>
> - *The nature of the guarantee is such that it can provide support for repayment of the indebtedness, in whole or in part, during the remaining loan term; and*
>
> *The guarantee should be legally enforceable."[46]*

The Federal Reserve Bank states *"A loan to a single-asset entity is often predicated upon the strength of the partners/guarantors.  Accordingly, understanding their financial strength, which frequently is made up of various partnership interests, is key to assessing the project's strength."[47]*   The Federal Reserve Bank further states: *"Partners/guarantors generally have investments in other projects included as assets on their financial statements.  The value of these investments frequently represents the partner's/guarantor's own estimate of the investment's worth, as opposed to a value based upon the investment's financial statements.  As a result, it is necessary to obtain detailed financial statements for each investment to understand the partner's/guarantor's complete financial picture and capacity to support the loan."[48]*

---

[46]   Office of the Comptroller of the Currency, Commercial Real Estate and Construction Lending, Attachment 1, November 1995.

[47]   FRB, Commercial Bank Examination Manual, Section 2100.4, November 2005, page 4.

[48]   FRB, Commercial Bank Examination Manual, Section 2100.1, May 2004, page 5.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2045

A reasonably prudent banker is trained to be skeptical of information gathered in the course of due diligence and is especially cautious in accepting information from the borrower. In this instance, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

The OCC states "*if the loan has a guarantor, a bank should obtain information on the guarantor's financial condition, income, liquidity, cash flow, contingent liabilities, and other relevant factors to evaluate the guarantor's financial capacity to fulfill the obligation if the borrower defaults on the loan. The bank also should investigate the number and amount of the guarantees currently extended by a guarantor to determine whether the guarantor has the financial capacity to satisfy all existing contingent claims*"[49] The Federal Reserve Bank has a similar guideline: "*It is important to consider the number and amount of the guarantees*

---

[49]  OCC, Comptroller's Handbook, Real Estate and Construction Lending, March 1998, page 14.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2046

*currently extended by a partner/guarantor to determine if they have the financial capacity to fulfill the continent claims that exist.*"[50] Bank policy requires: "*the following criteria should be considered when evaluating loans to home builders:  The reliability of the home builder; analyze at least two years of financial statements, credit history, cash flow, and current contingent liabilities*" (Emphasis Added). (2006 Loan Policy, Section 500.6.4).   An important step in evaluating a guarantor's ability to pay off a loan, if need be, is to determine the extent to which other lenders may also have a call on the guarantor's assets and liquidity.  ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

        For all these reasons, the Approvers did not obtain sufficient information to make a proper determination as to whether the guarantees justified the riskiness of the primary source of repayment.

E.      **NATCHES WAY**

        **Loan Details**

- Approval Date:  July 13, 2007

- Approvers: Codori, Snider, Wetzel (ELC); Berling, Bullock, Darré, Petak, Snider, Wetzel (DLC)

---

[50]   FRB, Commercial Bank Examination Manual, May 2004, page 5.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2047**

- Borrower:  Natches Way Development, LLC

- Loan Amount:  $3,357,467

- Purpose:   According to the NCR, "*Financing for the construction of a high end residential duplex within the Town of Steamboat Springs with views of the Valley and Mountains.  Units are speculative with LTV not to exceed 65%.*"

- Guarantors:  Jeremy MacGray, Charles Feldmann, Craig Falwell

- Term of Loan:  18 months

- Pricing:  Interest: Prime rate + 1.0%; Fee: 1.0%

- Collateral:  1st DOT on land and improvements

- Appraised Value:  Not prepared by date of approval; Ski Town Appraiser engaged per the NCR.

- Appraisal Review:  Not done by date of approval.

- LTV:  N/A by date of approval.  Per NCR, "NTE 65%".

- Interest Reserve:  Not stated.

- Repayment Sources:   Per NCR, "*Primary: Sale of Units; Secondary: Call on Guarantors/support from Summit the Mezz lender; Tertiary: Liquidation of collateral.*"

- Recommended Loan Grade:      5

- Subsequent Modifications:  (Not reviewed)

- Officer:  Michael Saun

## Overview

Natches Way was a loan to finance the development and construction of a speculative residential duplex in Steamboat Springs, Colorado. The identified primary source of repayment

58

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2048

was the sale of the residences to unknown buyers, and thus required an exception to the Bank's loan policy. No exception, however, was noted in the NCR or justified.  The secondary source of repayment was supposed to be a call on the Guarantors and/or support from a mezzanine lender.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████   ██████████████████████████████████

████████████████████████████████████████ The Approvers also could not justify the speculative primary source of repayment based on the tertiary source of repayment, the collateral, because the LTV was not low enough to provide a substantial cushion. No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

     1.    <u>The Identified Primary Source of Repayment Was Highly Speculative</u>

Bank policy states:  *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."* (2006 Loan Policy, Section 500.1).  *"A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2006 Loan Policy, Section 500.6).  *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit*

59

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2049**

*policy guidelines."* (2006 Loan Policy, Section 102.1.2). *"It is also an exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2006 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2006 Loan Policy, Section 102.1.6).

This was a speculative loan that was in clear violation of safe and sound lending practices. The buyers of the units were not identified; hence, the Bank was speculating that the market would produce these buyers at some future point in time. The Approvers knew that the loan to Natches Way was "speculative" because the 7/9/07 NCR plainly characterized it as such, i.e., *"Loan Purpose: . . . Units are speculative"* (NCR, page 1); *"Loan Type: Speculative Residential Construction"*(NCR, page 2); *"Transaction Weaknesses: Speculative high end residential construction"*(NCR, page 2); "*Due to the speculative nature,…*" (NCR, page 3); "*Exit Strategy: **The primary exit strategy of the proposed credit facility would be the sale of the units**"* (emphasis added) (NCR, page 8). In the section on *"Policy Exceptions"* and *"Mitigants to Exceptions,"* the NCR recognized and attempted to justify an exception for *"Environmental Questionnaire Only"* but said nothing about an exception for a speculative loan.

    2.    <u>The Identified Secondary Source of Repayment Cannot Justify An Exception</u>

Neither the identified secondary source of repayment nor any other factor remotely justified the policy exceptions discussed above. The secondary source of repayment was to be a call on the Guarantors, Jeremy MacGray, Charles Feldmann, and Craig Falwell. █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

60

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2050**

[REDACTED]

In the NCR's *"Discussion Of Asset Classification"* section (NCR, page 8), it does not even mention the guarantees as a justification for the loan. Similarly, the NCR does not mention the guarantees as a transaction strength or as a mitigant to the transaction weakness of *"Speculative high end residential construction."* (NCR, page 2).   The secondary source of repayment, therefore, was not strong enough to be a mitigant justifying an exception given the riskiness of the primary source of repayment.[51]

---

[51]   Although the NCR says that the secondary source of repayment also includes *"support from Summit the Mezz lender,"* the NCR seems to indicate that the mezzanine debt would go into the project, not to repay the Bank.

61

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2051

### 3.       The Identified Tertiary Source of Repayment Cannot Justify An Exception

The identified tertiary source of repayment, liquidation of the collateral, also cannot justify the loan. The "not to exceed" LTV of 65%, although below the policy maximum of 75%, was close to the maximum and thus provided no special credit support as required to justify the riskiness of an exception to a speculative primary source of repayment.  The LTV, however, was in fact 72%, higher than the "not to exceed" amount.[52]  In addition, a significant portion of the borrower's equity in the project came from mezzanine debt. The OCC has stated "other indications of potential or actual difficulties in a bank's commercial real estate portfolio may include . . . Loans with no or minimal borrower equity."[53]  Maximum LTV and LTC limits for Land Development loans are 75% and 80%, respectively (2006 Loan Policy, Section 500.3). The NCR states "total equity for the project will be $855,000 of which $765,000 is provided by Summit Investments (who will carry a 2nd DoT on the property) ███████████████████ ██████████████████████████████████████████████████████████████████████" compared with over $4 million in total project debt.  No responsible Approver could possibly have believed that this circumstance helped offset the substantial risk of *"Speculative high end residential construction."*  (NCR, page 2).


F.       **COLORADO MAIN**

**Loan Details**

- Approval Date:  October 23, 2007

- Approvers: Codori, Snider, Umbaugh, Wetzel (ELC)

---

[52]  Per the appraisals of $2.26 million and $2.4 million, dated July 13, 2007, performed by Ski Town Appraisal, Inc.

[53]  OCC, Comptroller's Handbook, Real Estate and Construction Lending, Warning Signs for Problem Real Estate Loans, November 1995, page 20-21.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2052**

- Borrower:  Colorado Main Development, LLC

- Loan Amount:   (a) $6,250,000 infrastructure and construction loan; (b) $520,000 Letter of Credit (LOC).

- Purpose:  Per the 10/16/07 NCR, "Provide infrastructure and vertical financing for 26-unit townhome development."   The (a) facility will provide infrastructure financing for the entire development and vertical financing for the first 14 units.  The (b) facility is a Letter of Credit to be issued to the City of Carbondale for infrastructure improvements.

- Guarantors:  Paul Rasmussen, Laurence Lederer

- Term of Loans:  12 months

- Pricing:  (a) Prime <u>minus</u> 1.0%, (b) 1.5% per annum; Fee: 0.25% at Closing.

- Collateral:  1st DOT on 1102 Colorado Ave., Carbondale, CO 81623

- Appraised Value:  Appraisal not done at time of approval (N.B.: Appraisal completed December 10, 2007).

- Appraisal Review:  Not done at time of approval (N.B.: Appraisal Review completed December 12, 2007) (FDIC-R-UNWB-0000260 0001).

- LTV: Per 10/16/07 NCR, "Not to exceed 80% LTV."

- Interest Reserve:  $210,938 (calculated assuming 50% average utilization at 6.75%).

- Repayment Sources:  According to the NCR, "*Primary: Sale of finished townhome units; Secondary: Guarantor net worth and cash flow; Tertiary: Liquidation of collateral.*"

- Recommended Loan Grade:      5

63

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2053**

- Subsequent Modifications:        Loan approval amount was increased to $7,475,000 total (a) + (b) on November 20, 2007.

- Loan Officer:  Ryan Beckman

**Overview**

Colorado Main was a loan to finance the development and construction of speculative townhomes in Carbondale, Colorado. The identified primary source of repayment was the sale of townhomes to unknown buyers, and thus required an exception to the Bank's loan policy. No exception, however, was noted in the NCR or justified.  The secondary source of repayment was supposed to be the net worth and cash flow of the Guarantors. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████The Approvers also could not justify the speculative primary source of repayment based on the tertiary source of repayment, the collateral, because the LTV was at or above the maximum LTV allowed by the loan policies for a loan of this type.  No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

1.    The Identified Primary Source of Repayment Was Highly Speculative

Bank policy states:  *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."* (2006 Loan Policy, Section 500.1).  *"A*

64

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2054**

*speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2006 Loan Policy, Section 500.6). *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2006 Loan Policy, Section 102.1.2). *"It is also an exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2006 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2006 Loan Policy, Section 102.1.6).

This loan clearly met the definition of "*high risk loans, with speculative characteristics,*" that is, the sale of the properties was the primary source of loan repayment. The loan was clearly "speculative" and the NCR plainly characterized it as such, e.g., <u>*Transaction Weaknesses*</u>: *Dependent on real estate sales*" (NCR, page 2); "<u>*Discussion of Asset Classification*</u>: *Higher Risk of Development/Spec Loan*" (NCR, page 8). The Approvers therefore knew from the credit memo that this was a speculative loan and knew, or should have known, that it was prohibited by policy. The NCR and the meeting minutes approving the loans, however, do not indicate that the Approvers recognized the need to justify any exceptions. The sections on *"Policy Exceptions"* and *"Mitigants to Exceptions"* in the NCR are blank.

2.     <u>The Identified Secondary Source of Repayment Cannot Justify An Exception</u>

Neither the identified secondary source of repayment nor any other factor remotely justified the policy exceptions discussed above. The secondary source of repayment was to be the net worth and cash flow of the guarantors, Paul Rasmussen and Laurence Lederer. ▉

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2055**



The secondary source of repayment, therefore, was not remotely strong enough a source of credit support to justify an exception given the riskiness of the primary source of repayment.

3.      The Identified Tertiary Source of Repayment Cannot Justify An Exception

The identified tertiary source of repayment, the collateral, also cannot justify the loan. The Bank's policy was to lend a maximum 75% LTV on Land Development Loans. Construction loans for *"1-4 Family Residential Construction"* could go as high as 80% LTV. (2008 Loan Policy, Section 500.3). This loan exceeded the Bank's policy for this type of real estate loan.   The loan was intended for land development (infrastructure), first, and for construction financing, second.  In addition, this was a 26-residential unit development. As such, the maximum LTV for this loan should have been 75%, not 80% as stated in the NCR: *"Transaction Overview: The credit facility will provide infrastructure financing for the entire development and vertical financing for the first phase (14 units)"* (NCR, page 3). The NCR approved on October 23, 2007, permitted a loan amount of $6,770,000 (including a $520,000 LOC) subject to a to-be-obtained appraisal evidencing a LTV not to exceed 80%.  This approved

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2056

amount was increased on November 20, 2007, to $7,475,000 with the specific notation that the amount of the LOC would not be included in the LTV calculation. According to the Commitment Letter issued on November 27, 2007, the LOC was now to be $911,236; hence, the net loan commitment was $6,550,000 or 77.5% of the appraised value of $8,450,000 determined by the appraisal dated December 10, 2007. Even if the applicable policy maximum was 80% LTV, the LTV here was close to the maximum and thus provided no special credit support as required to justify the riskiness of an exception to a speculative primary source of repayment.

4. <u>Failure to Confirm Borrower Equity ("skin in the game")</u>

The OCC has stated "*other indications of potential or actual difficulties in a bank's commercial real estate portfolio may include…..loans with no or minimal borrower equity.*"[54] Maximum LTV and LTC limits for Land Development loans are 75% and 80%, respectively (2006 Loan Policy, Section 500.3). The Bank's policy is: *The loan to purchase price (loan to cost) should generally not exceed 80%* (2006 Loan Policy, Section 500.1). The meaning of this rule is that the Borrower will provide at least 20% of the costs of the project from its own funds.

According to the above rule, the Borrower should have demonstrated $1,470,000 paid in equity ($7,350,000 total project costs x 20%). The NCR stated: ██████████████ ████████████████████████████████████████████████████████████████The NCR says "*An additional $323,071 will come in the form of earnest money deposits on pre-sales*". There was no substantiation noted in the NCR that the ██████ had actually been paid in and deposits cannot be considered a form of "equity". In any event, these amounts together still only represent 15% of total project costs, meaning the LTC was 85%, in excess of the Bank's

---

[54]   OCC, Comptroller's Handbook, Real Estate and Construction Lending, Warning Signs for Problem Real Estate Loans, November 1995, page 20-21.

67

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

maximum.  A balance sheet of the Borrowing entity evidencing the paid in equity should have been presented and analyzed in the NCR.

## G.   COMMUNICOM

### Loan Details

- Approval Date:  February 7, 2008 (ELC); February 8, 2008 (DLC)

- Approvers:  Berling, Bullock, Codori, Darré, Petak, Snider, Sterett, Wetzel

- Borrowers:   Communicom Corporation of America, LLC (CCALLC) and Communicom Broadcasting, LLC (CBLLC).

- Co-Borrowers:   Communicom Company of Louisiana, LP (WLNO-AM New Orleans); Communicom Company of Michigan, LP (WDRJ-AM Detroit); Communicom Company of Phoenix, LP (KXEG-AM Phoenix); Communicom Company of Arizona, LP (KXXT-AM Phoenix)

- Loan Amount:  $11,250,000

- Purpose:  Per 2/7/08 NCR, "*Refinance existing senior debt by MCG Capital Inc.*"

- Guarantors:  Richard L. Kylberg, Jr., Matthew E. Autterson

- Term of Loan:  5 years; I/O 1st 12 months, then 15 year amortization rate over remaining 4 year term.

- Pricing:  Interest: Prime + 0.25%; Fee: 0.75%

- Collateral:  Per NCR, "*1st priority security interest in all the tangible and intangible assets of both the Borrowers and Co-Borrowers.*"

68

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Appraised Value: Per NCR, "*The Bank has engaged Media Services Group to complete a full narrative summary enterprise valuation.*" "*The Borrowers anticipate a valuation of over $17,000,000.*"

- Appraisal Review: No evidence in file.

- LTV: 66%, LTV, based on Borrowers' valuation.

- Interest Reserve: Not mentioned in NCR

- Repayment Sources: Per NCR, "*Primary source of repayment is cash flow generated from block programming revenue (of which the Company has pre-sold the first 92% of available time through May of 2008); Secondary source of repayment is the two Guarantors; Tertiary source of repayment is through the liquidation of the Company's assets, the most valuable being the FCC licenses.*"

- Recommended Loan Grade: 5

- Subsequent Modifications: Not reviewed

- Loan Officer: David Livingston

### Overview

Communicom was a commercial term loan to refinance $11 million in existing senior debt and pay $80,000 in deferred interest owed to MCG Capital, Inc. The two Borrowers jointly owned and operated four subsidiaries (the Co-Borrowers), each of which owned an AM radio station that sold block programming time to Christian ministries. They had limited history with the bank and operations in locations and an industry outside the Bank's expertise. Combined cash flow of the Borrowers was identified as the primary source of repayment, but the NCR disclosed that ███████████████████████████████████████████████████ ███████████████████████████████████████ The Bank's exit strategy was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2059

proceeds from a speculative sale of the Borrowers or refinance of the loan.  The secondary source of repayment, guarantees from Richard L. Kylberg, Jr. and Matthew E. Autterson, were limited to $5.625 million and $3 million respectively, a ███████████████████████ ████████████████████████████████████████████████████████ The Approvers also failed to require the Borrowers' corporate parents to guarantee the loan.  The tertiary source of repayment for the loan was supposed to be liquidation of the Borrowers' assets, but the Approvers failed to obtain an appraisal of the liquidation value of the assets, much of which were intangible and illiquid assets such as broadcast licenses, before approving the loan. Furthermore, the generous loan structure given to the Borrowers, including an amortization period in excess of the loan term, was contrary to the Bank's loan policy and not justified.  No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

1.      The Identified Primary Source of Repayment Was Highly Speculative

The assumed increased in the Borrower's income when the Borrowers' track record was of losing money gave this loan clear speculative characteristics.   Bank policy states: *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2007 Loan Policy, Section 102.1.2).  Bank policy further states:   *"Prudent lending requires that the officer granting or recommending the loan:  …*

- *Understand the source and plan of repayment;*

70

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2060

...

- *Finds that the purpose, plan and source of repayment, as well as collateral, are acceptable, reasonable, practical, and achievable.  Undesirable features of each loan should be documented and mitigated."*

(2007 Loan Policy, Section 100.2.1).  Bank policy also states *"It is also exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture"* (2007 Loan Policy, Section 100.2).  Bank policy also states that *"[c]ollateral is not a substitute for the borrower's ability to repay."*  (2007 Credit Policy, Section 100.2.4).

The Borrowers' reported earnings were not remotely adequate to repay this $11.25 million loan. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████   The NCR also noted in the industry overview discussion that because "religious [radio] stations are non-commercial, revenue is comparatively low versus the overall radio industry."  Despite this, the NCR assumed dramatically improving revenues and decreasing expenses, and even then the Borrowers' ██████████████████████████████████████At best, the Borrowers might have been able to keep debt service current but they were highly unlikely to be able to repay the outstanding principal balance at the end of the five-year term.  The Approvers had no basis for concluding that the Borrowers' plan and source of repayment was "reasonable, practical, and achievable," and they also knew that the Borrower could not

71

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

qualify for the loan on an unsecured basis.   Despite this, the loan was approved and the Borrowers' disclosed inability to repay the loan was not even noted as an exception.

The Bank's true "Exit Strategy" (NCR, page 11) was speculative, i.e., "*sale of the company to a strategic buyer*" or refinance of the loan.   However, there was no substantiation that such a "strategic buyer" would appear within 5 years or that a "*continuing improving EBITDA*" to increase the company's valuation was anything more than hope.   The NCR contained no information or analysis regarding how economic or market conditions might affect the value of this enterprise in the future.   Given the absence of a clear "way out," this loan was highly speculative and required exceptionally strong mitigating factors to warrant approval.

The situation was made worse because none of the radio stations were in Colorado (although the parent companies were).   Bank policy states: "*The Bank's service area, as defined, is the intermountain west and more particularly, the Front Range area of Colorado including our primary Community Bank locations in Denver, Cherry Creek, and the Denver Tech Center, Boulder and Fort Collins and the surrounding communities.  . . . Out of area loans will be made when customer relationships and credit factors warrant, but will not be the primary emphasis of our marketing and business development efforts.*"   (2007 Credit Policy, Section 105.1.1).

In my experience, community banks typically identify specific geographic areas in which to operate so as to limit the bank's lending activities to areas in which it is familiar with local laws, regulations, customs and practices concerning extension of credit. This is particularly important in the event the loan defaults and the bank needs to take legal action to enforce its rights, including foreclosing on its collateral.  In addition, this policy provides an opportunity for bank officers to visit the Bank's collateral from time-to-time and stay in personal contact with the business operations during the life of the loan.  As the Bank had no demonstrated capability

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2062

or prior experience lending to this type of enterprise or industry, it was even more inappropriate to make this loan.

     2.    <u>The Identified Secondary Source of Repayment Cannot Justify An Exception</u>

The identified secondary source of repayment, the guarantees, did very little to mitigate the weaknesses discussed above.

Bank policy states: "*A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and 2. willingness to provide support for the credit. 3. The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable.*" (2007 Loan Policy, Section 200.4).   Bank policy further states that the Bank: "*...generally requires that all primary and/or majority stockholders guarantee loans to corporations.   Exceptions are to be clearly indicated on the front page of the credit write-up*" (2007 Loan Policy, Section 100.2.5).

73

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2063

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

    ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  The secondary source of repayment, therefore, was not strong enough to be a mitigant justifying an exception given the riskiness of the primary source of repayment.

    3.      The Identified Tertiary Source of Repayment Cannot Justify An Exception

    The tertiary source of repayment identified in the NCR was liquidation of the Borrowers' assets, but the liquidation value of the Borrowers' assets was not sufficient to mitigate the significant weaknesses of the loan.

    Bank policy states: *"Bank policy is that all term loans are supported by satisfactory and adequate collateral[.]"*  (2007 Credit Policy, Section 400.6.7).  Bank policy further provides: *"The quality and liquidity of collateral are important and must be confirmed before the loan is made.  Secured loans should be margined so that money received from the collateral under*

74

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*foreclosure or liquidation conditions will repay the loan."* (2007 Credit Policy, Section 100.2.4).



Although the Borrower reported ███████████████████, ████████████████

███████████████████████████████████████████████████

████████████████████████ Contrary to the loan policy, the Approvers failed to obtain an appraisal of the liquidation value of these broadcast licenses before making the loan. Instead, the Approvers obtained a "professional enterprise valuation" that valued the Borrowers as a going concern, even though liquidation would have been necessary to repay the loan in the event of default.   In addition, because federal law prohibits the transfer of a broadcast license without approval from the FCC, the Bank's ability to liquidate this collateral was uncertain. Certain of the Borrowers' assets also secured an existing credit facility between UWB and the Borrower with an outstanding principal balance of ████████ and therefore were not available to support the loan.  Furthermore ████████████████████████

████████████████████████████████████████████

████████████ Given the significant policy exceptions with respect to the Borrowers' reported cash flow, at a minimum the Approvers should have obtained a professional appraisal of the liquidation value of the Borrowers' assets prior to approving the loan. Without that information, the loan should not have been approved.

4.   <u>Loan Structure Was Contrary to the Loan Policy</u>

The generous loan structure given to the Borrowers was also contrary to the Bank's loan policy and was not mitigated by the insufficient sources of repayment obtained by the Bank.

Bank policy states:   *"It is currently the Bank's policy that term loan maturities will not exceed seven years and that term loans are structured to fully amortize over the term of the loan.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2065**

*The use of longer terms and balloon payments is discouraged.  Amortization periods in excess of seven years will be permitted only in situations where real estate collateral is obtained, with an equity position of acceptable percentage, and where the remaining useful economic life of the property exceeds the amortization period of the loan."*  (2007 Credit Policy, Section 400.6.4).

Contrary to loan policy, the Communicom loan had a five-year term but used a 15-year amortization rate, and thus was not structured to fully amortize over the term of the loan.  This structure required the Borrower to make a significant balloon payment at the end of the five-year term.  In addition, the Approvers failed to obtain sufficient real estate collateral to secure the loan.  Although the Bank obtained a security interest in the Borrowers' tangible and intangible assets, ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

## H.    18 COTTONWOOD LANE

### **Loan Details**

- Approval Date:  February 28, 2008 (ELC)

- Approvers:  Codori, Petak, Snider, Sterett, Umbaugh, Wetzel

- Borrower:  18 Cottonwood Lane, LLC

- Loan Amount:  $2,224,000 (per NCR); $2,310,000 (per LM)

- Purpose:  According to the 2/22/08 NCR, "*Funds will be used to take out existing UWB land loan as well as fund the construction of a high-end Spec home in Greenwood Village.*"

76

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2066**

- Guarantors:  Scott Thornock, John Fritzel

- Term of Loan:  15 months

- Pricing:  Interest: Prime + 1% (6% floor); Fee: 0.75%

- Collateral:   As per the NCR, "*1ˢᵗ DOT on land and improvements located at 18 Cottonwood Lane, Greenwood Village, CO 80121 & assn CD held at UWB ($303M) with a proposed UWB lien of $260M.*"  As per the 3/4/2008 LM, *"The CD will have a total lien in the amount of $100,000."*

- Appraised Value:  $3,062,000 as of 2/1/08.

- Appraisal Review:   (Not clear from file if done before approval.)

- LTV: 72%

- Interest Reserve: $150,000

- Payment Sources:  As per the NCR, "*Primary: Interest paid from interest reserve. Principal to be retired from sale of subject home; Secondary: Guarantors have the liquidity and cash flow to fund interest payments out of pocket; Tertiary: Liquidation of collateral, Call on Guarantor.*"

- Recommended Loan Grade:  5

- Subsequent Modifications:  March 4, 2008

- Loan Officer:  Kim Geiger

## Overview

18 Cottonwood was a loan to refinance an existing land acquisition loan held by UWB and to finance the vertical construction of a "high end spec home" home in Greenwood Village, Colorado.  The primary source of repayment was the sale of the subject home which is inherently speculative.   An alternative source of repayment was liquidation of the collateral, which

77

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2067

consisted of the property and a lien on a certificate of deposit ("CD") held at UWB.  The CD lien represented only a small fraction of the total loan commitment, and thus did little to mitigate the exception for a highly speculative primary source of repayment.  The property had an LTV of 75%, which was near the maximum allowed under the loan policies for a loan of this type.  In addition, by this time the Approvers knew that the housing market in Colorado was deteriorating.  The other alternative source of repayment, the guarantees of Scott Thornock and John Fritzel, also did not justify making this loan. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

1.      The Identified Primary Source of Repayment Was Highly Speculative

Bank policy states:  *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."* (2008 Loan Policy, Section 500.1).  *"A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2008 Loan Policy, Section 500.6).  *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2008 Loan Policy, Section 102.1.2). *"It is also an exception to the policy of*

78

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2068

*the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2008 Loan Policy, Section 100.2). *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2008 Loan Policy, Section 102.1.6).

This loan was especially risky and an unjustified exception to the loan policies. The potential future sale of the subject property to an unidentified end user was speculative and prohibited under the loan policies. The Bank was speculating that the marketplace would produce a buyer for this high-end home at some future date, even though the real estate market was well in decline by March 2008.

2.    The Collateral Cannot Justify An Exception

The collateral for the loan was comprised of the subject property and a lien on a CD held at UWB in the amount of $303,000.  The subject property, by itself, had an LTV of 73% in the original loan and 75% in the modified loan.  The amount of the CD lien (not used for an interest reserve) was $190,000 in the original loan and $100,000 in the modified loan.  These amounts represented only 8.5% and 4.3% of the Bank's total loan commitments respectively.  Viewing the collateral together, the LTV was 68% in the original loan and 73% in the modified loan. Significantly, moreover, the Approvers knew that the market was falling at this time.  In these circumstances, there was nothing remotely exceptionally strong about the collateral that could justify the policy exception for a speculative primary source of repayment.

3.    The Guarantees Cannot Justify An Exception

The guarantees of Thornock and Fritzel also cannot justify the loan.  Bank policy states: *"A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and willingness to provide 2. support for the credit. 3. The nature of*

79

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2069

*the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable."* (2008 Loan Policy, Section 200.4). The Federal Reserve Bank states: "*A loan to a single-asset entity is often predicated upon the strength of the partners/guarantors.  Accordingly, understanding their financial strength, which frequently is made up of various partnership interests, is key to assessing the project's strength.  In this example, it would be necessary to obtain financial information on the partner's/guarantor's other projects, even those not financed by the bank, to understand their overall financial condition*"[55].

Although the NCR listed "*Call on Guarantor's assets*" as the tertiary source of repayment, the NCR did not demonstrate that the Guarantors could repay the indebtedness. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

      ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[55]   FRB, Commercial Bank Examination Manual, November 2005, page 4.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2070**



I.   **ROC HENGE**

**Loan Details**

- Approval Date:  March 21, 2008

- Approvers:  Berling, Bullock, Codori, Petak, Snider, Wetzel

- Borrower:  ROC Henge, LLC

- Loan Amounts:  1) $800,000 (revolving line of credit); 2) $1,650,000 (equipment line of credit); Total: $2,450,000

- Purpose:   According to the 3/19/08 NCR, "*1) $800M Revolving Line of Credit (RLOC) for working capital purposes; 2) $1.65MM Equipment Line of Credit (ELOC) to fund capital expenditures*

81

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2071**

- Guarantors:  Robert Collawn

- Term and Pricing of Loans:  1) 12 months, I/O, Interest: Prime + 1%; Fee: 0.75%; 2) 12 months, I/O at Prime + 0.75%, after which loan balance converts to a fully-amortizing 6 year term loan at Prime + 0.50% fixed; Fee: 0.75%

- Collateral:  According to the NCR: "*1) Security interest in all business assets, including accounts receivable and inventories; 2) Specific liens on fixed assets being acquired under the equipment facility*

- Appraisal:  Not applicable

- Appraisal Review:  Not applicable.

- LTV:  Not applicable.

- Interest Reserve:  None

- Repayment Sources:  According to NCR: "*Primary: Operating Cashflow of ROC Henge; Secondary: Liquidation of collateral; Tertiary: Pursuit of Guarantor support*."

- Recommended Loan Grade:  5

- Loan Officer:  Margie Joseph

## Overview

The ROC Henge loans were comprised of two credit facilities – an $800,000 revolving line of credit and a $1.65 million equipment line of credit – to a newly organized stone and tile company specializing in kitchen countertops.  The Borrower was the result of a recent merger of three companies, two of which were losing market share, had antiquated business models, and had been acquired for less than book value.  The two lines of credit were structured as asset-based loans.

82

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2072**

The primary source of repayment was the cash flow of the Borrower, b███████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████ The Bank's stated exit strategy for the two

loans, *"refinance by another financial institution,"* was speculative and an exception to the loan

policy.

The secondary source of repayment was liquidation of the business assets of the

Borrower, including accounts receivable, inventories, and the fixed assets acquired under the

equipment line of credit.   However, as the Bank's own Loan Policy recognized, this type of

collateral is highly uncertain as a recovery source, as it typically involves the closure of the

business.   In addition, the NCR disclosed that the Borrower w███████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████

The tertiary source of repayment, an individual guarantee from Robert Collawn

("Collawn"), was also insufficient to justify making this loan. ███████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

83

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

These two lines of credit were the latest in a string of loans that the Bank had made to Robert Collawn's companies in several years.   Repayment of the loans was speculative and depended on an immediate turnaround of fortunes for the Borrower or refinance by another financial institution.   The Approvers should have seen a red flag immediately when presented with a proposal to lend to a turnaround enterprise comprised of several failing companies, the success of which was dependent on the real estate industry.   In essence, the Approvers allowed Collawn to use the Bank's funds in lieu of his own equity for a speculative turnaround venture.

1.      The Primary Source of Repayment was Speculative

Bank policy states: *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines"* (2007 Loan Policy, Section 102.1.2).   Bank policy further states:   *"Prudent lending requires that the officer granting or recommending the loan: ...*

- *Understand the source and plan of repayment;*

- *...*

- *Finds that the purpose, plan and source of repayment, as well as collateral, are acceptable, reasonable, practical, and achievable.   Undesirable features of each loan should be documented and mitigated."*

(2007 Loan Policy, Section 100.2.1).   Bank policy also states *"It is also an exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture"* (2007 Loan Policy, Section 100.2).   Bank policy also states

84

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2074**

that *"[c]ollateral is not a substitute for the borrower's ability to repay."* (2007 Credit Policy, Section 100.2.4).

The Bank's policy for asset-based loans ("ABL") states:  *"Although ABL loans are collateralized, the borrower's financial condition and cash flow must be thoroughly analyzed with the borrower demonstrating financial stability and/or improving trends.  Full repayment through collateral liquidation is not a primary source of repayment and is only a last resort."* The Bank's loan policy further states:  *"When analyzing a prospective borrower's financial statements, careful consideration must be given to working capital and trends."* (2008 Credit Policy, Section 400.4.7).

The NCR indicates that the Borrower was comprised of the assets of three other companies:  Stone Craft, Brekhus Tile and Stone, and Avanti Stone.  The NCR disclosed that Stone Craft and Avanti had been recently acquired for less than book value, and described them as weak businesses that had "failed to change as needed to maintain their market positions," and required "radical transformations of the business model to bring the companies from the 'stone age' of the stone business to the digital and robotic age."  The initial results of the combined entity were negative and the new business had not yet stabilized and matured at the time that the lines of credit were extended. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████  However, because the merged company had not yet stabilized, the Approvers had no basis on which to accept these projections. This is particularly true in light of the "radical transformation" that the Borrower was in the process of implementing for the merged businesses, and which was the very purpose for which

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2075

the Bank's lines of credits would be used.  ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

There was no evidence that the Bank performed a "reality check" analysis to give credence to these projections, nor was there any form of stress test performed to understand how the loans might perform in a downside scenario.  This is a classic example of speculation.

The speculation was even greater because the Borrower's future performance was tied to the success of the real estate market, which was already in decline by March 2008.  There was scant discussion in the NCR regarding the effect of a downturn in economic or market conditions on the loans' repayment prospects, even though there were clear signs of economic distress that could affect ROC Henge's target customers (i.e., residential real estate contractors).  The Approvers were aware of economic and market conditions affecting the real estate industry and should have declined to extend such significant lines of credit to a newly formed enterprise.

2.      The Identified Secondary Source of Repayment Cannot Justify An Exception

The Bank's policy states:   *"Lines of credit secured by general liens on accounts receivable and inventory must be perfected by executing a security agreement, filing a financing statement, and receipt of a satisfactory collateral search. This type of collateral should be taken as an abundance of caution on an unsecured line of credit. The collateral can most often only be realized by liquidating the business and the Bank taking possession of its collateral to prevent other creditors from obtaining a prior lien position at a later date.  The primary reason for taking such collateral would be to prevent other creditors from obtaining a prior lien position at a later date."*  (2008 Credit Policy, Section 400.4.5).  The Bank's policy further provides:   *"The*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*ability to recognize a borrower's financial problems as they develop and initiate immediate remedial action is important to the supervision of ABL credits. Theoretically, the line could be fully liquidated by refusing to make further advances and collecting the pledged receivables. However, such drastic action would likely force the borrower to close the business, resulting in a deterioration of the receivables from new disputes, and in returns and offsets.  Also, significant lender liability suits could be filed by the borrower against the Bank for abrupt cancellation of lending arrangements or sudden initiation of liquidation."*   (2008 Credit Policy, Section 400.5.7).

The Bank's secondary source of repayment was liquidation of the assets of the Borrower. As the Bank's own loan policy recognizes, however, such collateral is unreliable as a repayment source because it typically can be collected only in the event that the Borrower fails or is forced to close by the lender.

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████

3.      <u>The Identified Tertiary Source of Repayment Cannot Justify An Exception</u>

Bank policy states:  *"A financially responsible guarantor has the following attributes: 1. The guarantor must have both the financial capacity and willingness to provide 2. support for the credit. 3. The nature of the guarantee is such that it can provide support for the remaining indebtedness, in whole or in part, during the remaining loan term. 4. The guarantee is legally enforceable."* (2008 Loan Policy, Section 200.4).

87

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2077

The guarantee by Collawn was not sufficient to mitigate the significant weakness of the Borrower.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2078**

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████

J.     **CHARLES NASH**

**Loan Details**

- Approval Dates:  1) 3/31/08, 2) 6/2/08, 3) 7/14/08; 4) 8/26/2009

- Approvers:  1) Wetzel; 2) Wetzel; 3) Wetzel, Sterett, Petak; 4) all Defendants

- Borrower:  Charles Nash

- Loan Amounts:  1) $250,000 (first bridge facility); 2) $250,000 (second bridge facility), 3) $2,350,000 (first construction loan); 4) $278,000 (second construction loan)

- Purpose:  According to the NCRs and LMs: 1) "*Interim loan to fund a portion of proposed improvements to the subject property*", 2) "*Increase loan amount to allow further improvements to the subject property*", 3) "*Construction of a four unit luxury condominium project,*" 4) "*Extend the current facility by 6 months to the finish of one unit*"

- Guarantors:  N/A

- Term of Loan:  1) 6 months, Interest-only; 2) 6 months, Interest-only; 3) 6 months, Interest-Only; 4) 6 months, Interest-only.

- Pricing:  Interest: Prime + 1%; Fee: 1%

- Collateral:  All: 1st DOT on land and improvements on 2267-2281 Ogden Street; 3): Assignment of $545,000 note due to Borrower; 4): Assignment of a $225,000 note due to Borrower.

- Appraisal:  1) None, 2) Date: May 13, 2008; Value: According to LM: "$1,860M As-Is and $5,240M As-Complete"; 3) (Same); 4) Date: July 29, 2009; Value: According to LM, $4,190M "As-Is" and $4,990M "As Complete".

89

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2079**

- Appraisal Review:  1) Not done/Not required, 2) Not done, 3) Date: 5/21/08 by G. Tucker of Colorado Valuation Consultants; 4) Date: 8/17/09 by G. Owen of Equireal Appraisal Services

- LTV:  1) 38%, 2) 26.9% "As-Is"; 3) 54% "As Completed"; 4) 74.65% "As-Is," 62.79% "As Completed"

- Interest Reserve:  3) $160,000

- Repayment Sources:  According to LM for 7/14/2008 construction loan: "*Primary: Sale of subject units; Secondary: Income and other assets of Borrower*"; *Tertiary: Liquidation of collateral.*

- Recommended Loan Grade:  5

- Subsequent Modifications:  None

- Loan Officer:  John Fiedler

## Overview

The loans to Charles Nash were to fund the construction and renovation of a church into four luxury condominiums in Denver, Colorado.  The primary source of repayment for the loans was the sale of the subject units which, as previously indicated, is inherently speculative absent a commitment.  The highly speculative nature of the loan is well demonstrated by the fact that the subject property had two pre-sold units prior to completion, which subsequently fell through when the buyers walked away from the deals.  The secondary source of repayment was the income and other assets of the Borrower, which did little to justify an exception to the loan policy. ██████████████████████████████████████

████████████████ The tertiary source of repayment was liquidation of the collateral, which was comprised of the subject units and, for the July 2008 and August 2009 loans, assignments of two accounts receivable owed to the Borrower.  Although the combined collateral yielded an LTV of 49% on an as-completed basis when the July 2008 loan was approved, this was

90

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2080

insufficient to justify making a loan to a Borrower who had no other means of repayment at a time when the Approvers knew that the economy and real estate market were in sharp decline. Indeed, on the very day that the July 2008 loan was approved, Cindy Sterett sent an email to Gary Petak in which she candidly acknowledged that the loan was "not the strongest deal."

No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices.  For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

      4.    <u>The Identified Primary Source of Repayment Was Highly Speculative</u>

Bank policy states:  *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."* (2008 Credit Policy, Section 500.1).  *"A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house."* (2008 Credit Policy, Section 500.6).  *"We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines."* (2008 Credit Policy, Section 102.1.2).  *"It is also an exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture."* (2008 Credit Policy, Section 100.2). *"When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan."*  (2008 Credit Policy, Section 500.1).  *"Loans lacking a clearly identified primary source of repayment"* are *"Prohibited Loans."* (2008 Credit Policy, Section 102.1.6).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2081**

This loan was an unjustified exception to the loan policies. The potential future sales of the subject units to unidentified end users was speculative and prohibited under the loan policies. The Bank was speculating that the marketplace would produce a buyer for these high-end condominiums at some future date, even though the real estate market was well in decline by March 2008.  Indeed, the LMs reflect that two of the subject units had been pre-sold prior to completion of the project, with the would-be purchasers putting down $35,000 in earnest money as a hard down payment.  However, both purchasers ultimately walked away from the deals.

5.      The Identified Secondary Source of Repayment Cannot Justify An Exception

Neither the secondary source of repayment nor any other factor justified the policy exceptions discussed above.  ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

6.      The Identified Tertiary Source of Repayment Cannot Justify An Exception

The collateral for the loans was comprised of the subject property and, with respect to the July 2008 and August 2009 loans, assignments of two accounts receivable due to the Borrower in the amounts of $545,000 and $225,000, respectively.  At the time of the July 2008 loan, the subject property, by itself, had an LTV of 54% on an as-completed basis.  The amount of the account receivable assigned to the Bank in connection with the July 2008 loan was $545,000, which represented 19.1% of the Bank's total loan commitment at the time.  Viewing the collateral together, the LTV for the July 2008 loan was 49% on an as-completed basis.  However, given that the Bank had no information about the collectability of the note, little to no value should have been attributed to it for collateral purposes.  In addition, the Approvers knew

92

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2082

in July 2008 that the real estate market was in decline.  In these circumstances, there was nothing exceptionally strong about the collateral that could justify the policy exception for a speculative project for which the Borrower had no independent means of repayment.

K.    **RED BUTTE**

**Loan Details**

- Approval Date:  April 1, 2008

- Approvers:  Codori, Petak, Sterett, Wetzel (ELC)

- Borrower:   1375 Red Butte Dr., LLC, single-asset entity established January 2008. Ownership was 50% Lee Coleman and 50% Dan Coleman.

- Loan Amount:  $7,145,000

- Purpose:   According to the Bank's March 20, 2008 New Credit Request ("NCR"), "*Purchase property from investors and refinance existing debt into a mini-perm.*"

- Guarantors:   Lee and JoAnn Coleman, Dan and Wynee Coleman, Coleman Brothers Construction, LLC ("CBC").

- Term of Loan:  12 months, Interest-Only

- Pricing:  Interest: Prime + 0.75%; Fee: 0.50%

- Collateral:  According to the NCR: "*1st DOT on completed luxury SFR home located at 1375 Red Butte Drive in Aspen, CO.  Additional collateral will be a $450,000 CD.*"

- Appraisal Review:      Not done as of approval date.

- LTV:  62%

- Interest Reserve:  According to the NCR, "*$450M of the proceeds will be placed in a CD and held for a year as additional collateral.  The interest due monthly will be paid out of pocket by the borrowers.*"

93

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Repayment Sources:  According to NCR: "*Primary: Sale of subject property at market price; Secondary: Guarantors' income; Tertiary: Liquidation of collateral.*"

- Recommended Loan Grade:  5

- Subsequent Modifications:    (Not reviewed)

- Loan Officer:  Cari Kuhlman

## Overview

Red Butte was a loan to finance the acquisition and resale of a completed "spec-house" home in Aspen, Colorado.  The primary source of repayment, sale of the home at "market price," was speculative because there was no sale contract in place at the time the loan was approved. The NCR also demonstrates that the secondary source of repayment, the guarantors' income, ███

███████████████████████     ████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████     The tertiary source of repayment, the collateral, also was not supported, because the appraisal was six months old and the Approvers knew the market was falling.  In addition, the borrower had little if any "skin in the game."   No special circumstances even arguably justified the approval of a loan that deviated from the Bank's credit policies and safe and sound lending practices. For these reasons and those below, the Approvers acted well below the standard of care for prudent lending, must have known they were exposing the Bank to a substantial danger of losing millions of dollars by approving this loan and disregarded the consequences to the Bank of their doing so.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2084**

1.     The Identified Primary Source of Repayment Was Highly Speculative

Bank policy states:  "*When resale of the property is the primary source of repayment, we classify the credit as a speculative purpose loan.*" (2006 Loan Policy, Section 500.1).  "*A speculative or 'spec' house is being constructed without a contract for sale; the builder is 'speculating' that someone will buy the house.*" (2006 Loan Policy, Section 500.6).  "*We generally want to avoid three classes of loans that can be described as follows: . . . High risk loans, with speculative characteristics that do not meet the Bank's underwriting and credit policy guidelines.*" (2006 Loan Policy, Section 102.1.2). "*It is also exception to the policy of the Bank to lend money to support speculative investment activities unless the borrower can fully qualify for the loan on an unsecured basis and repayment is in no way dependent on the success of the speculative venture.*" (2006 Loan Policy, Section 100.2).  The potential future sale of properties to unidentified end users was speculative and prohibited under the loan policies.  The Bank was speculating that the marketplace would produce buyers at some future date.  Approvers should not have relied on the primary source of repayment absent a compelling justification for such exceptions.

2.     The Identified Secondary Source of Repayment Cannot Justify an Exception

Neither the identified secondary source of repayment nor any other factor remotely justified the policy exceptions for the absence of a reliable primary repayment source.  The secondary source of repayment was to be the "[g]uarantor's income."  The Federal Reserve Bank states "*A loan to a single-asset entity is often predicated upon the strength of the partners/guarantors.  Accordingly, understanding their financial strength, which frequently is made up of various partnership interests, is key to assessing the project's strength.*"[56]  The

---

[56]   FRB, Commercial Bank Examination Manual, November 2005, page 4.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2085**

Federal Reserve Bank further states: "*Partners/guarantors generally have investments in other projects included as assets on their financial statements.  The value of these investments frequently represents the partner's/guarantor's own estimate of the investment's worth, as opposed to a value based upon the investment's financial statements.  As a result, it is necessary to obtain detailed financial statements for each investment to understand the partner's/guarantor's complete financial picture and capacity to support the loan.*"[57]

A simple review of the financial information disclosed in the NCR should have confirmed to the Approvers that the Guarantors ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████████████

████████████████████████   The OCC states: "*if the loan has a guarantor, a bank should obtain information on the guarantor's financial condition, income, liquidity, cash flow, contingent liabilities, and other relevant factors to evaluate the guarantor's financial capacity to fulfill the obligation if the borrower defaults on the loan.  The bank also should investigate the number and amount of the guarantees currently extended by a guarantor to determine whether the guarantor*

---

[57]   FRB, Commercial Bank Examination Manual, Section 2100.1, May 2004.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2086

*has the financial capacity to satisfy all existing contingent claims*"[58]   The Federal Reserve Bank has a similar guideline: "*It is important to consider the number and amount of the guarantees currently extended by a partner/guarantor to determine if they have the financial capacity to fulfill the continent claims that exist.*"[59] Bank policy requires: "*the following criteria should be considered when evaluating loans to home builders:  The reliability of the home builder; analyze at least two years of financial statements, credit history, cash flow, and current contingent liabilities*". (2006 Loan Policy, Section 500.6.4).

The Guarantors were plainly an insufficient secondary source of repayment to justify an exception for the riskiness of the primary source of repayment.

    3.    <u>The Identified Tertiary Source of Repayment Cannot Justify an Exception</u>

The identified tertiary source of repayment did not justify the policy exceptions discussed above.  The tertiary source of repayment was to be liquidation of the collateral.  Bank policy (1000.8.3.1) states: "*[A]ll commercial appraisal reports completed for this Bank shall be sufficiently current to the effective date of the appraisal to reduce the likelihood that material changes in actual market conditions might have occurred by the time the loan or purchase decision is made.*" The OCC states; "*A principal indication of an unsound real estate loan is an*

---

[58]   OCC, Comptroller's Handbook, Real Estate and Construction Lending, March 1998, page 14.

[59] FRB, Commercial Bank Examination Manual, May 2004, page 5.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2087**

*improper relationship between the amount of the loan, the potential sale price of the property, and the availability of a market. The potential sale price of a property may or may not be the same as its appraised value. In dealing with unsound mortgage loans, the current potential sale price or liquidating value of the realty is of primary importance, and the appraised value is of secondary importance. There may be little or no current demand for the property at its appraised value, and it may have to be disposed of at a sacrifice value.*"[60]   By the time the loan was approved, the Approvers were well aware of the housing market downturn.   The NCR specifically references "the housing market downturn."  (NCR at 8).  Despite this knowledge, the Approvers accepted an appraisal prepared six-months prior as the basis for the value of the collateral.

---

[60]   OCC, Comptroller's Handbook, <u>Real Estate Loans</u>, March 1990, page 3.

98

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2088**

Appendix A

# *<u>Richard W. George</u>*

733 Front Street, Suite 502
San Francisco, CA 94111
Phone 530-550-7875
Cell 530-363-2037
george@bankexperts.com

---

**Experience**

| 2002-2013 | Haas Graduate School of Business | University of California, Berkeley |
|---|---|---|

*Lecturer in Finance*

| 1998-2002 | Georgetown University | Washington, DC |
|---|---|---|

*Lecturer in Finance*

- Engage graduate students on issues in modern global banking, emerging market economies, capital markets and corporate finance, including structured finance, valuation, investment analysis, derivatives and emerging market dynamics.
- Coach/Mentor students with career objectives in commercial/investment banking; recipient of Haas School's E.F. Cheit Award for Outstanding Teaching, Spring 2004.

| 1999-Present | Bank Experts Group | CA, MA and NJ |
|---|---|---|

*Principal*

- Provide **turnaround** services to financial institutions and **expert consulting** services to law firms.

| 2001-Present | Gulf Banking Consultants | London and Bahrain |
|---|---|---|

*Partner*

- Provide consulting services to international financial institutions

| 1999-2002 | Woori Bank | Seoul, Korea |
|---|---|---|

*Consultant*

- Designed complete corporate finance and credit training program for all relationship managers in this $70 Billion bank.
- Provided tailored credit instruction program.

| 2000-2001 | Treasury Bank, Ltd. | Washington, DC |
|---|---|---|

*President and CEO*

- Stabilized management of this distressed community bank.
- Provided credible interface with shareholders and Federal regulators; successfully met terms of MOU/Formal Agreement.
- Managed and improved quality of asset and loan portfolio and effected sale of bank to Countrywide Finance.

| **1971–1999** | **Citigroup, Inc.** | **New York, NY** |
|---|---|---|
| 1992-1999 | Citicorp Dealer Finance | Harrison, NY |

*Director of Captive Finance and Senior Credit Officer*

- Expanded **vendor finance** sales/marketing program to cover 1400 core client accounts.
- Executed innovative dealer receivables **securitization** programs.
- Remediated and Sold multiple dealer real estate properties.
- Launched unique global partnership with GE Medical Services.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| **1989–1992** | **Citibank Corporate Audit** | **New York, NY** |

*Head, North American Commercial Real Estate Review*

- Prompted remedial action that avoided over $300MM in losses on major North American customer relationship.
- Carried out on-going critical assessment of management and loan quality on Citibank's **commercial real estate, syndicated loans**, **corporate banking** and **venture capital** portfolios.

| **1985-1989** | **Citicorp Real Estate, Inc.** | **Dallas, TX** |

*Senior Relationship Manager*

- Underwrote financing for commercial real estate projects, incl. office, residential, retail and industrial, for Texas-based national developers.
- Managed $2 Billion, multi-property **workouts**.

| **1982–1985** | **Citicorp Travel Services** | **Tokyo, Japan** |

*Asia/Pacific Business Head*

- Headed marketing, sales and operations in 27 countries for two Citicorp retail products - Travelers Checks and Diners Club; Launched first Yen-denominated travellers check; increased regional market share.

| **1975–1982** | **Citibank, NA** | **Istanbul, Turkey & Manama, Bahrain** |

*Country Corporate Officer*

- In Arabian Gulf, managed full service branch operation including trade services and syndicated bond financings; returned audit rating of $5 Billion FX and treasury funding operation to "Satisfactory"; improved profitability of $1.4 Billion construction bond and $1 Billion direct loan portfolio; established School of Banking.

  In Turkey, established initial Citibank presence and built portfolio; restructured syndicated loans to government and managed reduction of exposure during subsequent economic crisis while maintaining positive reputation with government and corporate clients; originated and managed $400 million multi-currency portfolio.

| **1971–1975** | **Citicorp Leasing, Inc.** | **San Juan, Puerto Rico** |

*Asset-Based Finance Head*

- Restored profitability of Citibank's largest dealer and equipment finance/leasing portfolio outside U.S.; Recovered bank's loan principal in successful workout of commercial sea farming operation in Grand Cayman, BWI.

| **1970–1971** | **McKinsey & Company, Inc.** | **San Francisco, CA** |

*Management Consultant*

- Carried out market research/analysis and recommended courses of action to senior management on strategic planning, corporate relocation, organization and product development.

**Education**
- 1967 – BA, Liberal Arts, University of California,  Berkeley, CA
- 1969 -  MBA, Finance & International Business, University of California, Berkeley, CA

**Affiliations/ Licenses**
- Member: American Association of Bank Directors; Member: Board of Advisors, Institute for Bank Director Education, Member: Risk Management Association, Member: American Securitization Forum, Member: Commercial Real Estate Finance Council, Member: Investment Committee, Tahoe Truckee Community Foundation; Licensed CA real estate broker.

**FDIC-R Opp. Appx. 2090**

Appendix B

Richard W. George, Testifying Experience Prior 4 Years (June 2011 – June 2015).

### Deposition Testimony

1. (June 2011) *Schulken, et al, Plaintiff, v. Washington Mutual Bank, Henderson, Nevada, et al, Defendants,* U.S. District Court for the Northern District of California, Case No. 10-CV-02708-LHK. I testified on behalf of Plaintiff, Schulken.

2. (December 2011) *Yesenia Guitron and Judi Klosek , Plaintiffs, v. Wells Fargo Bank, N.A., et al, Defendants,* U.S. District Court for the Northern District of California, Case No. CIV-10-03461-CW. I testified on behalf of Plaintiffs, Guitron and Klosek.

3. (May 2012) *John K. Baldwin, Plaintiff, v. United States of America, Defendant,* U.S. District Court for the Northern Mariana Islands, Case No. CV 09-0033.  I testified on behalf of Defendant, U.S.A.

4. (June 2012) *Complex Systems, Inc., Plaintiff, v. ABN AMRO Bank N.V., Defendant,* U.S. District Court for the Southern District of New York, Civil Action No. 08-cv-7497.  I testified on behalf of Defendant, ABN AMRO.

5. (December 2012) *Robin Kaneshiro and Frances Kaneshiro, Plaintiffs, v. Michael Kim, Bank of America Home Loans, et al, Defendants,* In the Circuit Court of the First Circuit State of Hawaii, Case No.: 11-1-0932-05.  I testified on behalf of Defendants, Bank of America.

6. (January 2013) *In re Osama El-Atari, Debtor, Kevin R. McCarthy, Trustee, Plaintiff v. Wells Fargo Bank, N.A., Defendant,* U.S. Bankruptcy Court, Eastern District of Virginia, Case No. 09-14950-BFK, Chapter 7.  I testified on behalf of Plaintiff, Kevin McCarthy, Trustee.

7. (November 2013) *Federal Deposit Insurance Corporation, As Receiver for Alpha Bank & Trust, Plaintiff, v. James A. Blackwell, Jr., et al, Defendants,* U.S. District Court for the Northern District of Georgia, Atlanta Division, Civil Action File No.: 1:11-CV-3423-RWS. I testified on behalf of Plaintiff, FDIC-R.

8. (March 2014) *Federal Deposit Insurance Corporation, As Receiver for Eurobank, Plaintiff, v. Rafael Arrillaga-Torrens, et al, Defendants,* U.S. District Court for the District of Puerto Rico, Case No. 13-01328.  I testified on behalf of Plaintiff, FDIC-R.

9. (March 2014) *Brian A. Bash, Chapter 7 Trustee, Plaintiff, v. Textron Financial Corp., et al, Defendants,* U.S. District Court for the Northern District of Ohio, Civil Action No. 5:12-CV- 00987-PAG.  I testified on behalf of Plaintiff, Brian Bash, Trustee.

10. (April 2014) *Federal Deposit Insurance Corporation, As Receiver for First Piedmont Bank, Plaintiff, v. William H. Whitley, et al, Defendants,* U.S. District Court for the Northern

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

District of Georgia, Gainesville Division, Case No. 2:12-CV-170.  I testified on behalf of Plaintiff, FDIC-R.

### Testimony at Trial or Arbitration

11. (October 2011) *In Re. Boris Putanec & Jeana J. Toner, Petitioners, vs. Commissioner of Internal Revenue, Respondent,* U.S. Tax Court, San Francisco, Docket Nos. 13025-08 and 27211-10.  I testified on behalf of Petitioners, Putanec and Toner.

12. (April 2013) *Legacy Bank, Claimant, v. Stillwater National Bank and Trust Corporation, Respondent,* American Arbitration Association, AAA Case No.71 1480021212.  I testified on behalf of Claimant, Legacy Bank.

### Testimony at Deposition and at Trial

13. (August 2012) *Garden Grove Galleria LLC (GGG), Plaintiff, v. Cathay Bank, et al, Defendants,* Superior Court of the State of California for the County of Orange, Civil Complex Center, Case No. 30-2010-00342212.  I testified on behalf of Plaintiff, Garden Grove Galleria LLC.

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2092**

**APPENDIX C – Materials Considered**

| Date | Deposition Transcripts and All Exhibits Thereto |
|---|---|
| 04/10/2015 | Deposition of Susan Salerno |
| 04/22/2015 | Deposition of John S. Umbaugh |
| 04/23/2015 | Deposition of Anthony C. Codori |
| 05/12/2015 | Deposition of Bernard C. Darré |
| 05/13/2015 | Deposition of Charles J. Berling |
| | Exhibits 1-85 numbered consecutively and used throughout all depositions. |

| Related approval documents and loan files for the Loans and borrowers at issue in the Complaint, including but not limited to the Bates ranges indicated: | Bates Range |
|---|---|
| 18 Cottonwood Lane, LLC | FDIC-R-UNWB-000009, FDIC-R-UNWB-0000156-001363 |
| Arizona Land Company, LLC | FDIC-R-UNWB-0000016, FDIC-R-UNWB-0000043-001265 |
| AZCO II, LLC | FDIC-R-UNWB-0000019-000020, FDIC-R-UNWB-0000385-0001283; FDIC-R-UNWB-0030417 |
| Charles Nash | FDIC-R-UNWB-0000010, FDIC-R-UNWB-0000304-001228 |
| Colorado Main Development | FDIC-R-UNWB-0000260-001148 |
| Communicom Corp. of America, et al. | FDIC-R-UNWB-0000101-001363 |
| High Prairie Polo Construction | FDIC-R-UNWB-0000017-0000018, FDIC-R-UNWB-0000500-001318 |
| Natches Way Development, LLC | FDIC-R-UNWB-0000008, FDIC-R-UNWB-0000444-001405 |
| One Carefree Place, LLC | FDIC-R-UNWB-0000014-0000015, FDIC-R-UNWB-0000036-001265 |
| 1375 Red Butte, LLC | FDIC-R-UNWB-0000011, FDIC-R-UNWB-0000211-001175 |
| Roc Henge, LLC | FDIC-R-UNWB-0000012-0000013, FDIC-R-UNWB-0000350-001264 |

| Criticized and Classified Asset Reports, including but not limited to the Bates ranges indicated: | FDIC-R-UNWB-0003673-0003692; FDIC-R-UNWB-0003829-000051; FDIC-R-UNWB-0046852; FDIC-R-UWNB-0046892; FDIC-R-UNWB-0056209; FDIC-R-UNWB-0056322; FDIC-R-UNWB-0124682 |
|---|---|

| Matrix Capital Bank/United Western Bank Loan Policies, 2006 through 2010, including but not limited to the Bates ranges indicated: | FDIC-R-UNWB-0000023-0035; FDIC-R-UNWB-0000626-00628; FDIC-R-UNWB-00001518; FDIC-R-UNWB-0001731; FDIC-R-UNWB-00001934; FDIC-R-UNWB-0004012; FDIC-R-UNWB-0004237; FDIC-R-UNWB-0004257; FDIC-R-UNWB-0004333; FDIC-R-UNWB-0023192; FDIC-R-UNWB-0050308-50322; FDIC-R-UNWB-0081433; FDIC-R-UNWB-0111661; FDIC-R-UNWB-0119923-9943; FDIC-R-UNWB-0179342; FDIC-R-UNWB-0207098 |
|---|---|

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Other Documents Considered**

| Date | Title | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|
| | | | |
| 03/01/2006 | Email from Larry Heesch to David R. Livingston, cc: Gary Petak; Subject: FW: MBA NewsLink | FDIC-R-UNWB-0179973_001 | FDIC-R-UNWB-0179973_009 |
| 10/16/2006 | New Credit Request for High Prairie Polo Construction Company, LLC | FDIC-R-UNWB-0002687_001 | FDIC-R-UNWB-0002687_007 |
| 10/31/2006 | Minutes of Loan Committee Meeting of United Western Bank | FDIC-R-UNWB-0001524_001 | FDIC-R-UNWB-0001524_005 |
| 01/03/2007 | Minutes of Board of Directors Meeting of United Western Bank | FDIC-R-UNWB-0194032_023 | FDIC-R-UNWB-0194032_028 |
| 01/03/2007 | United Western Bank, Board of Directors Meeting, Delegation of Authority and Signature Resolution | FDIC-R-UNWB-0001584_001 | FDIC-R-UNWB-0001584_010 |
| 01/18/2007 | Executive Loan Committee Minutes, United Western Bank | FDIC-R-UNWB-0059085 | FDIC-R-UNWB-0059085 |
| 02/01/2007 | Minutes of the Special Meeting of the United Western Bank Directors Loan Committee | FDIC-R-UNWB-0000728_001 | FDIC-R-UNWB-0000728_003 |
| 07/25/2007 | Email from Gary Petak to A. Codori, C. Sterett; FW: CBHI: Losing that Rocky Mountain High: Cleanup Quarter for CBHI | FDIC-R-UNWB-0093654_001 | FDIC-R-UNWB-0093654_010 |
| 12/13/2007 | Minutes of Board of Directors Meeting of United Western Bank | FDIC-R-UNWB-0194096_007 | FDIC-R-UNWB-0194096_012 |
| 04/01/2008 | Email from Bill Snider to S. Wetzel, D. Santistevan, B. Hirsh; FW: Nautilus Alert – State of the Commercial Whole Loan Market | FDIC-R-UNWB-0179965_001 | FDIC-R-UNWB-0179965_002 |

**Pleadings:**

| Date | Title | | |
|---|---|---|---|
| | | | |
| 01/17/2014 | Complaint - Jury Trial Demanded; *FDIC as Receiver for United Western Bank v. Charles J. Berling, et al.*, USDC for the District of Colorado, Civil Action No. 1:14-cv-00137-CMA; Doc 1 | | |
| 04/21/2014 | Answer and Affirmative Defenses of Defendants to Plaintiff's Complaint and Jury Demand; *FDIC as Receiver for United Western Bank v. Charles J. Berling, et al.*, USDC for the District of Colorado, Civil Action No. 1:14-cv-00137-CMA; Doc 28 | | |

**Other Sources:**

| Date | Title | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|
| | | | |
| 03/1990 03/1998 | Office of the Comptroller of the Currency, Administrator of National Banks, Real Estate Loans, Comptroller's Handbook, Section 213; Narrative – March 1990, Procedures – March 1998 | | |
| 1993 | FDIC, Interagency Policy Statement on the Allowance for Loan and Lease Losses, Loan Classification or Credit Grading Systems | | |
| 10/28/1994 | Interagency Appraisal and Evaluation Guidelines | | |
| 11/1995 | Commercial Real Estate and Construction Lending, Comptroller's Handbook; Narrative – Nov. 1995, Procedures – March 1998; Comptroller of the Currency, Administrator of National Banks | | |

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**FDIC-R Opp. Appx. 2094**

| | | | |
|---|---|---|---|
| 04/1998 | OCC, Comptrollers' Handbook, Loan Portfolio Management | | |
| 10/08/1998 | FDIC, FIL-110-98: Financial Institution Letters: Acquisition, Development, and Construction Lending | FDICRUNWB-0000001 | FDICRUNWB-0000002 |
| 10/27/2003 | FDIC, Financial Institutions Letter, FIL-84-2003, Independent Appraisal and Evaluation Guidelines | | |
| 05/2004 11/2005 | Federal Reserve Board, Commercial Bank Examination Manual | | |
| 02/20/2005 | FDIC, Risk Management Manual of Examination Policies, Section 3.2 – Loans, Other Credit Issues, Loan Problems, Lack of Attention to Changing Economic Conditions | | |
| 03/22/2005 | FDIC, Frequently Asked Questions on Appraisal Regulations and Interagency Statement on Independent Appraisal and Evaluation Functions | | |
| 12/12/2006 | FDIC, Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices; Federal Register / Vol. 71, No. 238 / Tuesday, Dec. 12, 2006 / Notices, 74580-74588 | FDICRUNWB-0000003 | FDICRUNWB-0000011 |
| 08/2013 | OCC Comptroller's Handbook, Safety and Soundness, Commercial Real Estate Lending | | |

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-00137

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR
UNITED WESTERN BANK,

Plaintiff,

v.

CHARLES J. BERLING, JAMES H. BULLOCK, ANTHONY C. CODORI,
BERNARD C. DARRE, GARY G. PETAK, WILLIAM D. SNIDER, CINDY J.
STERETT, JOHN S. UMBAUGH and SCOT T. WETZEL, Defendants.

## SUPPLEMENTAL EXPERT DISCLOSURE OF

### RICHARD W. GEORGE

**AUGUST 26, 2015**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FDIC-R Opp. Appx. 2097

Since submitting my initial expert report on June 12, 2015, I have received and reviewed additional materials. These materials are set forth in Appendix A. The additional information in these materials confirms my opinions in my initial report. Also, based on this additional information, I make the following observations:

With respect to the deposition testimony of certain former employees of the Office of Thrift Supervision (Walt Santos, Steven Harris, Kevin Swanson, Nicholas Dyer), it appears that the OTS examiners did not review most of the Subject Loans in connection with the 2007 and 2009 examinations. As for the three Subject Loans that appear to have been reviewed – High Prairie, One Carefree Place, and Communicom – I am not aware of there being any testimony from any of the examiners who actually looked at these loan files. Further, Santos, Harris, Swanson, and Dyer all testified that they were higher-level employees who did not review the loan files and had no direct knowledge of what the examiners who were supposed to review the loan files actually did.[1] It is not known what information the examiners did or did not consider, what information they did or did not receive from the Bank, how much time they spent reviewing the loans, etc. This lack of information is particularly significant given the testimony that the OTS had limited resources, was understaffed and had time constraints for the 2007 exam (which included High Prairie and One Carefree).[2] In any event, an OTS examiner's opinion is simply an opinion. It may be more or less persuasive depending on the process and information on which it is based. Here, we do not know either one. For these reasons, the former OTS employees' testimony does not cause me to change my opinions.

The testimony of George Welch, a former officer of JP Morgan Chase Bank, confirms my opinions with respect to AZCO II. Among other things, Welch's testimony shows that the Defendants approved the loan modification based on a term sheet that was explicitly non-binding and that was provided for discussion purposes only.[3] In addition, Welch confirmed that JPMC would not have made or participated in an approximately $88MM vertical construction loan without AZCO II first putting tens of millions of dollars of additional equity into the project to make up the difference between the total project costs and the potential construction loan.[4] Yet I saw no indication that as of the loan modification approval in September 2007, AZCO II was willing to or could provide that additional equity. Thus, Defendants had no legitimate basis to believe that JPMC would make or lead a construction loan to repay UWB. In my opinion, under these circumstances, it was reckless to approve an additional $5.1MM where the primary source of repayment was to be a vertical construction loan.[5]

---

[1] Santos Dep. at 265-67; Harris Dep. at 229, 235; Swanson Dep. at 304-306, 307-309; Dyer Dep. at 275-277.

[2] Swanson Dep. at 43, 44, 53, 126-128, 323-326; Harris Dep. at 58.

[3] Welch Dep. at 22-24, 61-62.

[4] Welch Dep. at 34-37, 43-45.

[5] Mr. Welch's testimony regarding the commercial real estate market in Colorado, especially the high end of the market, beginning in late 2007, including his statement that "all hell broke loose" on October 12, 2007 during that time, also is consistent with my opinions regarding the other Subject Loans in this case. Welch Dep. at 63-64, 76-78.

1

FDIC-R Opp. Appx. 2098

The testimony of Scot Wetzel and William Snider regarding "speculative" real estate loans is contrary to common sense and common understanding in the banking industry.[6] As Defendant Codori testified, a speculative project is a project that does not have an indentified source of repayment at the time it was originated.[7] As Defendant Umbaugh testified, a speculative loan is one that does not have an end buyer in place at the moment of approval.[8] That is, the borrower is "speculating" that it will eventually be able to sell the property to someone at a high enough price to make a profit, or at least be able to pay back the loan. UWB's Loan Policy 500.1 stated that such loans "should not be made." Under Policy 104, exceptions to Policy 500.1 could be made, but exceptions had to be specifically discussed, justified, and documented.

Regarding High Prairie, Snider confirms in his deposition that the January 29, 2007 memorandum from the loan officer informing the ELC that the borrower was not going to construct polo amenities until some sales activity warranted it required the Defendants to do "a lot more analysis" before an approval would be appropriate.[9] Yet the ELC approved the loan the very next day, and the DLC only two days after that. There is no indication that either the ELC or the DLC conducted a further inquiry or had any basis for believing that the polo facilities would be built, including how or when the borrower would obtain financing to do that construction, by the time they approved the loan.[10] In addition, the Defendants did not require or obtain an appraisal for the project without the polo amenities. Thus, Defendants did not know the value of the property they would have to rely on as collateral before making a judgment about the sufficiency of the LTV (with or without a letter of credit ("LOC")). This is the equivalent of making a $15MM real estate loan without an appraisal of the project on which they were lending, which is reckless in my opinion.[11] With respect to the LOC that was supposed to provide a certain amount of credit enhancement, I note that, according to the testimony of Wetzel and Bullock, Defendant Petak had responsibility to ensure that an LOC was in place that actually supported the credit.[12] This further supports my opinion that the LOC does not excuse reckless approval of this loan, especially as to Petak.

My criticism of the One Carefree loan is made even stronger by fact that the LTV, when using a proper appraisal methodology, was not 75%, as stated in the credit memo, but over 90%. That appraisal acknowledged that consideration of the "Bulk Value" of the property is "one that is

---

[6] *See, e.g.*, Wetzel Dep. at 148-156; 259-60; Snider Dep. at 193-94; 205-07; 234-240.

[7] Codori Dep. at 34.

[8] Umbaugh Dep. at 86.

[9] Snider Dep. at 154-56 ("I understood this to be a summary memo identifying some developments within this….But before anybody would be satisfied, they would need to see a thorough analysis of what—what this meant in the overall project. So this is just a high-level memo, really. This is an invitation to do a lot more analysis on the modifications."; "The understanding is I would need to do a lot more analysis and look at the modification thing instead of the new credit request.").

[10] Wetzel Dep. 246-48; Snider Dep. at 155-59.

[11] It also appears that the OTS examiners failed to understand that the loan would *not* fund the amenities. Harris Dep. at 236-237, 248-249; Swanson Dep. at 321, 323-324.

[12] Wetzel Dep. at 252-53; Bullock Dep. at 164, 211.

2

required by federal rules," but that was ignored.[13] A 90% LTV is far above policy limits, yet it was not noted or documented as a policy exception.

These observations are not intended to summarize each and every fact observed from the additional information reviewed after my initial report. My review is ongoing and I reserve the right to supplement disclosure accordingly.

---

[13] FDIC-R-UNWB-0036887_002.

3

FDIC-R Opp. Appx. 2100

APPENDIX A
to
SUPPLEMENTAL EXPERT DISCLOSURE OF RICHARD GEORGE

| Date | Description |
| --- | --- |
| 6/12/15 | Schwartz Expert Report |
| 6/12/15 | Lewien Expert Report |
| 7/10/15 | Schwartz Rebuttal Report |
| 7/10/15 | Lewien Rebuttal Report |
| 7/9/15 | Wetzel Transcript |
| 8/6/15 | Harris Transcript |
| 7/15/15 | Snider Transcript |
| 7/29/15 | Santos Transcript |
| 8/14/15 | FDIC-R's Supplemental Responses and Objections to Defendants' First Set of Interrogatories |
| 8/12/15 | Swanson Transcript |
| 8/13/15 | Gibson Transcript |
| 8/13/15 | Ramsey Transcript |
| 8/14/15 | Welch Transcript |
| Various | Depositions Exhibits 1-174, 185-187 |
| 8/14/15 | Dyer Transcript |
| 8/6/15 | Bullock Transcript |
| 8/7/15 | Bullock Transcript |
| Various | Deposition Exhibits 175-176 |
| 1/1/08 | Valuation of radio stations re Communicom (FDIC-R-UNWB-0000101) |
| 12/31/06 | 4Q2006 Policy Exceptions Report (FDIC-R-UNWB-0075327) |
| 3/31/07 | 1Q2007 Policy Exceptions Report (FDIC-R-UNWB-0001924) |
| 6/30/07 | 2Q2007 Policy Exceptions Report (FDIC-R-UNWB-0001958) |
| 9/30/07 | 3Q2007 Policy Exceptions Report (FDIC-R-UNWB-0001988) |
| 12/31/07 | 4Q2007 Policy Exceptions Report (FDIC-R-UNWB-0002013) |
| 3/31/08 | 1Q2008 Policy Exceptions Report (FDIC-R-UNWB-0177786) |
| 6/30/08 | 2Q2008 Policy Exceptions Report (FDIC-R-UNWB-0118448) |
| 9/30/08 | 3Q2008 Policy Exceptions Report (FDIC-R-UNWB-0002111) |
| 12/31/08 | 4Q2008 Policy Exceptions Report (FDIC-R-UNWB-0132456) |
| 1/31/09 | 1Q2009 Policy Exceptions Report (FDIC-R-UNWB-0110393) |
| 3/31/09 | 2Q2009 Policy Exceptions Report (FDIC-R-UNWB-0002154) |
| 9/30/09 | 3Q2009 Policy Exceptions Report (FDIC-R-UNWB-0002214) |

**FDIC-R Opp. Appx. 2101**